## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LE T. LE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-615 LPS |
| | ) | |
| CITY OF WILMINGTON, JOSEPH F. | ) | |
| CAPODANNO, JR. and JAMES J. | ) | |
| O'DONNELL, | ) | |
| | ) | |
| Defendants. | ) | |

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT ON COUNTS III-VIII

---

Mary B. Matterer (#2696)
James H. McMackin, III (#4284)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
jmcmackin@morrisjames.com

Attorneys for Defendants

Dated: May 21, 2010

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................1

SUMMARY OF ARGUMENT.............................................................................................1

STATEMENT OF FACTS...................................................................................................1

    A.    Background...............................................................................................1

    B.    Decision to Outsource Computer Network.................................................1

    C.    Le Notified of Potential Layoffs.................................................................4

    D.    Layoffs Made Official.................................................................................5

    E.    Le Removes Software from City Server .....................................................5

ARGUMENT ....................................................................................................................6

    A.    Standard of Review...................................................................................6

    B.    The Court Should Grant Summary Judgment on Le's Claim under
            42 USC § 1981 Because There Is No Such Action Against Individuals. ...............7

    C.    The Court Should Grant Summary Judgment on Le's Discrimination Claims
            for Lack of Evidence..................................................................................8

           1.    The Court Should Grant Summary Judgment on Le's Claim of
                Discriminatory Termination Because There is No Evidence of Pretext. ..................8

                (a)    The McDonnell-Douglas Procedural Framework..................................8
                (b)    Le Cannot Establish Pretext...........................................................10

           2.    Le's Claim that He Was Not Afforded Another Position on the Basis of
                Race Fails Because of Lack of Evidence and His Lack of Exercising His
                Bumping Rights.........................................................................................15

           3.    The Court Should Grant Summary Judgment on Le's Hostile Work
                Environment Claim for Lack of Evidence..................................................16

                (a)    Le Never Suffered Discrimination Because of His Race. .....................16
                (b)    The Conduct Described by Le, Even if It Actually Occurred,
                          Was Not Pervasive and Regular...................................................17

    D.    Defendants Cannot Be Found Liable for Conspiracy under § 1985.....................18

           1.    Le Cannot Base His § 1985 Claim on a Violation of § 1981. ...................18

            2.    The Claim Fails Even if It Is Based on Other Violations. .........................19

    E.    Because Le's § 1985 Claim Fails, His § 1986 Claim Must Be Dismissed...........19

    F.    Delaware Law Does Not Recognize *Prima Facie* Tort in the Employment
            Context...................................................................................................19

    CONCLUSION.........................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................... 7

*Andrews v. City of Philadelphia*,
    895 F.2d 1469 (3d Cir. 1990) ............................................................................... 17

*Beatty v. Township of Elk*,
    2010 WL 1493118 (D.N.J. April 14, 2010) ......................................................... 9

*Billet v. CIGNA Corp.*,
    940 F.2d 812 (3d Cir. 1991) ............................................................................... 11

*Brooks v. Fiore*,
    2001 U.S. Dist. LEXIS 16345 (D. Del. Oct. 11, 2001) ....................................20

*Brown v. Philip Morris Inc.*,
    250 F.3d 789 (3d Cir. 2001)...........................................................................18, 19

*Bruton v. Diamond State Tel. Co.*,
    623 F. Supp. 939 (D. Del. 1985).......................................................................... 7

*Carter v. Del. State Univ.*, No. 99-642 GMS,
    2002 U.S. Dist. LEXIS 3116 (D. Del. Feb. 27, 2002) ...................................... 19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................6, 7

*Dixon v. Boscov's, Inc.*, No. 02-1222,
    2002 U.S. Dist. LEXIS 13815 (E. D. Pa. July 17, 2002)................................... 19

*Duffy v. Dep't of State*,
    598 F. Supp. 2d 621 (D. Del. 2009)................................................................... 18

*Ezold v. Wolf, Block, Schorr and Solis-Cohen*,
    983 F.2d 509 (3d Cir. 1992)............................................................................... 15

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998) .......................................................................................... 17

*Fuentes v. Perskie*,
    32 F.3d 759 (3d Cir. 1994) ...........................................................................10, 11

*Gonzalez v. Comcast Corporation*,
    2004 U.S. Dist. LEXIS 14989 (D. Del. July 30, 2004) .......................................... 18

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*,
    442 U.S. 366 (1979) ................................................................................................ 18

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ............................................................................................ 16, 18

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 (1989) .................................................................................................. 7

*Jones v. School Dist. of Philadelphia*,
    198 F.3d 403 (3d Cir. 1999) ................................................................................... 11

*Keller v. Orix Credit Alliance, Inc.*,
    130 F.3d 1101 (3d Cir. 1997) ................................................................................. 11

*Kunin v. Sears Roebuck & Co.*,
    175 F.3d 289 (3d Cir. 1999),
    *cert. denied*, 528 U.S. 964 (1999) ........................................................................ 16

*Lord v. Souder*,
    748 A.2d 393 (Del. 2000) ....................................................................................... 19

*Martin v. Healthcare Bus. Res.*, No. 00-3244,
    2002 WL 467749 (E.D. Pa. Mar. 26, 2002) ..................................................... 12, 13

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .............................................................................................. 8, 9

*McGovern v. City of Philadelphia*,
    554 F.3d 114 (3d Cir. 2009) ..................................................................................... 7

