## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LE T. LE,

               Plaintiff,

v.

CITY OF WILMINGTON,
JOSEPH F. CAPODANNO, JR. AND
JAMES J. O'DONNELL,

               Defendants.

C.A. NO. 08-615 LPS

---

## DEFENDANT CITY OF WILMINGTON'S OPENING BRIEF IN SUPPORT OF SUMMARY JUDGMENT ON COUNTS I & II (COPYRIGHT)

---

Mary B. Matterer (#2696)
James H. McMackin, III (#4284)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Attorneys for Defendants

Dated:  May 21, 2010

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDINGS .........................................1

III.  SUMMARY OF THE ARGUMENTS .................................................................2

      A.    Fraud/ Copyright Misuse/Unclean Hands.................................................2

      B.    Work Made for Hire.....................................................................................2

      C.    Estoppel.........................................................................................................2

      D.    Implied Irrevocable License. ......................................................................2

IV.   STATEMENT OF FACTS .....................................................................................3

      A.    Software development was within the scope of Le's employment...........3

      B.    Licenses and Inspections controlled the development of the Work. .......4

      C.    The City recognized Le for his contribution to the group effort............7

      D.    Le was notified his job might be terminated............................................8

      E.    Le developed a retaliatory scheme. ...........................................................8

      F.    Le Removes Work from City Server. .........................................................9

      G.    Le's misappropriation of the Work continues after his termination. ...............10

V.    ARGUMENT ........................................................................................................10

      A.    Standard of Review....................................................................................10

      B.    Fraud/Copyright Misuse/Unclean Hands...............................................11

      C.    Work Made for Hire...................................................................................13

      D.    Estoppel.......................................................................................................17

      E.    Implied Irrevocable License. ....................................................................18

VI.   CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................11

*Attig v. DRG, Inc.,*
   2005 WL 730681 (E.D.Pa. 2005) ...............................................................19

*Aymes v. Bonelli,*
   980 F.2d 857 (2d Cir. 1992)..........................................................................13

*Baltimore Orioles, Inc. v. Major League Baseball Players Association,*
   805 F.2d 663 (7th Cir. 1986) ........................................................................13

*Carson v. Dynegy,*
   344 F.3d 446 (5th Cir. 2003) ........................................................................18

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ......................................................................................10

*Community for Creative Non-Violence v. Reid,*
   490 U.S. 730 (1989)..........................................................................2, 13, 15

*Gaffin v. Teledyne, Inc.,*
   611 A.2d 467 (Del. 1992) .............................................................................11

*Genzmer v. Public Health Trust of Miama-Dade County,*
   219 F. Supp. 2d 1275 (S.D. Fla. 2002) ..................................................14, 17

*Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.,*
   128 F.3d 872 (5th Cir. 1997) ..................................................................19, 20

*MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.,*
   952 F.2d 769 (3d Cir. 1991)..........................................................................18

*Marshall v. Miles Labs, Inc.,*
   647 F. Supp. 1326 (N.D. Ind. 1986) .......................................................14, 15

*Miller v. CP Chemicals, Inc.,*
   808 F. Supp. 1238 (D.S.C. 1992)............................................................15, 17

*Naghiu v. Inter-Continental Hotels Group, Inc.,*
   165 F.R.D. 413 (D. Del. 1996).....................................................................11

*National Assoc. for Stock Car Auto Racing, Inc. v. Scharle*,
    184 Fed. Appx. 270, 2006 WL 1697101 (3d Cir. June 21, 2006) .......................................18

*Norman v. Elkin*,
    617 F. Supp. 2d 303 (D. Del. 2009) .......................................................................................11

*Rouse v. Walter*,
    513 F. Supp. 2d 1041 (S.D. Iowa 2007) ................................................................................14

*Schoch v. First Fid. Bancorporation*,
    912 F.2d 654 (3d Cir. 1990) ...................................................................................................11

*Whelan Associates v. Jaslow Dental Laboratory, Inc.*,
    797 F. 2d 1222 (3d Cir. 1986) ................................................................................................17

**Statutes**

17 U.S.C.A. § 101 ...........................................................................................................................13

17 U.S.C.A. § 102(a) ......................................................................................................................13

17 U.S.C.A. § 201(a) .................................................................................................................13, 14

17 U.S.C.A. § 201(b) ......................................................................................................................13