*McKenna v. Pac. Rail Serv.*,
    32 F.3d 820 (3d Cir. 1994) ....................................................................................... 8

*Miller v. Aluminum Co. of Am.*,
    679 F. Supp. 495 (W.D. Pa. 1988),
    *aff'd*, 856 F. 2d 184 (3d Cir. 1988) ...................................................................... 18

*Naghiu v. Inter-Continental Hotels Group, Inc.*,
    165 F.R.D. 413 (D. Del. 1996) .................................................................................. 7

*O'Connor v. Consol. Coin Caterers Corp.*,
    517 U.S. 308 (1996) .................................................................................................. 9

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ...................................................................................................16, 17

*Parker v. Comcast Corp.,* No. 04-344-KAJ,
    2005 U.S. Dist. LEXIS 22612  (D. Del. Oct. 5, 2005) ...........................................20

*Petrocelli v. DaimlerChrysler Corp.,* No. 04-943-KAJ,
    2006 U.S. Dist. LEXIS 11972 (D. Del. Mar. 22, 2006) ...........................................8

*Pryor v. NCAA,*
    288 F.3d 548 (3d Cir. 2002)........................................................................................7

*Rizzo v. PPL Serv. Corp.,* No. Civ.A. 03-5779,
    2005 WL 913091 (E.D. Pa. Apr. 19, 2005)...........................................................12, 13

*Schoch v. First Fid. Bancorporation,*
    912 F.2d 654 (3d Cir. 1990) ...................................................................................7, 17

*St. Mary's Honor Ctr. v. Hicks,*
    509 U.S. 502 (1993) .............................................................................................9, 10, 11

*Texas Dep't of Cmty. Affairs v. Burdine,*
    450 U.S. 248 (1981) .................................................................................................10

**Statutes**

42 USC § 1981 ...........................................................................................1, 7, 8, 18, 19

42 USC § 1983 ........................................................................................................8

42 USC § 1985 .................................................................................................1, 18, 19

42 USC § 1986 .....................................................................................................1, 19

42 U.S.C. § 2000e ............................................................................................8, 17, 18

19 Del.C. § 710...........................................................................................................8

**Rules**

Federal Rule of Civil Procedure 56 ...........................................................................6

## NATURE AND STAGE OF THE PROCEEDINGS

On June 22, 2009, Plaintiff Le T. Le ("Plaintiff") filed an Amended Complaint against defendants City of Wilmington ("City"), Joseph F. Capodanno, Jr. ("Capodanno") and James J. O'Donnell ("O'Donnell" and collectively with the City and Capodanno, the "Defendants"). Discovery is closed and Defendants move for summary judgment because there are no genuine issues of material fact and they are entitled to judgment as a matter of law. This is the Defendants' timely motion for summary judgment on the employment issues. Defendants are filing separately a motion for summary judgment with respect to the copyright claims set forth in Counts I and II.

## SUMMARY OF ARGUMENT

(1)    The Court should grant summary judgment on Le's claim under 42 USC §1981 because there is no such action against individuals.

(2)    The Court should grant summary judgment on Le's discrimination claims for lack of evidence.

(3)    Defendants cannot be found liable for conspiracy under § 1985.

(4)    Because Le's § 1985 claim fails, his § 1986 claim must be dismissed.

(5)    Delaware law does not recognize *prima facie* tort in the employment context.

## STATEMENT OF FACTS

### A.    Background

From 2003 until his termination in 2007, Le worked in the Network Unit (the "Unit") as an Information Analyst II in the City's Innovative Technologies ("IT") Department. Ex. A at 4[1]. Le's primary responsibility was to maintain and support the computer network. O'Donnell is the Director of IT. Capodanno is the Manager of IT. One of the groups they oversaw was the Unit.

### B.    Decision to Outsource Computer Network

In January 2007, the IT department decided to outsource all of its networking duties.

---

[1] Exhibit references herein are to the Declaration of James H. McMackin, III filed concurrently.

Three network positions within the City, including Le's, would be eliminated. Le worked in the Unit with two other minorities: his manager, Terry Jones ("Jones") and his co-worker James Lewis ("Lewis"). When Le was terminated, there were ten to twelve people working under the management of O'Donnell and Capodanno. Ex. A at 10. Eight were minorities. Ex. A at 185-188; Ex. B at 200-201. Only the jobs of Le, Jones and Lewis were outsourced. Ex. B at 217-219. Lewis found other work in the City. Ex. B at 205; Ex. A at 83.

Jones had a big ego, was a bully, and was hard to get along with. Ex. C at 27-28. Le and Jones were close. Ex. A at 20. Jones taught Le a lot about computer networking. *Id.* at 20. They corresponded frequently using company email about non-work issues and about personal matters, and frequently forwarded jokes and email forwards to each other. Le admits the Unit was particularly protective of information. *Id.* at 59. Jones' predecessor even issued an internal order not to assist with a major software implementation process. *Id.* at 183. The record is replete with examples of various City employees complaining about the Unit's lack of cooperation. (e.g. Ex. E at 10270; 34957; 13053-62; 34943; 14272; 14283; 14182; 36904; 12756; 10774; 36425; 11183; 43440; 35096). Le's close relationship to Jones likely hurt his stature in the City. Ex. D at 27-28.