17 U.S.C.A. § 203(a)(4) ..................................................................................................................19

**Rules**

Federal Rule of Civil Procedure 56 ...............................................................................................10

**Other**

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A]................................19

## I.    INTRODUCTION

Plaintiff Le T. Le ("Le") has asserted in this action both employment discrimination claims and copyright claims. He alleges the City of Wilmington ("the City") infringes the Work registered with the Copyright Office under TXu1-359-357 (the "Work") when the City uses it for its program to issue Instant Tickets for code violations. Previously, however, before the employment dispute arose, Le and the City both understood that the Work was the City's property, and Le in fact manifested his understanding of the City's ownership by including in several places in the Work the copyright notation: "Copyrights ©2004. **City of Wilmington, Department of Information Technology.**" (emphasis added)("the City Mark"). Not until after Le learned his position could be outsourced did he, intentionally and without the City's knowledge or consent, alter the copyright notice to make it appear as if he owned the copyright. He thereafter registered the copyright with the wrongfully-altered source code and led the Copyright Office to believe the Work he sought to register was his when in fact it was a "work made for hire." He admittedly disposed of early copies of the Work which included the City Mark, and spoliated his remaining copy of the Work during the course of this litigation on the eve of producing it in discovery. The City rightfully owns the Work as a work made for hire. Le was one member of a team that together created the Work. The City raises in this motion the additional defenses of fraud, estoppel, and implied irrevocable license.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Fact and expert discovery is completed. This is the City's timely motion for summary judgment on the copyright issues. The City and the individual defendants are filing under separate cover a motion for summary judgment with respect to the employment claims.

## III.   SUMMARY OF THE ARGUMENTS

### A.   Fraud/ Copyright Misuse/Unclean Hands

Le understood that the Work belonged to the City but secretly deleted the City's Mark and replaced it with his own.  He then fraudulently misrepresented to the Copyright Office that he owned the Work in order to induce the Copyright Office to register the copyright in his name to disrupt the City's business in retaliation for outsourcing his position.

### B.   Work Made for Hire

The Work which is the subject of the copyright-in-suit is a work made for hire, applying the factors set forth in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989).  The Work is accordingly owned by the City.

### C.   Estoppel

Le is estopped from asserting any infringement claims against the City.  Le himself loaded the Work onto the City's server and encouraged the City to use it both expressly and impliedly, consenting to its use without claiming ownership.  He was aware that the City expended considerable resources relying on the ability to issue Instant Tickets using the contested Work for that purpose, and that the City would be injured by its removal.

### D.   Implied Irrevocable License

To the extent Le is found to own any copyrightable portion of the Work (which the undisputed evidence refutes), he impliedly granted an irrevocable license to the City to use and revise it as needed for its Violations and Instant Ticket programs.  The license is irrevocable because the City provided consideration for this license.

## IV.    STATEMENT OF FACTS

### A.    Software development was within the scope of Le's employment

Le was a salaried employee of the City from November, 2003, until his termination in July, 2007. Ex. A at 374[1].  He received a W-2, taxes were withheld, and he received benefits such as vacation. Ex. A at 374.  He was a City employee at the time.  Ex. B at 21.  During this period of employment, he represented to the U.S. Internal Revenue Service that his occupation was "web developer." Ex. H at LTL 104-107.  In applying for City employment, Le represented that his experience included employment as webmaster, web developer, database/intranet developer, and senior web developer.  Ex. H at LTL 108-109.  In response to the request on the employment application to "summarize your education, training and experience *relative to the qualifications and selective requirements as described on the job announcement*" (emphasis added), Le highlighted his software development skills.  He claimed his five years of training at Drexel where he studied computer science prepared him for:

> any situation that I might encounter at work." Duties included "creating and maintaining the hospital's centralized database... I was also responsible for fixing softwares [sic] problems ... I have worked with clients to help them with their computer problems such as developing a new system that their company needs to generate better revenue, or consulting with them on how to manage their business (technology-wise)

Ex. E at City 386.  Thus, Le successfully marketed his software development skills as applicable to the job he obtained with the City.

The job description itself included:

> NATURE OF WORK PERFORMED: "... providing support, and technical assistance to users of the City's departmental PCs.

---

[1] Exhibit references herein are to the Declaration of James H. McMackin, III filed concurrently.