Jones thought he should have been the director of IT. Ex. B at 136. Management did not know what they were doing, but Jones thought he did. Ex. B at 153. Le claims he and Jones were much more capable of running IT than were Capodanno and O'Donnell. Ex. A at 45. Le and Jones complained to each other about management and about discrimination.[2] After their termination, they even hired the same counsel to represent them with regard to pursuing discrimination claims on their

---

[2] Le alleges in his complaint (D.I. 17 at ¶36 ) that high level City employees wanted to get rid of him. The only person he could identify as a discriminator is a minority female. Ex. A at 116. Later, he changed his testimony and stated only Capodanno and O'Donnell discriminated against him. *Id.* at 118-119.

behalves. Thus, it is no surprise much of Le's case hinges on facts he hoped Jones could corroborate.

Overwhelming evidence shows the decision to outsource the Unit to a contractor ("Diamond Technologies") was because of the Unit's inability to support the City's computer network. Many of the Unit's challenges involved the City's implementation of the "MUNIS" software platform. The City uses MUNIS as an accounting tool, linking its finance, billing and payroll departments. There can be no reasonable dispute that the City's conversion to the MUNIS platform was delayed and wrought with difficulties. (e.g. Ex. E at 10284; 10278; 14097; 14098; 36206). Le admits disconnections and server connections were problems in the IT department. Ex. A at 148-149.

There was a significant amount of finger-pointing with regard to what caused the City's network to be unable to connect to the MUNIS server located in the City's building. The Unit said it was a software problem. Software vendors, consultants and others all believed the problem was an infrastructure problem at the City.   (e.g. Ex. E at 36208; 10268; 11222; 13053-62; 14297) Capodanno and O'Donnell did not have an IT background, so they had to rely on others. Le claims Capodanno and O'Donnell knew it was not an infrastructure problem because he and Jones "told them so." Ex. A at 54.

Le says the problems were not his fault, but were the fault of software programs. However, not just MUNIS experienced drops in connectivity.  Many other software programs experienced connectivity problems.  These included Microsoft Outlook, Riskmaster, and others. (e.g. Ex. E at 12479; 37001; 36173; 11721) The common denominator was connection drops across independent software programs.

Although MUNIS was eventually integrated, this occurred only after the City retained Diamond Technologies for assistance.   At significant expense, the City frequently retained outside consultants.  Ex. A at 94.

3

Le admits it was his group's charge to maintain the network (Ex. A at 33), there were always "minor" problems with the network connectivity (*Id.* at 32), the network was only working 95-97 percent of the time (*Id.* at 33), and network connectivity problems are major problems (*Id.* at 33). He also admits that anything other than 0% packet loss (the amount of information not received between two communicating devices) was unacceptable. Tests run repeatedly by independent persons showed packet loss was a systemic network problem. (Ex. E at 10264; 14117; 12457; 13053-62; 46609).

The Unit had numerous other problems as well. They could not keep users from being randomly thrown off the network. They installed a new core router onto the City's computer system and left a wireless cable connected to the router (perhaps inadvertently), which allowed anyone from the general public access to the City's private servers. In every one of these incidents there is the same common denominator - Le blaming contractors for these problems.

In the end, it was a simple decision. The Unit was unable to manage the network, causing the City to incur substantial costs for outside consultants on top of the salaries paid to the Unit, all for services the outside consultants performed more effectively.

### C.    Le Notified of Potential Layoffs

On January 8, 2007, the Unit met with O'Donnell, Capodanno, William Jones, Personnel Administrator and Martha Gimbel ("Gimbel"), Labor Relations and Classifications Manager. The purpose of this meeting was to inform the Unit their positions *might* be eliminated for the next Fiscal Year. Ex. A at 51. Le's employment would end as of June 30 unless he found other work in the City. *Id.* at 51. The City tried to find other work for Le. He was sent postings of available jobs and met with the labor relations department to find other work. *Id.* at 56-57. Gimbel scheduled a skills assessment to see for what jobs he may be suited. *Id.* at 57.

### D.     Layoffs Made Official

On May 24, 2007, Gimbel informed Le that City Council had approved the budget and that his position, along with all others of the Unit, would be eliminated effective July 1.

### E.     Le Removes Software from City Server

Le never participated in a skills assessment.   On June 5, 2007, shortly after he was notified his position was being eliminated, Le intentionally removed software from the City's computer network.  Ex. A at 64.  He did so in violation of orders from his supervisor forbidding anyone from altering or removing software without prior authorization. *Id.* at 65 (e.g. Ex. E at 36874).[3]

Le never gave anyone any warning he would remove the software on June 5, 2007.  Ex. B at 67; Ex. A at 69, 81.  He did not receive permission beforehand.  Ex. B at 75; Ex. A at 70.  He claims he did not need permission because it was "his."  Ex. A at 70. Removing the software was a drastic change that required advance permission.  Ex. B at 73-75.  Other than Le, no one else removed software claimed to be their own. *Id.* at 114.  The only reason Jones did not terminate Le on the spot was because Le suddenly claimed a copyright. *Id.* 76.  No one was sure how to handle the copyright ownership issue at the time. *Id.* at 76.[4]

Le said it was his software, again, "because I said so" which is a recurring theme for Le. Le did not care that the City was using the software to fulfill its public duties, because "it was mine."  Ex. A at 78.  When asked why he did not just take a copy, and instead took the program,

---

[3] Le claims he was exempt from this rule because he was regularly taking the software off the system when tweaking it.  The City was actively using the software in June 2007 to issue tickets for ordinance violations, and Le had never previously taken the software off after it went into use.  Ex. A at 68, 70.  He also admits no one told O'Donnell or Capodanno that the order to not remove software without permission did not apply to him. *Id.* at 65, 74.