> EXAMPLES OF WORK PERFORMED: suggest systems for the management and sharing of information. ... ***Performs related work as required.***
>
> REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES: General knowledge of Web and Intranet, computer systems (hardware peripherals), along with structured programming techniques.

Ex. E at CITY 389 (emphasis added).

Le agreed to abide by the Personnel Policy Manual - Code of Ethical Conduct. He expressly agreed:

> To pursue a course of conduct that is honorable and merits the public(s) trust. ...
> To refrain from using my position as an employee to secure ...
> private advancement or gain or the appearance of such. I shall not require a financial interest in any private enterprise, in which I may be directly involved in decisions to be made in an official capacity on behalf of the City. ...

Ex. E. at City 410. Thus Le expressly agreed not to use his position as a City employee for private gain.

### B.    Licenses and Inspections controlled the development of the Work

Le began to work for the City in November, 2003, in the Information Technology Department ("IT") as an Information Analyst II. Ex. A at 4. He began to work on the ticketing program at the direction of Jeffrey Starkey, Commissioner of Licenses and Inspections ("L&I") Ex. Q at 18-19. In December, 2003, following a meeting to discuss how the Department of Information Technology could assist L&I, it was decided that "Le T. Le will be developing a web-enabled Building Inspection/Violation Notice form." Ex. E at CITY 16999, Le Dep. Ex. 52. Le's supervisor, Terry Jones, assigned Le to the task of developing software for the instant violation/ticketing application because the software was <u>not</u> to be purchased from a vendor but instead created by IT. Ex. B at 16. Jones chose Le to develop it because of his programming skills discussed at his interview. *Id.* at 17. The IT budget reflects the software cost as "the cost

of staff to develop software tools." Ex. L at TJ0214, 0255. Le was given sample paper tickets in use before Instant Ticketing which contained the information which needed to be captured in the electronic version. A sample paper ticket is found at Ex. E at CITY 2277-2283, Le Dep Ex. 61; Ex. A at 322. The features already in use by the City even before Le was hired which are common to the Work include the following: certification number, date inspected, date prepared, disclaimer, premises in violation, name and number, occupancy status, responsible party, façade, story, type of building, code, compliance date. Ex. A at 321-23. There is no dispute that Le used an old form to determine what to include, and that he purported to copyright only the source code, and not the form. *Id.* at 324. There is no writing where Le claimed ownership to the Work. *Id.* at 343. Le acknowledges that part of the City's business was to issue tickets for code violations. *Id.* at 345. He included the City's logo in the screen shots and deposited the City's logo with the Copyright Office but deposited no screen shots. *Id.* at 345-46. He hired no assistants. *Id.* at 346. It is undisputed that at least some of the source code was created and fixed at the City. *Id.* at 346.

As part of his job, Le periodically identified the job responsibilities he was handling for the City, which included the L&I Violations project (later to include the Instant Ticket project) and unrelated other assignments such as: Service Pack 3 Deployment, Outlook 2003 Deployment, Setup Routers for PBX, Servers Migration, Inventory Cartridge, Backup, and Touch Screen Database/ Printer supplies. Ex. M at City 11030, Le Dep. Ex. 3. In December, 2003, Le claims he completed a "demo Inspection system for L&I" as one of his "projects" and offered to show it to his supervisor Terry Jones. Ex. M. He provided periodic additional project reports to Jones, among others, from at least June, 2004 though January, 2007, Ex. M, some of which include specific references to coding. See Ex. M at City 016925, 016895. On January 16,

2007, Le indicated in his list of responsibilities: "creat[ing] web application system for housing & building inspectors to do instant ticketing and inspections." Ex. M at City 012668. He told a vendor he worked for the City and wanted to buy tablet PCs because he created a web application **for L&I** at the City. Ex. M at City 036297. Le did other computer programming besides the Instant Ticketing programming for the City. Ex. B at 20.

Despite his claim that he worked on his own time, Le is not aware of any facts suggesting that the City knew prior to June 5, 2007 that Le allegedly created the Work program on his own time. Ex. A at 121, 125. Le indicated that he completed coding the application on June 28, 2004. Exhibit M at CITY 035697. He also claims he finished creating the program in early 2004. Ex. A at 378. See also D.I. 17, Amd. Cmplt. at ¶12. Le did not file the Certificate of Registration of the copyright until May 21, 2007. The copyright registration indicates that the program was not completed until May 3, 2007. Ex. H at LTL 1450-51, Le Dep. Ex. 63.