[4] As set forth in the Defendants' copyright brief, the software belongs to the City.

he replied: "Well, the program is mine." *Id.* at 77.

Removal of the software had an immediate and serious impact on the City's ability to issue citations to City Code violators. Without it, the City was hamstrung. *Id.* at 73. The City could not issue tickets without it. *Id.* at 75-76. Le initially refused to put the software back on the system. *Id.* at 82. Le told the City that he had filed for a copyright but did not have a copy with him. *Id.* at 82. Le finally relented and reinstalled the software. The decision to suspend Le was made by two minority females with the input of Capodanno and O'Donnell. *Id.* at 128. He was later terminated, because it was an egregious act of misconduct to remove software from the network without permission. Pursuant to Le's duties, he had access to sensitive information, such as other's email accounts. *Id.* at 11. He just could not be trusted after his misconduct.[5]

## ARGUMENT

### A.    Standard of Review

Federal Rule of Civil Procedure 56 mandates the entry of judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 327 (1986) (noting also that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"). Although the defendant bears the initial responsibility of asserting the basis for its motion, the defendant is not required to negate the plaintiff's claim. Rather, the defendant must only point out that there is an absence of evidence to support the plaintiff's case or, alternatively, offer affirmative evidence which demonstrates that the plaintiff cannot

---

[5] Le referenced in his expert report documents that were not produced in this litigation, that originated from the City after his termination. When called upon to explain how he obtained the documents, he invoked the privilege against self-incrimination. (See Ex. F). In other words, he obtained the documents through criminal means.

prove his case. *Naghiu v. Inter-Continental Hotels Group, Inc.*, 165 F.R.D. 413, 418 (D. Del. 1996).

After the defendant demonstrates a lack of evidence to support the non-moving party's claims, the plaintiff must present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citation omitted). Although the court is to view all evidence in a light favorable to the plaintiff, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, a dispute must exist over a <u>material</u> fact. *Id.* To survive a motion for summary judgment, therefore, the plaintiff must come forward with specific, admissible and credible evidence supporting each element essential to his case; mere conclusory allegations or denials are not enough. *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Speculation, without proof, is likewise insufficient. *Bruton v. Diamond State Tel. Co.*, 623 F. Supp. 939, 943 (D. Del. 1985). Applying this standard, Le's claims fail as a matter of law.

**B.    The Court Should Grant Summary Judgment on Le's Claim Under 42 USC
§ 1981 Because There Is No Such Action Against Individuals.**

Count IV is brought only against Capodanno and O'Donnell. It alleges discrimination in violation of 42 USC § 1981. No private right of action lies against a state actor under § 1981. *See McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir.2009); see also *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989).

If the Court construes the allegations in Count IV to allege a claim against the City (despite expressly bringing it "Against Individual Defendants"), the claim still fails because "he did not allege that the discrimination he suffered was pursuant to an official policy or custom of the City." *McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2009).[6]

---

[6] Had this claim survived, establishing an "intent to discriminate on the basis of race" is identical in the Title VII and § 1981 contexts. *Pryor v. NCAA*, 288 F.3d 548, 569 (3d Cir. 2002).

**C.    The Court Should Grant Summary Judgment on Le's Discrimination Claims for Lack of Evidence.**

Le's Amended Complaint contains two other counts alleging discrimination. Count III alleges discrimination by the City in violation of 42 U.S.C. § 2000e et seq. ("Title VII") and 19 Del.C. § 710. Count V alleges discrimination by Capodanno and O'Donnell in violation of 42 USC § 1983. Despite being brought under different statutes, Counts III and V are analyzed under the familiar burden-shifting analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *McKenna v. Pac. Rail Serv.,* 32 F.3d 820, 826 n. 3 (3d Cir. 1994) (claims under Title VII, section 1983, and section 1981 analyzed under the same standard). *Petrocelli v. DaimlerChrysler Corp.,* No. 04-943-KAJ, 2006 U.S. Dist. LEXIS 11972 (D. Del. Mar. 22, 2006) (discussing Delaware Code). Le cannot meet his burden of showing that he was subject to discriminatory conduct at any time, and his claims therefore must be dismissed.

Within Counts III and V, Le essentially advances three separate claims of discrimination: discriminatory termination, failure to afford him another position, and hostile work environment. For the reasons discussed below, the Defendants are entitled to summary judgment on each of these claims.

**1.    The Court Should Grant Summary Judgment on Le's Claim of Discriminatory Termination Because There is No Evidence of Pretext.**

**(a.)    The McDonnell-Douglas Procedural Framework.**

Where, as here, there is no direct evidence of discrimination[7], the burden of proof is governed

---

[7] Neither Capodanno nor O'Donnell made racially insensitive statements or comments to Le or to others that were relayed to Le. Ex. A at 87-88. Moreover, in the over 55 years the City has employed them, neither has any discipline or reprimands for insensitive comments. *Id.* at 90-91. Neither said anything about Le's race, ethnicity, or any other prohibited factor. Ex. B at 107-108. The only "derogatory" comments Jones is aware of are comments they could not understand Le. Ex. B at 108. Jones never reported this because he did not see blatant discrimination. *Id.* at 110. Le claims an inability to understand him is evidence of racism. However, there is no evidence that the inability to understand him has anything to do with race. They never made statements that they could not understand Le because he is Asian. *Id.* at 105. Le admits he speaks with an accent. Ex. A at 36. He could just as easily have been hard to understand because, as he states repeatedly, his level of

by the well-known framework erected by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and clarified in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case by a preponderance of the evidence. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).