This nearly three-year discrepancy is due to the fact that the code was continuously tested and revised not by Le alone, but with much assistance of other City personnel. The City's network was used for testing. Ex. B at 69. City personnel gathered data for the program. *Id.* at 24. Le ran tests of the Work and shared the results with City employees. *Id.* at 24. He was working on the Work pursuant to his job duties. *Id.* at 24-25. His supervisor understood the program was being developed for the use of the City. *Id.* at 32. He never thought it was being developed for anyone else. *Id.* at 32. He consulted with the City's Licensing and Inspection department ("L&I") when working on the Work and provided them with drafts. *Id.* at 43. His own supervisor did not know he applied for the copyright until after the fact. *Id.* at 30. Le stated he has worked on other applications, and for programs he works on during the day at work, he understands he has to put on the City of Wilmington copyright mark. Ex. A at 359. Le was aware the City was using the Work from the

time he put it on the City's network until June 2007 and that use was permitted. *Id.* at 370-371.
He received input as to inspectors, building codes, housing codes, and was notified of glitches
such as information being deleted.   Ex. A at 343-344; Ex. N.   He was instructed as to the
appearance of the form and text and heading modifications.   Le was told what reports – by
inspector, census track, dates, and street – were required, Ex. N at City 010968, and these could
not have been completed without City employees' input, Ex. A at 286, particularly the input of
Commissioner Starkey, who closely supervised Le in this project, Ex. Q at 17.   Meetings were
held sometimes weekly (Ex. A at 301; *see e.g.* Ex. O and Ex E at CITY 36315, 17049, 12504)
and the program was adjusted even after the copyright was registered.   While Le now discounts
the contributions of all others who worked on this project, the input from others in the design,
revision, and testing form an essential part of the creative process in producing this Work.   Even
Le concedes he could not have created this Work alone.   Ex. A at 286.   In fact, the source code
Le claims was completed in 2004 was not in fact ready then and was combined with later
modifications: a 2007 version was eventually deposited with the Copyright Office.   *Id.* at 330.
Le does not remember exactly what he deposited with the Copyright Office.   *Id.* at 262.

### C.      The City recognized Le for his contribution to the group effort

The Mayor of Wilmington recognized Le's contribution to the L&I team project by
awarding him a "Keys to Success Award" on October 4, 2004, in recognition of "outstanding
service to the City of Wilmington."  Ex. H at LTL 52.  This was for his work on the Work.  Ex.
A at 144-145.  Starkey nominated Le for the award noting Le was assigned to the L&I project
and worked with L&I in designing the system to meet L&I's needs.  Ex. E at City 11043.  Le
accepted the award at the time the Work bore the City of Wilmington copyright and without

mention of any claim of ownership on his part. The award was presented exclusively to employees at the Annual Employee Banquet. Ex. E at City 012931-12932.

### D.      Le was notified his job might be terminated

On January 8, 2007, Le was notified that his position might be eliminated for the next Fiscal Year. Ex. A at 51. This would be subject to City Council approval. *Id.* at 51; Ex. B at 11. Le's employment would end as of June 30, 2007 unless he found other work in the City. Ex. A at 51.

### E.      Le developed a retaliatory scheme

Soon after he was informed he might be laid off, while publicly Le went through the motions of seeking alternative employment within the City, secretly he developed a plan to retaliate. He took steps to copyright the Work application in his own name. Around February 1, 2007, Le, without authorization, removed the City's Marks and replaced them with the mark "copyrights 2004© Le T Le. (the "Le Mark" ). Ex. K. At least twenty-three of sixty-seven subprograms in the application contained the Le Mark by February 1, 2007, at 12:06 p.m. Three more were modified shortly thereafter (detailcert.asp on April 10, 2007; Instant_Ticket.asp on May 3, 2007, and search.asp on March 16, 2007). Ex. K.

On May 21, 2007, Le filed a Certificate of Registration with the U.S. Copyright office. Ex. H at LTL 1450-1451, Le Dep. Ex. 63. Le has not produced a copy of his deposit in the Copyright Office. Ex. A at 324. He has instead produced only a disk, LTL1, containing an application he modified after he submitted a file to the Copyright Office. Ex. I; Ex. A at 326. A print-out of the files on LTL1 evidences the fact that some files were last modified after the purported May 3, 2007 completion date. Ex. I. In fact, every one of the twenty-three subprograms which bear the Le Mark were modified not only after Le represented to the Copyright Office that the program was completed, but again well after this litigation commenced

and over two years after Le submitted the copyright registration on May 4, 2007.  Exh. I.