Le claims that the members of the Unit happened to be minorities is evidence of discrimination. This fails as evidence. The Court should not "entertain a race discrimination claim on the sheer fact that [plaintiff] happens to be a minority. His racial status alone is not evidence of improper treatment." *Beatty v. Township of Elk*, 2010 WL 1493118 (D.N.J. April 14, 2010). When Le was terminated, there were ten to twelve people working under the management of O'Donnell and Capodanno. Ex. A at 10. Eight were minorities. Ex. A at 185-188; Ex. B at 200-201. Only the jobs of the Unit were outsourced. Ex. B at 217-219. Lewis found other work in the City. Ex. B at 205; Ex. A at 83. Le claims the Unit was the only all-minority group in IT. He now admits this is untrue. Ex. A at 186.[8]

The Court needs to look no further than the testimony of Le and Jones to determine that ridding IT of an all-minority group played no role in the outsourcing. They admit other things may have caused the layoff. Jones believes the "whole thing" is really about him, not Le. Ex. B at 6, 136. Jones said they had to terminate the Unit in order to get him. *Id.* at 221. Jones thinks Lewis and Emerson Gale (both African-Americans) provided false information to Capodanno, which led to outsourcing the Unit. Ex. B at 206, 224. Le says they wanted to get rid of the Unit because they were a threat. Ex. A at 103. One must wonder - Which was it? There is no

---

technological sophistication so far exceeded theirs that they could not understand him technically, which may have made O'Donnell and Capodanno uncomfortable. *Id.* at 101-102.

[8] Happenstance is "evidence" to Le. Indeed, in the administrative process before the Department of Labor, he also alleged a gender discrimination claim because all three laid off employees "happened" to be males.

evidence of discrimination besides the "happenstance" that the outsourced employees were minorities. *See* Ex. B at 223 (they "happened to be three minority people.")

Other evidence from Le shows that race did not motivate his termination. Le never filed a grievance regarding his feelings of discrimination. Ex. A at 86. He never went to HR. *Id.* at 100. He felt that the Director of Personnel, was "pretty much in the group" with Capodanno and O'Donnell. *Id.* at 86. However, she is also a minority, belying his belief in discrimination.

Le appealed his termination, listing five reasons why he was unlawfully discharged: (1) He copyrighted the software; (2). He had better skills than the consultants; (3) The State Merit Rules were not followed; (4) He was denied bumping rights; and (5) He removed his own property. *Id.* at 174. He does not mention discrimination as a factor. *Id.* at 174. Even some time into the termination appeal process, when counsel represented him, he did not mention discrimination. *Id.* at 178-179. On July 13, 2007, an appeal hearing was conducted by Sam Pratcher. *Id.* at 180. Pratcher upheld Le's termination. Pratcher is African-American. *Id.* at 180.

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to merely articulate a legitimate reason for its decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the employer does so, any presumption of discrimination drops from the case, and the plaintiff must satisfy the ultimate burden of proving discrimination. *See id.* at 256. The ultimate burden of persuasion remains at all times with the plaintiff, who must prove the defendant's reason is pretextual and the defendant intentionally discriminated against the plaintiff. *See Hicks*, 509 U.S. at 515-16; *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### (b.)    Le Cannot Establish Pretext.

Assuming Le established a *prima facie* case of discrimination, Le's claim fails because the City offers a legitimate, non-discriminatory reason for Le's outsourcing based on an inability to maintain a stable network going back years, and Le offers nothing but his own subjective belief as evidence of

pretext. There is simply no evidence from which a rational fact finder could determine the City's stated reasons for outsourcing the Unit – its inadequate performance and failure to improve that performance – are false and that the real reason for its decision was Le's race. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999) (affirming grant of summary judgment to employer).

To establish pretext and avoid summary judgment, Le must point to evidence that would allow a fact finder to reasonably infer that the Defendants' reasons were either a post-hoc fabrication or otherwise did not actually motivate the employment action. *See Fuentes*, 32 F.3d at 764. Le's disagreement with the independent consultants' assessment of the cause of the network performance problems cannot establish that the Defendants' legitimate, non-discriminatory reasons were pretextual. *Id.* at 765; *see also Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (plaintiff's "view of his performance is not at issue; what matters is the <u>perception of the decision maker.</u>") (emphasis added), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Plaintiff "must show, not merely that [Defendants'] proffered reason was wrong, but that it was <u>so plainly wrong</u> that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (emphasis added).

The Defendants' decision was, if wrong (which is not conceded), not so plainly wrong that it could not have been the City's real reason. The Unit's outsourcing was the result of a major performance failure, followed by a sustained failure to improve performance of the network. Le cannot reasonably dispute that this performance failure occurred. To establish pretext, Le must show that the Defendants' understandable reaction to the Unit's failures by repeatedly paying large sums of money to contractors to fix the Unit's mistakes (or to oversee the Unit, as Le would say) were nothing more than an expensive multi-year long charade undertaken to secure Le's termination <u>because of his race</u>. This is preposterous. Moreover, Le concedes the decision was equally motivated by Capodanno and

11

O'Donnell's perception of him as a threat, because Le and Jones were "so good" with technology.  Ex. A at 47-48.  In other words, Le admits his termination was not primarily motivated by discrimination. The following is all that Le can offer as evidence that Capodanno and O'Donnell's conduct was racially motivated and none of it shows the reason for termination was false (pretextual):

      1.      <u>"I just feel as though, you know, I wasn't welcome."</u> Ex. A at 96.