Critically, a copy of what Le deposited with the Copyright Office has not been placed in evidence.

### F.    Le Removes Work from City Server

On May 24, 2007, Le received notice that City Council had approved the Fiscal Year 2008 budget and that his position, along with all others of the Unit, would be eliminated effective July 1.  Ex. H at 1636, Le Dep Ex. 14.  On June 5, 2007, shortly after he registered a copyright for the disputed Work program and was notified his position was being eliminated, Le intentionally removed the disputed Work program from the City's computer network.  Ex. A at 64.  He did so without permission or warning and in violation of an order from his supervisor forbidding Le, or anyone else, from altering or removing work without prior authorization.  Ex. A at 65; Ex. E at CITY 36874.  He removed only the source code; he concedes the database and data belong to the City.  Ex. A at 73.

Le never gave anyone any warning that he would remove the Work on June 5, 2007.  Ex. B at 67; Ex. A at 69, 81.  He did not receive permission beforehand.  Ex. B at 75; Ex. A at 70.

As Le intended, removal of the Work had an immediate and serious impact on the City's ability to issue citations to violators of the City Code.  Without the Work, the Instant Ticketing program was hamstrung.  Ex. A at 73.  The City was using the Work at the time it was removed and could not issue tickets without it.  *Id.* at 75-76.  Le did not care that the City was using the Work to fulfill its public duties, because "it was mine."  *Id.* at 78.  When asked why he did not just take a copy, and instead took the whole program he replied: "Well, the program is mine."  *Id.* at 77.

Le initially refused to put the Work back on the system. Ex. A at 82. Le told the City on June 5, 2007 that he had filed for a copyright but did not have a copy of the certificate. *Id.* at 82. Le finally relented and reinstalled the Work. He was later terminated for cause.

### G. Le's misappropriation of the Work continued after his termination

Again resorting to self-help rather than available legal channels, on or before September 21, 2007, over three months after Le was terminated, he misappropriated printouts of screen shots, Ex. H at LTL 1547-1563, from the City's confidential internal database which his counsel thereafter submitted to the Department of Labor on October 10, 2007. Mr. Le was adverse to the City and represented by counsel at the time he acquired these documents. He told the Department of Labor that "on September 11th, 2007, I know that the City had made a few changes to the way the program [sic] laid out and changes [sic] a few things around" and attached those illicitly-obtained screenshots. Ex. H at LTL 1492. Those screenshots, are clearly marked as having been downloaded from the City's internal files with the date downloaded (September 11, 2007). When asked how Le came to acquire these documents after he was no longer employed by the City, his counsel indicated his client refused to answer based on the "privilege against possible self incrimination of the Fifth Amendment to the Constitution of the United States and Art 1 section 7 of the Constitution of the State of Delaware of 1897." Ex. F.

## V. ARGUMENT

### A. Standard of Review

Federal Rule of Civil Procedure 56 mandates the entry of judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 327 (1986). The defendant must only point out that there is an absence of evidence to support the

10

plaintiff's case or, alternatively, offer affirmative evidence which demonstrates that the plaintiff cannot prove his case. *Naghiu v. Inter-Continental Hotels Group, Inc.*, 165 F.R.D. 413, 418 (D. Del. 1996). The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, a dispute must exist over a <u>material</u> fact. *Id.* To survive a motion for summary judgment, therefore, the plaintiff must come forward with specific, admissible and credible evidence supporting each element essential to his case; mere conclusory allegations or denials are not enough. *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Applying this standard, the undisputed facts establish that Le's claims fail as a matter of law.

### B.      Fraud/Copyright Misuse/Unclean Hands

The elements of a common law fraud (or deceit) cause of action consist of (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *Norman v. Elkin*, 617 F.Supp.2d 303 (D. Del. 2009) citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).

Le committed fraud by taking the L&I program from the City and claiming it as his own individual work as part of a scheme to disrupt the City's operations in retaliation for outsourcing his job. He represented to the Copyright Office that he owned the Work and the Copyright Office registered the copyright in reliance on that representation.