This subjective belief is utterly inadequate to establish pretext, and courts routinely grant summary judgment when such evidence is all a plaintiff can offer. *See, e.g., Rizzo v. PPL Serv. Corp.*, No. Civ.A. 03-5779, 2005 WL 913091, *11 (E.D. Pa. Apr. 19, 2005) (granting summary judgment where "the only basis for alleged age discrimination is the Plaintiff's own subjective beliefs that 'no other explanation' is plausible"); *Martin v. Healthcare Bus. Res.*, No. 00-3244, 2002 WL 467749, at *6 (E.D. Pa. Mar. 26, 2002) ("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her race . . . is not a substitute for competent evidence.").

      2.      <u>Capodanno and O'Donnell never listened to his advice.</u>

This does not show that the decision to outsource the Unit was pretextual.  There were critical infrastructure problems at the City.   Other than the assertion that the Unit told Capodanno and O'Donnell that the consultants were wrong about the cause of the network connectivity problems,[9] Le has no reason to suspect Capodanno or O'Donnell knew that the Unit was right and the consultants were wrong about the cause. Ex. A at 115.  This admission eliminates any possibility of pretext.  It is thus impossible that O'Donnell and Capodanno knew what caused the network problems but blamed the Unit anyway <u>because of their race</u>.

      3.      <u>Capodanno and O'Donnell had consultants oversee his work.</u>

Le said O'Donnell would run things past the consultants before agreeing with Le's suggestions. Ex. A at 30.  There is, however, no evidence that wanting a second opinion is pretextual.

---

[9] Again, echoing Le's belief that "I told you so" means he was right.

4.    Capodanno and O'Donnell never met with him.

Le complains neither O'Donnell nor Capodanno met with the Unit. *Id.* at 92-93.  However, he

has no idea whether O'Donnell or Capodanno met with other groups. *Id.* at 31- 32, 37-38.  Even if true,

this does not show pretext.

5.    Once, Capodanno was in Le's office looking for him.

Le claims that on one (and only one) occasion, Capodanno was in Le's office looking for him.

*Id.* at 96.  How this can possibly be construed as evidence of pretext is perplexing.

6.    "Capodanno and O'Donnell said I was incompetent."[10]

Le alleges that Capodanno and O'Donnell said he was incompetent.  There is no evidence in

support.  Le admits he was never called incompetent to his face. *Id.* at 27.  Le testified that he only

heard that O'Donnell, not Capodanno, called him incompetent. *Id.* at 26, 37.  Le testified that he heard

it from Jones, who heard from Alphonso Ballard and Oscar Cornelius. *Id.* at 27.  Cornelius and Ballard

both denied this.  Ex. C at 27-29; Ex. D  at 12.

Even if O'Donnell did call Le incompetent, (which the evidence conclusively refutes)

there is no evidence he did so based on race.  The only support that the unsubstantiated

comments were racial comes from Jones, who said it must be racial because they were not

incompetent.  Ex. B at 215.  This subjective belief is utterly inadequate to establish pretext. *See,*

*e.g., Rizzo,* 2005 WL 913091, *11 and *Martin* 2002 WL 467749 at *6.  When asked why Le

thought O'Donnell thought he was incompetent because of his race, Le stated it was because

O'Donnell trusted the contractors whom Le viewed as incompetent.  Ex. A at 29.  This is not

evidence of pretext.

---

[10] The only alleged "rumors" Capodanno and O'Donnell spread were that Le was incompetent. Ex. A at 91.

7.    "They knew it was my copyright and terminated me anyway."

Presumably, Le is no longer claiming the termination (only the layoff notice before the termination) is discriminatory, because he admits had he been paid a royalty for the software program, he would not have filed a charge of discrimination over the termination. Ex. A at 251-252. Regardless, there is no evidence of pretext in the City's determination to terminate him for interfering with the City's statutory obligation to issue tickets for ordinance violations.

8.    "They disciplined me for things I did not do."

Le claims he was disciplined for things I did not do.  However, he offers no evidence that Capodanno or O'Donnell (i) made up the incidents, (ii) knew he did not commit the violations, or (iii) disciplined him due to his race.  Indeed, all he has is his own subjective belief that these infractions were not his fault.  One incident involved a backup tape and another involves a power outage.  He blames Dennis Cherrin (Caucasian) for one incident and Melvin Tuller (African-American) for the other.  *Id.* at 39.  He states that with regard to the Cherrin incident, he was "yelled at" one time by O'Donnell.  *Id.* at 40.[11]  He was not written up, not suspended and not terminated.  He later testified this was not even a verbal reprimand.  *Id.* at 42.  He was thus not even disciplined.  Regarding the Tuller incident, he has the audacity to claim that he was blamed, because of his race, for an incident he blames on another minority.  However, even if he was blamed inappropriately, Capodanno and O'Donnell did not know it was someone else's job to do the backup Le was blamed for not doing.  Ex. B at 128.[12]

---

[11] Le does not even recall when he was yelled at the one time. *Id.* at 41.