Although Le now claims he believed it was understood that the Work was legally his property and that he was permitting the City to use it at his discretion, Ex. A at 371, that belief is

11

belied by his intentional concealment of the fact of the City Mark.  Furthermore, if the parties had been in agreement as to Le's ownership, which they were not, Le would not have needed to be secretive about his copyright mark, the registration of the application, and the removal from the network.

Le manifested his understanding in writing that the contested Work belongs to the City when he included the following notation in at least fifteen locations in the source code: "Copyrights ©2004. City of Wilmington, Department of Information Technology." After learning that his position could be outsourced, Le, without permission, switched his name for that of the City in the copyright marks. He then fraudulently represented to the Copyright Office that he owned the Work in order to induce the Copyright Office to register the copyright in his name. He thereafter misused the illicitly obtained copyright claiming ownership of the Work as an excuse to remove the Work from the City's network, without notice or permission, in order to disrupt the City's business in retaliation for outsourcing his position.

Having himself placed the City Mark in the source code and secretly switched the City's Mark for his own, Le can not credibly claim the City disclaimed ownership of the application for which it had expended considerable resources.  Le's resort to self-help was not to make sure he had a copy of the Work he claimed to own, since he would presumably have had a copy on his personal computer if his claim of working on it solely at home was accurate.  Otherwise, he could have made a copy to take with him.  The intent could only have been to injure the City. Otherwise, the ownership issue could have been resolved later, as is being done now.

Furthermore, Le continued his unlawful acts on September 11, 2007, when he sought and obtained screenshots from the City's internal website over three months after he was terminated.

## C.    Work Made for Hire

The City, not Le, owns the Work as a work made for hire under 17 U.S.C.A. § § 101, 102(a), 201(b).  Under the work made for hire doctrine, a court first ascertains whether the Work was prepared by an employee or an independent contractor.  The employer owns the rights to the copyright if the Work was prepared by an employee (a) within scope of employment and (b) the parties have not expressly agreed otherwise in signed, written instrument. 17 U.S.C. § 201(a); *Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663 (7th Cir. 1986).  Since he was indisputably an employee during the entire period the Work was created, the Work belongs to the City as there is no written instrument to the contrary.

In *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), the Supreme Court held that "employee" should be interpreted under the common law of agency.  The factors the courts consider in determining whether a Work is a work made for hire and thus the property of the employer are:

(1)*    the hiring party's right to control the manner and means by which the work is created;
(2)*    the level of skill required;
(3)     the source of the instrumentalities and tools;
(4)     the location of the work;
(5)     the duration of the relationship between the parties;
(6)     whether the hiring party has the right to assign additional projects to the hired party;
(7)*    the extent of the hired party's discretion over when and how long to work;
(8)     the method of payment;
(9)     the hired party's role in hiring and paying assistants;
(10)    whether the work is part of the regular business of the hiring party;
(11)    whether the hiring party is in business;
(12)*   the provision of employee benefits;
(13)*   the tax treatment of the hired party.

The five most important *Reid* factors are marked with an asterisk.  *See Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).

The mere fact that preparations were done outside an employee's office or normal working hours does not remove them from scope of employment for purposes of determining whether preparations are a work made for hire as to which employer owns copyright. *Marshall v. Miles,* 647 F. Supp 1326 (N.D. Ind. 1986). An employee cannot avoid the work for hire doctrine solely on the basis that work was done off-hours at home. 17 U.S.C.A. § 201(a); *Rouse v. Walter*, 513 F.Supp. 2d 1041 (SD Iowa 2007).

*Genzmer v. Public Health Trust of Miama-Dade County,* 219 F. Supp. 2d 1275 (S.D. Fla. 2002) is directly on point. A salaried employee (a doctor), whose job description did not include computer programming, wrote a computer program at home during his off-duty hours using his home computer he bought with his own funds. The doctor was hired to undertake a research assignment that encompassed "a myriad of activities" regarding organizing, directing and administering a critical care unit. *Id.* at 1281. The program was developed at home but the test phase occurred at the work place and the software was altered after testing. He loaded the software into his Department's computers with the approval of the employer and later registered a copyright. Rather than later removing the software from the employer's computers, as Le did, he programmed a "bug" to disable the software after his employment was terminated. The court found on summary judgment the software was a work made for hire. *Id.* at 1283. The court noted that the fact the doctor received praise was strong support for the contention that the work was of the kind the doctor was employed to perform. *Id.* at 1282 at n.6. What mattered was not the time of day the program was developed but that the doctor performed the work during the period he was employed. *Id.* at 1282. The case is even more compelling in the instant case where Le's responsibilities included software management, he was assigned to write the

program, where he encoded the City Mark in the Work, and where there is ample evidence even the coding was performed during business hours and meetings were held during business hours.