[12] Le claims the blame he received (instead of Tuller) caused his evaluation to be lowered in 2006.  Ex. A at 42.  Tuller is also a minority.  *Id.* at 43.  Le claims that Capodanno and O'Donnell blamed him because Tuller was not a threat.  *Id.* at 43-44.  In other words, Le admits they made decisions on a non-prohibited basis.

14

9.    The lowered evaluation in 2006.

Le claims that O'Donnell and Capodanno lowered his evaluation in 2006 as punishment for the Tuller incident.[13]  There is no evidence to support this other than Le and Jones' belief.  Again, it just makes no sense that the decision to discipline one minority over another is motivated by race.  Regardless, Capodanno and O'Donnell did not know it was someone else's job to do the backup Le was blamed for not doing.  Ex. B at 128.  The decision thus could not have been based on race.

In the end, all Le can offer to show pretext is his own subjective belief that his performance was adequate, and therefore he must have been terminated because of his race.  This subjective belief is insufficient to create a genuine issue of fact as to pretext.

### 2.    Le's Claim that He Was Not Afforded Another Position on the Basis of Race Fails Because of Lack of Evidence and His Lack of Exercising His Bumping Rights.

There is no evidence to support Le's claim he did not get another position because of his race.  Le applied for the positions of Application Specialist I and Application Specialist II after he was informed he may be laid off.  Ex. A at 98.  He claims he was discriminated against when he did not get either position.  He ignores the fact that minorities received both positions.  *Id.* at 99.[14]  He offers nothing to rebut the evidence they were more qualified for the positions.  Le admits he does not know whether the alleged discriminators had any input on his ability to get another job in the City.  Ex. A at 60.

Le claims he was denied the right to "bump" into another position.  Le was told he had to follow the process and could not just unilaterally pick positions to bump into.  *Id.* at 176.  That he could

---

[13] That Le received positive evaluations prior to his termination does not support an inference of pretext.  *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992).

[14] Belying the contention that Capodanno and O'Donnell discriminated against Le is the fact they tried to get him a job after he was informed he may be let go.  However, he does not recall following up on the opportunity.  Ex. A at 129.  Further, they asked him if he was interested in a webmaster position, but he never responded.  *Id.* at 255.

15

not unilaterally select a position "discouraged" him because "he knew what his skills were." *Id.* at 188.

He was not denied any bumping rights. Le admits no one at the City told him that he would not be able to get another job at the City. *Id.* at 64-65. There is thus no basis to conclude he was denied the opportunity to bump. Even if there was, Le admits he does not know whether the alleged discriminators had any input on his ability to exercise bumping rights. *Id.* at 60.

### 3.   The Court Should Grant Summary Judgment on Le's Hostile Work Environment Claim for Lack of Evidence.

To establish a *prima facie* case of hostile work environment, a plaintiff must show:  (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) the existence of *respondeat superior* liability. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999), *cert. denied*, 528 U.S. 964 (1999). It is not enough for a plaintiff to show that he subjectively believed his work environment to be hostile; rather, he must show that a reasonable person would have found it so. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A plaintiff also cannot simply show that his work environment was hostile in general; rather, he must show that his work environment was hostile because of his race. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Against these standards, no rational trier of fact could conclude that Capodanno or O'Donnell subjected Le to a hostile work environment. While Defendants do not concede Le establishes any of the elements of such a claim, it is particularly clear Le did not suffer discrimination because of his race and did not suffer pervasive and regular discrimination.

### (a.)   Le Never Suffered Discrimination Because of His Race.

Le's hostile work environment claim fails because there is no evidence anyone harassed Le "because of" his race. *Oncale*, 523 U.S. at 81. First, Le described his working relationship with both Capodanno and O'Donnell, whom he alleges created a workplace riddled with hostility, as being

"professional" in both cases. Ex. A at 23-24. The inquiry into the hostile work environment claim ends there. However, there is more. Neither Capodanno nor O'Donnell ever made racially insensitive statements or comments to Le or about Le. *Id.* at 87-88. Neither O'Donnell nor Capodanno ever said anything about Le's race or any other prohibited factor. Ex. B at 107-108. Neither Capodanno nor O'Donnell ever gave Le a written reprimand. Ex. A at 201. Le's salary increased and was never decreased. *Id.* at 7. He was never denied vacation days. *Id.* at 55. He was never demoted. *Id.* at 97. His hours were never cut. *Id.* at 99. His work was never criticized by O'Donnell or Capodanno other than with regard to the Cherrin and Tuller incidents. *Id.* at 84. These two instances of "hostility" Le points to were the result of disputes over the adequacy of Le's work, and Le can offer nothing to suggest that these incidents had anything to do with his race. Therefore, Le offers nothing more than his subjective belief and conclusory allegations to support his hostile work environment claim, which are insufficient to defeat summary judgment. *See Schoch*, 912 F.2d at 657 (affirming summary judgment; conclusory allegations were not enough).

### (b.) The Conduct Described by Le, Even if It Actually Occurred, Was Not Pervasive and Regular.

Even if Le could demonstrate hostility because of his race, Le cannot establish the second prong of his hostile work environment claim – *i.e.*, that the conduct was sufficiently "pervasive and regular." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990); *see also Oncale*, 523 U.S. at 78 (referring to "severe or pervasive"). The Supreme Court has made clear that the standard for judging hostility in the workplace is "demanding," to "ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale*, 523 U.S. at 80). Liability only attaches "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment". *Oncale*, 523 U.S. at 78.