In another highly analogous case, computer programs created by an employee laboratory supervisor and designed for use in his employers' quality control lab were also held to have been created within the scope of employment in *Miller v. CP Chemicals, Inc.,* 808 F. Supp. 1238, 1240, 1244 (D.S.C. 1992). Although the programs were written and tested at employee's home on his personal computer and the employee was never paid for work he did in developing the programs, the programs were developed solely for purposes of simplifying his work-related duties and related directly to calculations done for specific products manufactured by employer.

In *Marshall v. Miles Labs, Inc.,* 647 F. Supp. 1326 (N.D. Ind. 1986), the court pointed out that an employee cannot avoid the "work for hire" doctrine merely by preparing the Work during non-working hours or in a place not controlled by the employer.

It is undisputed that Le was a salaried employee of the City during the entire period from 2003 to 2007 he worked on the program which he copyrighted, that taxes were withheld, and that he received employee benefits. Ex. A at 374. There is also no dispute that the City paid all personnel engaged in this project and that Le hired no assistants. Ex. A at 346. The Work was indisputably made to facilitate the City's business of issuing tickets of various violations. Indeed, the City logo appears in screenshots. Ex. G. Furthermore, it is undisputed that the City could and did assign additional projects to Le. Le has placed in issue only *Reid* factors (2), (3), (4) and (7). Le has produced nothing in discovery other than his unsupported testimony in support of his claim. Even assuming for the purpose of summary judgment Le comes forward with evidence in his favor on these factors, it would still be insufficient to avoid the work made for hire doctrine.

Factor (2) – level of skill. The coding task clearly involved the level of skill for which Le, a computer scientist, was hired. Le erroneously claims the Work did not fall within his job description, but Le himself expressed that his background in computer science and his work experience in designing web software were relevant when he applied for his position. He performed other coding functions in addition to working on the L&I project and claimed title to none of them.

Le claims he worked on the program on his own time on his own computer at home, yet he offers no evidence to support these claims. It is clear that the City provided at least a desktop computer, a laptop, a camera, and a blackberry. Ex. A at 298-300. Le admits that the City's computer network server was made available "for testing and comment." D.I. 17 at. ¶12. The earliest version of the Work with the City Mark was found in the City's electronic database from files where he was the custodian. Le claims to have lost all the CDs with the application made from his home computer. Ex. A at 294. With the exception of the Le-marked subprograms, which were all modified during this litigation after August 10, 2009, and nearly 11 months after the complaint was filed on September 28, 2008, Ex. I, all evidence shows Le worked on the application almost exclusively during business hours. Le claims without any evidentiary support that his supervisor Terry Jones, <u>expressly</u> forbade Le from working on IT applications during his hours working at his job. D.I. 17 at ¶11. Jones has expressly denied that claim. Ex. B at 50-53. Moreover, Le's periodic reporting of his work on this project as part of his responsibilities belies that claim. It is submitted that an employee who is instructed not to work on a project would not thereafter furnish periodic progress reports to his supervisor.

Le's claim that he wrote the program in his own time and space, even if it were accurate, which it is not, is not dispositive. *See Genzmer,* 219 F.Supp. 2d at 1283; *Miller,* 808 F. Supp. 1238.

It is furthermore too limited for him to claim ownership under the  broad analysis of the creation of a computer program as set forth in *Whelan Associates v. Jaslow Dental Laboratory, Inc.,* 797 F. 2d 1222 (3d Cir. 1986).  Under *Whelan,* copyright protection of a computer program extends beyond the writing of source code and includes identifying the problem the programmer is trying to solve, outlining a solution, refining the structure and making decisions about what data are needed, where the data should be introduced and how it should be inputted, writing the source code, debugging, documentation and maintenance.   The coding process is a comparatively small part of the programming. *Id.* at 1229-31.  The identification of the problem took place before Le was assigned to the project.  The outline of the solution and the decisions as to what data were needed were provided in the form of the then existing paper citation forms. Ex. E at CITY 2277-2283.  Documentation was provided in the form of instructions for use.  Ex. P.  The debugging was a group activity.  Ex. N.  Maintenance of the Work was also a collaborative effort as problems arose in the deployment of the program.  Suzanne Oliver took over the maintenance and eventually did a complete rewrite of the code.   The Work is accordingly owned by the City and no issues of material fact indicate otherwise.