In support of his claim, Le complains he was yelled at once.[15] Even if Le's characterization of these events was true it would still fall far short of a workplace so "permeated with discriminatory intimidation, ridicule and insult" that it altered the conditions of Le's employment and created an "abusive working environment." *Harris*, 510 U.S. at 21; *see e.g., Duffy v. Dep't of State*, 598 F. Supp. 2d 621 (D. Del. 2009) (granting summary judgment on hostile work environment claim where plaintiff presented evidence of rudeness and nasty comments); *Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 502 (W.D. Pa. 1988), *aff'd*, 856 F. 2d 184 (3d Cir. 1988) ("Snubs and unjust criticisms of one's work are not poisonous enough to create an actionable hostile work environment."). The Court should, therefore, grant summary judgment in Defendants' favor on Le's hostile work environment claim.

### D. Defendants Cannot Be Found Liable for Conspiracy under § 1985.

#### 1. Le Cannot Base His § 1985 Claim on a Violation of § 1981.

§ 1985 forbids any conspiracy to deprive, either directly or indirectly, any person of the equal protection of the laws, or of equal privileges and immunities under the laws. *Gonzalez v. Comcast Corporation*, 2004 U.S. Dist. LEXIS 14989, *16 (D. Del. July 30, 2004)(citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001)). However, "the statute itself does not create any substantive right; rather, it serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere." *Id.* "[T]he Supreme Court explicitly rejected an attempt to employ § 1985(3) as an adjunct to a Title VII employment discrimination claim." *Id.* (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979)). The Third Circuit has stated that, "in order to prevent the use of § 1985(3) as a general federal tort law, courts have been careful to limit causes of action thereunder to conspiracies that deprive persons of constitutionally protected rights, privileges and immunities." *Id.* at *17 (citing *Brown*, 250

---

[15] Capodanno never yelled at him. Ex. A at 41. Neither Capodanno nor O'Donnell ever berated Le and always spoke to him in a normal civil tone. Ex. A at 56.

F.3d at 805).   Therefore, "alleged violations of statutory rights under § 1981, by themselves, cannot be a foundation for a conspiracy claim under § 1985(3)."   *Id.*; *Dixon v. Boscov's, Inc.*, No. 02-1222, 2002 U.S. Dist. LEXIS 13815 at *7 (E. D. Pa. July 17, 2002) (holding that the Third Circuit's decision in *Brown* compels conclusion "that statutory rights pursuant to § 1981 cannot be the basis of a § 1985 remedy.").   Therefore, even if Le's § 1981 race discrimination claim were viable – which it is not – his § 1985 claim must be dismissed as a matter of law.

### 2.   The Claim Fails Even if It Is Based on Other Violations.

In an effort to plead around these prohibitions, Le specifically alleges the Defendants conspired by (1) starting rumors about Le (D.I. 17, Amended Complaint at ¶ 67) and (2) agreeing to discriminate against him.   (D.I. 17 at ¶ 68).   The only "rumors" were that Le was incompetent. Ex. A at 91.   As set forth above, there is no evidence he was called incompetent.   There is also no evidence of conspiracy.   Neither Le nor Jones is aware of any facts to support a conspiracy.   Ex. B at 135; Ex. A at 126-127.

### E.   Because Le's § 1985 Claim Fails, His § 1986 Claim Must Be Dismissed.

Le's § 1986 claim similarly fails.   In *Carter v. Del. State Univ.*, No. 99-642 GMS, 2002 U.S. Dist. LEXIS 3116 (D. Del. Feb. 27, 2002), the court granted summary judgment on plaintiff's claims under § 1985 and § 1986 and his civil conspiracy claim.   *Id.* at *24-26.   The court explained that because there is no violation of § 1985, there can be no violation of § 1986. *Id.*; *see* 42 U.S.C. § 1986 (limiting liability to those who fail to prevent any of the wrongs "mentioned in section 1985 of this title.").

### F.   Delaware Law Does Not Recognize *Prima Facie* Tort in the Employment Context.

In *Lord v. Souder*, 748 A. 2d 393, 402-03 (Del. 2000), the Delaware Supreme Court held that a claim for *prima facie* tort was *not available in the employment context* because such a claim would be inconsistent with Delaware's employment at-will doctrine. *Id.* at 403 (emphasis

added); *Parker v. Comcast Corp.*, No. 04-344-KAJ, 2005 U.S. Dist. LEXIS 22612, *9 (D. Del.

Oct. 5, 2005) (dismissing plaintiff-employee's *prima facie* tort claim brought in the employment

context); *Brooks v. Fiore*, 2001 U.S. Dist. LEXIS 16345 at *29-30 (D. Del. Oct. 11, 2001)

(under Delaware law, claims for *prima facie* tort are not permitted in the employment context).

Therefore, Le's *prima facie* tort claims are not viable, and should be dismissed.[16]

## CONCLUSION

For the reasons set forth herein, there are no genuine issues of material fact and the Court

should grant Defendants' motion for summary judgment as to Le's employment claims.

Mary B. Matterer (#2696)
James H. McMackin, III (#4284)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
jmcmackin@morrisjames.com

Dated: May 21, 2010                    Attorneys for Defendants

---

[16] Le claims he was threatened with arrest if he did not put the software back on the network. His own testimony belies this argument. He testified that Capodanno said "Somebody please call the cops." Ex. A at 76. Later, Monica Gillespie allegedly said "you could be prosecuted for this." *Id.* at 76. The police were never called. *Id.* at 77.