### D.     Estoppel

Courts applying the doctrine of estoppel in copyright cases utilize a four-prong test: (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted upon or act such that defendant has the right to believe that

17

it so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury. *Carson v. Dynegy,* 344 F.3d 446, 453 (5th Cir. 2003).

Based on these principles, Le is estopped from asserting any infringement claims against the City. Le was indisputably aware of and indeed encouraged the City's use of the contested Work, and both expressly, by inserting the City Mark, and impliedly, by not informing the City of his claim of ownership or demanding a license, consented to the City's use. He was, furthermore, aware that the City expended considerable resources relying on the ability to issue instant tickets using the contested Work for that purpose. Ex. A at 372. It is also apparent the City was unaware of Le's claim to ownership. Le's undisclosed registration of the Work came as a complete surprise, as Le intended, when he took the Work off the City's server. The City was immediately injured by Le's scheme when it could not issue Instant Tickets. The injury continues with this lawsuit.

### E.    Implied Irrevocable License

A non-exclusive license may arise from implication where the creator of a Work at a defendant's request hands it over, intending that the defendant copy and distribute it. *MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.,* 952 F.2d 769, 779 (3d Cir. 1991). Delivery of a copy of the Work is one factor in determining that an implied license has been granted. Other courts have found an implied license where (1) a person requests the creation of the work; (2) the creator makes the particular work and delivers it to the person who requested it; and (3) the licensor intends that the licensee-requestor copy and distribute his work. *National Assoc. for Stock Car Auto Racing, Inc. v. Scharle,* 184 Fed. Appx. 270, 2006 WL 1697101 (3d Cir. June 21, 2006)(summary judgment finding implied license upheld).

Here, there can be no serious question that an implied license was granted. Le was asked to work on the L&I project and the Work was created for the City's use so that the City could use it. He delivered the Work when he uploaded it on the City's server for use by City employees. Le inserted the City Mark into the source code in 2004 and left it there for nearly three years as the Work continued to be modified at the City's direction. Thus the City's right not only to use but also to modify the program was understood by Le and the City.

A grant of license to a copyright is subject to termination under certain conditions, one of them being that the termination "shall be effected by serving an advance notice in writing. 17 U.S.C. § 203(a)(4). It is undisputed no termination notice was provided at all, and certainly not a written notice.

Even if Le is found to be the owner of the copyright-in-suit, the City is nonetheless not liable for infringement since Le granted the City irrevocable license to use the Work and also to revise it as needed for its Violations and Instant Ticket programs. A nonexclusive license is irrevocable if supported by consideration. *Attig v. DRG, Inc.*, 2005 WL 730681 (E.D.Pa. 2005) (holding that where defendants gave plaintiff consideration, there was no triable fact that the defendants had an irrevocable license to use purportedly copyrighted files, graphics and codes). The license is irrevocable because the City provided consideration for this license in the form of salary to Le and support staff, provision of essential elements included in the program, and technology for coding, testing and deployment of the contested Work.

In addition, in *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.,* 128 F.3d 872 (5th Cir. 1997) the court noted that under federal law, a nonexclusive license can be irrevocable if supported by consideration, *citing* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A]. In *Lulirama,* the argument that the lawsuit filed by the employee served

19

as a revocation was rejected, since it was tantamount to an argument that it had the ability to terminate the license at will. *Id.* at 882. In addition, any perceived right to terminate the license, which was analogized to a contract, would render the license illusory. *Id.* at 882-883.

Similarly, Le never indicated and the City never agreed that Le could remove the software from its use at Le's will. It defies credulity to imagine the City would agree to invest so heavily in a project with the understanding that an employee could remove the software without notice and at will.

## VI.    CONCLUSION

There are no material facts in dispute which preclude summary judgment in favor of the City.   Accordingly, summary judgment is appropriate in favor of the City on the copyright claims.

*Mary Matterer*

Mary B. Matterer (#2696)
James H. McMackin, III (#4284)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Dated: May 21, 2010                    Attorneys for Defendants

20