# EXHIBIT   A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LE T. LE,                          )
                                   )
          Plaintiff,               )
                                   )  Civil Action No.
v.                                 )  08-615 LPS
                                   )
CITY OF WILMINGTON,                )
JOSEPH F. CAPODANNO, JR., and      )
JAMES J. O'DONNELL,                )
                                   )
          Defendants.              )

          Videotape Deposition of LE THANH LE,
taken pursuant to notice at the law offices of
Morris James, LLP, 500 Delaware Avenue, Suite
1500, Wilmington, Delaware, beginning at 10:33
a.m., on Friday, April 9, 2010, before Terry
Barbano Burke, RMR-CRR, and Notary Public.

APPEARANCES:

        VICTOR F. BATTAGLIA, SR., ESQUIRE
        BIGGS & BATTAGLIA
          921 North Orange Street
          Wilmington, Delaware  19801
          For the Plaintiff

        JAMES H. McMACKIN, III, ESQUIRE
        MARY B. MATTERER, ESQUIRE
        MORRIS JAMES LLP
          500 Delaware Avenue, Suite 1500
          Wilmington, Delaware  19801
          For the Defendant
ALSO PRESENT:
        CHELSEA BORDEAUX, Video Specialist
        Discovery Video Services
                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com





1    medical conditions that would influence your

2    ability to testify accurately today?

3        A.   No.

4        Q.   If I ask you a question and you answer

5    it, I'm going to assume that you understand the

6    question.  Is that understood?

7        A.   Yes.

8        Q.   Okay.

9        A.   If I don't understand a question, I could

10   ask you to repeat the question or because certain

11   things happened for a couple years now, it might

12   take me a little bit of time to refresh my memory

13   in order to answer.  Is that okay?

14       Q.   I understand.

15       A.   Okay.

16       Q.   When were you hired by the City of

17   Wilmington?

18       A.   November 2003.

19       Q.   And what was your position?

20       A.   Information Analyst II.

21       Q.   At any time when you were employed by the

22   City, did you hold any other positions?

23       A.   At the City?

24       Q.   Yes.



1      Q.   Okay.   Did you receive any raises after

2    Joe Capodanno started working in the IT group?

3      A.   Yes.

4      Q.   Okay.   And after Jim O'Donnell started

5    working in the IT group, did you receive any

6    raises?

7      A.   Yes.

8      Q.   Okay.   At any time after Joe Capodanno

9    and Jim O'Donnell started working in the IT

10   group, was your salary ever decreased?

11     A.   No.

12     Q.   Have you spoken with anyone besides your

13   attorney, Mr. Battaglia, regarding this lawsuit?

14     A.   Regarding this lawsuit?   No.

15     Q.   Did you tell Tyrone Smith anything about

16   this lawsuit?

17     A.   No.

18     Q.   Did you tell Terry Jones anything about

19   this lawsuit?

20     A.   No.

21     Q.   Did you tell Chau Le anything about this

22   lawsuit?

23     A.   No.

24          My sister Chau Le, she knows about a



Le T. Le

10

1    working at the City?

2         A.   I would not know that.

3         Q.   Okay.   Within the IT group, were there

4    any individuals besides yourself whose first or

5    last name was Le, spelled "L-E"?

6         A.   The whole name or just part of the name?

7         Q.   Where either the first name or the last

8    name was "L-E"?

9         A.   What I mean is, is it the whole name

10   spelled "L-E" or just part of the named spelled

11   "L-E"?

12        Q.   The whole name spelled "L-E"?

13        A.   In the IT Department?

14        Q.   Correct.

15        A.   No, I don't think so.

16        Q.   Okay.   About how many employees were in

17   the IT department while you were employed there?

18        A.   I could give you a rough estimate of

19   around a dozen.

20        Q.   Okay.

21        A.   10 to 12.

22        Q.   Were any of those 10 to 12 people with

23   the first name of "L-E" besides yourself?

24        A.   No, I don't think so.



Le T. Le

11

1    Q.   How about with a last name of "L-E"?

2    A.   I don't think so either.

3    Q.   Okay.  While you were employed by the

4    City, did you have access to other individuals'

5    passwords?

6    A.   Other individual, as in anybody from

7    working in the City?

8    Q.   Correct.

9    A.   No.

10   Q.   Did you have the ability, while you were

11   working at the City, to change people's pass

12   codes?

13   A.   Yes, because I have to reset people's

14   password when they forget their password.

15   Q.   While you were working for the City, did

16   you have access to any sensitive information?

17   A.   As in?

18   Q.   As in the ability to access other

19   people's e-mail accounts?

20   A.   Yes, I do.

21   Q.   Okay.

22          How would you describe your working

23   relationship with Tara Carty?

24   A.   Professional working relationship.



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Le T. Le

20

1    Q.  Do you have any reason to suspect that he

2   lacks truthfulness?

3    A.  I would not know.

4    Q.  Would you say that your relationship with

5   Terry Jones was closer, more distant, or the same

6   as your relationship was with Tyrone Smith?

7    A.  A little bit closer, because he was my

8   direct manager, and he taught me a lot of the

9   networking technical there.

10    Q.  Did you and Mr. Jones socialize outside

11   of work?

12    A.  Aside from when the vendors gave us

13   tickets to go to a Phillies game and one time I

14   invite him to my marriage, my wedding, no, we

15   don't talk much, no.

16    Q.  Did you ever at any time talk or e-mail

17   outside of work while you were employed by the

18   City?

19    A.  To who?

20    Q.  With Mr. Jones?  I'm sorry.

21    A.  With Mr. Jones.

22         I may have.  I don't remember.  I

23   don't recall.

24    Q.  Your shift was 8:30 to five; is that



Le T. Le

23

1    A.   Professional.  In my point of view.

2    Q.   Was it professional from his point of

3 view also?

4    A.   I do not know.

5    Q.   Okay.  Do you have any reason to suspect

6 that Mr. Capodanno had a tendency to lack

7 truthfulness?

8    A.   Yes.

9    Q.   Okay.  And what is the basis for that

10 suspicion?

11    A.   Throughout my years there when

12 Mr. Capodanno was the office manager, he never

13 has made any complaint regarding my performance

14 or anything about me.  Yet when I was terminate,

15 wrongfully terminate, in his affidavit he lists

16 all the complaints that were untruthful about me.

17 So that's what I would base that on.

18    Q.   Do you have any other basis to state that

19 Mr. Capodanno has a tendency to lack

20 truthfulness --

21    A.   Besides --

22    Q.   -- besides what you just told me?

23    A.   Those, just those.

24    Q.   Same questions for Mr. O'Donnell, you're

Le T. Le

24

1   familiar with him, I'm assuming?

    A.   Yes.

3   Q.   And how would you describe your working

4   relationship with Mr. O'Donnell?

5   A.   From my point of view, professional.

6   Q.   Okay.   And how about from his point of

7   view?

8   A.   I do not know.

9   Q.   Are you aware of any reason to suspect

10  that Mr. O'Donnell has a tendency to lack

11  truthfulness?

12  A.   Yes, I do.

13  Q.   And what is that reason?

14  A.   Also the reason is that when I was there,

15  throughout my year there, and when he became

16  director, he never talked to me about any issue

17  he has with me.  He never meet with me to ask me

18  about my job responsibility.

19          Responsibility or get to know me as

20  person or as an IT specialist.  Yet he said I was

21  incompetent without knowing me, but not to my

22  face, and only when after I was wrongfully

23  terminate that he said that I was incompetent and

24  he said things about me in his affidavit and that

1   name.

2       Q.   Did Oscar and Al Ballard tell you that

3   O'Donnell said you were incompetent?

4       A.   Terry Jones, Al Ballard and Oscar told

.5   Terry and Terry told myself.

6       Q.   Okay.

7       A.   Told me.

8       Q.   But you didn't hear O'Donnell say that

9   you were incompetent; is that correct?

10       A.   I do not hear him tell me that I was

11   incompetent, but from the action that he showed,

12   it showed that he sees me as incompetent.

13       Q.   So other than the fact that Terry Jones

14   told you that somebody told him that Jim

15   O'Donnell said you're incompetent and you're

16   feeling that through his actions he showed that

17   he thought you were incompetent --

18           MR. BATTAGLIA:  Objection to the form

19   of the question.  You changed -- he testified

20   that Terry Jones told him that these people said

21   he was incompetent and then you added in your

22   question that Terry Jones said that somebody told

23   him that they said it.  Do what you will, and my

24   objection is on the record.

1          MR. McMACKIN:   I will.   Thank you.

2    I'll start the question over again.

3    BY MR. McMACKIN:

4       Q.   With respect to incompetence, you've told

5    me two different things that form your basis for

6    believing that Mr. Jones -- excuse me, that

7    Mr. O'Donnell said you're incompetent.   First,

8    Mr. Jones told you that someone else told him

9    that O'Donnell said you're incompetent.   And

10   second, through Mr. O'Donnell's actions, you

11   think he believes you're incompetent; is that

12   correct?

13      **A.   Yes, from his, mostly from his action**

14   **that led me to believe that he looks down on me**

15   **and see me as incompetent.**

16      Q.   Did he ever say to you that he thought

17   you were incompetent?

18      **A.   No.**

19      Q.   And other than to Al Ballard and Oscar

20   Cornelius, are you aware of anybody else that

21   Mr. O'Donnell told that he thought you were

22   incompetent?

23      **A.   I do not know.**

24      Q.   Okay.



1      Q.   Why is that?

2      A.   Because he did not say that to anybody

3    else, even though they could not get their job

4    done, even the consultant that he brought in,

5    they sometime could not get the job done as well

6    as we do.  And they are all Caucasian and he

7    doesn't say that about him.  And even when we get

8    our job done correctly and we get things fixed,

9    he still said that we're incompetent.  That makes

10   me feel as though he looked down upon me because

11   of my race.  When he became the director, he

12   never bothered to meet with the group, our

13   minority group, to get to know us, to get to know

14   what our job responsibility is, to get to know

15   what we accomplish since we came to the City.

16   And yet he said that we're incompetent, and

17   immediately after he came to the City, he brought

18   in all white consultants who oversee what we're

19   doing.  That show us that he's not trusting us as

20   the IT professional or as a person.

21     Q.   And is it your belief that he was not

22   trusting you because of your race?

23     A.   Yes.

24     Q.   And do you have any foundation for that



Le T. Le

30

1    belief?

2        A.   Because there were times when we would

3    tell him there are certain things that the

4    network need to be upgrade and he would tell us

5    to wait on it until he talked to his consultant.

6             There were one time when we have a

7    network issue that one of the other consultant, a

8    white consultant named Rick Hobbs, accidentally

9    connect a network cable that bridged the widest

10   network onto the internal network.  We found that

11   out and I was the one fixing the issue the next

12   morning and we found out that Rick Hobbs was the

13   one that created the issue, so he was terminate.

14            Now, when we left the City,

15   Mr. Capodanno rehired Rick, even though he was

16   terminated for doing something that he was not

17   supposed to do.

18            From that you can see he let go all

19   the minority from the network group, and yet he

20   hired somebody who was terminated because of the

21   wrongdoing, and that person he rehire is a white

22   consultant.

23       Q.   You said that he didn't meet or

24   Mr. O'Donnell didn't meet with your group when he

Le T. Le

31

1  started working in the City.  Do you recall

2  saying that?

3      A.  Yes.

4      Q.  What other groups were there under IT

5  besides the network group?

6      **A.  The help desk, communication, and I**

7  **believe the finance.**

8      Q.  What about word processing?

9      **A.  Let me see.  Is that when -- I do not**

10  **know at that time word processing was under IT.**

11      Q.  There were minorities in the help desk,

12  though; right?

13      **A.  There were, there were one.**

14      Q.  Okay.  And there were minorities in

15  communications?

16      **A.  Yes.**

17      Q.  And there were minorities in finance?

18      **A.  Yes.**

19      Q.  And there were minorities in word

20  processing?

21      **A.  Yes.**

22      Q.  And do you know whether he met with the

23  other groups?

24      **A.  I do not know.  There were -- the network**

1    group is the only group that consists of all

2    minority.

3        Q.  And -- I'm sorry.

4        A.  And he never met with us to even get to

5    know what we could do, what our responsibility

6    is, before making a prejudgment on what we're

7    capable of and calling us incompetent.

8        Q.  At the time Mr. O'Donnell started working

9    in IT, were there problems with network

10   connectivity?

11       A.  Before or --

12       Q.  At the time that he started?

13       A.  There were always issue, minor issue with

14   the network connectivity.  I do not know how much

15   you know about the IT field, but there were

16   always network issue no matter where you go.  No

17   place is 100 percent up all the time.

18            Prior to us coming to the City, prior

19   to Terry and myself coming into the City, the

20   network was up only 50 percent of the time, and

21   there were no help desk group.

22            Terry came and created the help desk,

23   and when I came in the one and a half year I was

24   there prior to Jim became director, we upgrade

1    the network and it was up around 95 to 97 percent

2    from 50 percent up time.

3        Q.  Do you have any documentation to show

4    that the network uptime increased from 50 percent

5    to 95 to 97 percent?

6        A.  I do not have those information at this

7    point.

8        Q.  And you were in the network group, not in

9    the help group; is that correct?

10       A.  Yes.

11       Q.  And was it the network group's

12   responsibility to maintain the network?

13       A.  Yes.

14       Q.  If there was an inability to connect to

15   software, would you describe that as a minor or a

16   major network connectivity problem?

17       A.  It would depend.  If it's a network

18   connectivity issue, then it would be major

19   network problem.  But if it's something in the

20   software that create the issue, then it is not

21   part of a network problem.

22       Q.  And wasn't it ultimately determined that

23   the problems connected to MUNIS were a network

24   connectivity problem, not a software problem?



Le T. Le

34

1    A.   No.   It was actually a software problem,

2    and I do have things to prove that.

3    Q.   Okay.   How would you describe your

4    working relationship with Karen Ingram?

5    A.   Professional.

6    Q.   Do you have any reason to doubt her

7    tendency to tell the truth?

8    A.   I do not know.   I don't know her

9    personally.

10   Q.   Al Ballard, are you familiar with him?

11   A.   Yes, I do.

12   Q.   And how would you describe your working

13   relationship with him?

14   A.   Also professionally.

15   Q.   Any reason to believe she had a tendency

16   not to tell the truth?

17           MR. BATTAGLIA:   You said "she."

18           MR. McMACKIN:   I'm sorry, I'll start

19   the question over again.

20           MR. BATTAGLIA:   Gender.

21   BY MR. McMACKIN:

22   Q.   With respect to Al Ballard, do you have

23   any reason to suspect that Mr. Ballard has a

24   tendency to not tell the truth?

Le T. Le

36

1    conflicts between yourself and Emerson Gale?

2        A.  Not that I know of.

3        Q.  Same question with regard to Melvin

4    Tuller?

5        A.  Also not that I know of, no.

6        Q.  Did your sister Chau Le ever have

7    occasion to work with Jim O'Donnell?

8        A.  I do not know.  I never asked her about

9    that, so I do not know.

10       Q.  Did she ever have any complaints to you

11   about Jim O'Donnell?

12       A.  I also do not know.

13       Q.  Did your sister Chau Le ever have

14   occasions to work with Joe Capodanno?

15       A.  I don't know.

16       Q.  Did she ever complain to you about Joe

17   Capodanno?

18       A.  Don't know either.

19       Q.  Do you think you speak with an accent?

20       A.  I believe I do have an accent, but it's

21   understandable.  Nobody else has an issue with my

22   accent before, or at least nobody ever tell me to

23   my face that they have an issue with my accent.

24       Q.  So with regard to the incompetence issue



Le T. Le

37

1    that we were talking about a couple of minutes

2    ago, I believe you said that Jim O'Donnell had

3    said things about your competence.  Are you aware

4    of Joe Capodanno ever saying anything about your

5    competence?

6        A.   I guess the same thing with Joe, even

7    though he never said it to my face or never said

8    it that I could hear.  His action, when he came

9    to the IT department, also show that he thought

10   very little of me and the network group.

11       Q.   Okay.

12       A.   He, the same way as Jim O'Donnell, never

13   meet with us.  I do not know why he became the

14   manager of IT even though he have no, he has no

15   IT experience or background.  He was put in there

16   by Jim O'Donnell, and when he became the manager

17   of IT, he never meet with us also to get to know

18   us, to get to know our ability, and he just bring

19   in his own people, just like Jim.

20       Q.   Do you know whether Capodanno ever met

21   with the help desk?

22       A.   I do not know.

23       Q.   How about with communications?

24       A.   I do not know.

Le T. Le

38

1    Q.   Word processing?

2    A.   Word processing is right directly under

3    Joe Capodanno, so he might have talked to them,

4    but I do not know if he met with him.

5    Q.   Do you know if he met with finance?

6    A.   I do not know.

7    Q.   Okay.

8         So other than the fact that you

9    believe Mr. Capodanno and Mr. O'Donnell thought

10   you were incompetent and you were terminated, do

11   you have any reason to suspect that either one of

12   them took any action against you on the basis of

13   your national origin or your race?

14        MR. BATTAGLIA:   I'm going to object

15   to the form of the question because it does not

16   include all of the testimony that the witness has

17   given on those issues.

18   BY MR. McMACKIN:

19   Q.   Other than the testimony that you've

20   given with regard to the reasons you believe

21   Mr. Capodanno and Mr. O'Donnell discriminated

22   against you on the basis of race, do you have any

23   other reason to believe that they discriminated

24   against you on the basis of race or national

Le T. Le

39

1    origin?

2        A.   Could you repeat that slowly?

3        Q.   Sure.

4            Other than the reasons that you've

5    given thus far for the reasons you believe that

6    Messrs. O'Donnell and Capodanno discriminated

7    against you on the basis of national origin and

8    race, do you have any other reason to suspect or

9    believe that either of them discriminated against

10   you on the basis of race or national origin?

11       A.   There were -- no.  There were incidents

12   that led me to believe that besides the one that

13   I told you.  There were time when I was

14   disciplined for something that wasn't my

15   responsibility.

16           And one time when there was a power

17   outage on the building on a Saturday, Terry and I

18   came in to turn on the server that were our

19   responsibility and we make sure those server up

20   and running.  And Dennis Cherrin, the other

21   manager, was supposed to come in, or at least

22   responsible for the finance server that he was

23   responsible for and he failed to do so.  And it

24   took us a couple hours to get those things up and

Le T. Le

40

1  running for people so the user would not

2  complain, and yet Dennis Cherrin did not get

3  disciplined, even though it was his

4  responsibility.

5       The time when Melvin Tuller failed to

6  back up and restore a file, I got disciplined

7  even though it wasn't my responsibility.  And Joe

8  Capodanno forces Terry to lower one of my

9  evaluation by a few points because of that.

10      Q.  With regard to the Dennis Cherrin

11  incident first, how were you disciplined?

12      A.  I wasn't written up, but I was told why I

13  was -- basically I was yelled at why didn't we

14  have those server up and running for users,

15  because users were complaining to Jim O'Donnell

16  of not being able to get into the system, but it

17  wasn't our system that they could not get in.

18      Q.  Did you take -- or were you subject to

19  any other discipline for that incident?

20      A.  No.  Just the verbal.

21      Q.  Okay.  And you said Capodanno yelled at

22  you?

23      A.  I believe it was Jim.

24      Q.  Did he yell at you any other time?



Le T. Le

41

1      A.   Not at me, no.  Not any other time, no.

2      Q.   And was O'Donnell led to believe that it

3   was your responsibility, not Dennis Cherrin's

4   responsibility, by anyone?

5      A.   No, it was, I believe everybody

6   understand it was Dennis Cherrin's

7   responsibility.  It was always been his

8   responsibility for those finance server.

9      Q.   And does O'Donnell have a finance

10   background or an IT background, do you know?

11      A.   As far as I know, he has a finance

12   background.

13      Q.   So would he know that that server was

14   Sharon's responsibility and not yours?

15      A.   I believe so.

16      Q.   Why's that?

17      A.   Because he work with Dennis before and he

18   knows what Dennis responsibility is.

19      Q.   When did this occur that you were yelled

20   at?

21      A.   I do not remember.

22      Q.   Was it in 2006?

23      A.   I do not remember.

24      Q.   In 2007?

1    A.   I would say roughly around 2006, but I

2    don't remember exact date.

3    Q.   The Melvin Tuller incident, you said that

4    Tuller wasn't disciplined and you were for a

5    power outage; is that correct?

6    A.   Not the power outage.   That was a time

7    when one of the users --

8             MR. BATTAGLIA:   I'm sorry, I need to

9    object because I don't know that he used the

10   word "disciplined."   That's the questioner's -- I

11   just object to the form.

12   BY MR. McMACKIN:

13   Q.   With respect to Melvin Tuller, you said

14   there was an incident with Mr. Tuller --

15   A.   Uh-huh.

16   Q.   -- where Mr. Tuller wasn't disciplined,

17   but you were; is that correct?

18   A.   It wasn't disciplined as in a verbal or

19   written up, but they used that as a way to lower

20   my evaluation.

21   Q.   What did Mr. Tuller do and what did you

22   do, explain the incident to me.

23   A.   Melvin Tuller responsibility at that time

24   was to back up and restore files for the city's



1      user, and one time he failed to back up and

2      restore a file for one of the Wilmington user.

3      And that, basically the user complained and Joe,

4      I guess, said I did it, that it was my

5      responsibility and I was supposed to handle that.

6      And so he used that as the basis to force Terry

7      to lower my evaluation.

8          Q.  Is Melvin black?

9          A.  Yes.

10         Q.  Why would -- let me start the question

11     over again.

12             Do you have any reason to suspect

13     that Mr. Capodanno or Mr. O'Donnell took an

14     incident that another minority was responsible

15     for, took it out on you?

16         A.  Because from my belief, Melvin Tuller was

17     not a threat to him as I was.

18         Q.  Why were you a threat to -- who were you

19     a threat to, first of all?

20         A.  When Jim and Joe came into office,

21     because of their background, they have no IT

22     experience, they were afraid that because myself

23     and Terry, we are a minority and we know more IT

24     than they do, they are afraid that we would do

1   something to take the position away from them,

2   which we were never -- those were never in our

3   mind.   We were just trying to be professional and

4   do our work.   While Melvin Tuller, he also, he

5   doesn't know much about computer, so he wasn't a

6   threat to his directorship or managership.

7       Q.   So we got Capodanno and O'Donnell, they

8   are two older white guys; right?

9       A.   (Witness nods.)

10      Q.   And they are not the most tech savvy

11  people in the world, is that a fair statement?

12      A.   Yes.

13      Q.   Okay.   They are not IT background folks;

14  right?

15      A.   Yes.

16      Q.   They are administrators?

17      A.   Excuse me?

18      Q.   They are administrators?

19      A.   Yeah, you could say they are like

20  management.

21      Q.   Long-time City employees?

22      A.   Possibly.   I do not know their history.

23      Q.   Okay.   Probably not the most technically

24  capable persons to be working in an IT field, is



1    that a fair statement?

2        A.   Yes.

3        Q.   And you and Mr. Jones, you guys were real

4    good with computers; right?

5        A.   **I get my work done.**

6        Q.   When there were issues with the computer

7    system, Joe and Jim would look to you and Terry

8    to fix them; is that right?

9        A.   **He would look to the consultant that he**

10   **brought in for guidance and he would tell the**

11   **consultant to go to us to oversee what we do.**

12       Q.   Were you and Mr. Jones much more capable

13   of running the IT group than were Jim and Joe on

14   a technical level?

15       A.   Yes.

16       Q.   And is that why you think that they saw

17   you as a threat?

18       A.   Yes.

19       Q.   Do you think they were kind of looking

20   out for their own best interest?

21       A.   I don't know.

22       Q.   Were there network connectivity issues

23   before Joe and Jim started in the IT group?

24       A.   **As I say earlier, there were always**



Le T. Le

47

1       A.   It was Terry's idea.

2       Q.   Okay.   Are you sure that Jim or Joe

3    didn't instruct Terry to do that?

4       A.   That was before Jim came aboard.

5       Q.   Okay.   You were here when Mr. Jones

6    testified; right?

7       A.   Yes.

8       Q.   And Mr. Jones testified that the reason

9    they got rid of the network group was because Jim

10   and Joe saw Terry as a threat to them.   Do you

11   recall that testimony?

12              MR. BATTAGLIA:   I'm going to object

13   to the question because it doesn't include the

14   full context of the reason.

15              MR. McMACKIN:   I'll start over.

16   BY MR. McMACKIN:

17      Q.   Do you recall Mr. Jones' testimony that

18   one of the reasons Jim and Joe wanted to

19   outsource the network group was because they

20   viewed Terry as a threat?

21      A.   I recall that, yes.

22      Q.   Do you dispute that testimony?

23      A.   I do not dispute what Terry believes in.

24      Q.   Okay.   In your view, were you -- excuse

Le T. Le

48

1    me.  Let me start the question over.  I

2    apologize.

3              In your view, was the decision to

4    outsource the network group made primarily

5    because Jim and Joe thought the network group

6    individuals were a threat to them or because of

7    your race and national origin?

8         A.  Both, I would say, in my view.

9         Q.  Does one outweigh the other?

10        A.  I would say equally.

11        Q.  Are you aware of any documents in the IT

12   department that set forth how to manage the

13   network while you were employed by the City?

14        A.  What do you mean by "how to manage the

15   network"?

16        Q.  Perhaps an overlay of what systems need

17   to be updated on what basis and what connects to

18   what?

19        A.  I mean we have documents where we put

20   together once in awhile.  If there is addition to

21   the server, I sometimes keep documents of

22   network, like network diagram of the different

23   server and what -- or which router it connect to,

24   any new addition to the computer in the City,

51

1          THE WITNESS:  Excuse me.

2    BY MR. McMACKIN:

3        Q.  The question is, are you aware of any

4    documents that show that your evaluation was

5    decreased as a result of the Melvin Tuller

6    incident?

7        A.  No, I don't have the document on it, but

8    that would be the only reason since there were no

9    other incident that would, that would do that.

10       Q.  At a certain time, you became informed

11   that your group may be outsourced; is that

12   correct?

13       A.  Yes.

14       Q.  If I were to tell you that that was

15   around January 8th, 2007, is that about right?

16       A.  I would say that's about right.

17       Q.  And you were told that you may be

18   outsourced subject to City Council approval; is

19   that correct?

20       A.  Yes.

21       Q.  Okay.  And were you told that unless you

22   found other work, your employment would terminate

23   as of June 30th?

24       A.  Yes.



Le T. Le

54

1    Q.   They don't have an IT background; is that

2    correct?

3    A.   Yes.

4    Q.   So what is the basis for your suspicion

5    that they knew it was a software issue, but

6    instead concluded that it was a network issue?

7    A.   **Because we told them about that.**

8    Q.   And they were getting different

9    information from other people; is that right?

10   A.   **That I do not know.**

11   Q.   Could Joe or Jim decide to eliminate the

12   network group or did that have to be approved by

13   City Council?

14   A.   **I do not know the process, but I think it**

15   **would be through City Council.**

16   Q.   While you were working for Joe and Jim,

17   did they permit you to take training classes

18   outside of the City?

19   A.   **Not during their time.**

20   Q.   Did they pay for you to take training

21   classes?

22   A.   **Not during their time.**

23   Q.   So you were never permitted to take any

24   training?

Le T. Le

55

1    A.   I was taking training.   I took two

2    training class, but that was before they

3    became -- they came to IT.

4    Q.   Did they permit you to take vacation

5    days?

6    A.   Yes.

7    Q.   Did they treat you with respect when they

8    talked to you?

9    A.   I don't think so.

10    Q.   Why is that?

11    A.   Because of the way how they just came in

12    and just take their people in and not bother to

13    take our advice, even though after they go

14    through their consultant, it will be the same

15    things as what we told them.   So not taking what

16    we said at heart and not believing us when we

17    tell them something, that shows me that they are

18    not respecting me as a person and as an IT

19    personnel.   And Joe just give orders instead of

20    talking to me as a co-worker, he would just give

21    order and expect it to get done.

22    Q.   Did he do that with everybody, or just

23    with you?

24    A.   I do not know.

Le T. Le

56

1    Q.  Okay.  When he spoke with you, did he

2    speak in a civil tone?

3    A.  A civil tone?

4    Q.  Yes.

5    A.  Normal?

6    Q.  Normal conversational tone?

7    A.  More of a commanding tone, like you have

8    to do this.

9    Q.  Was he ever berating you?

10   A.  Excuse me?

11   Q.  Did he ever berate you?

12   A.  Not that I remember.  I don't remember

13   that.

14   Q.  How about Jim O'Donnell, did he ever

15   berate you?

16   A.  I don't remember that either.

17   Q.  After you received word that you may be

18   outsourced on January 8th, 2007, up until you

19   were terminated, was the City making efforts to

20   try to find other jobs for you within the City?

21   A.  What kind of effort do you mean?

22   Q.  Were you sent postings of available jobs?

23   A.  Yes, I was sent postings.

24   Q.  Did you have meetings with the labor

Le T. Le

57

1    relations people about trying to put you in other

2    jobs?

3        A.   I believe I had a meeting where they said

4    they would try, though I don't know if they do or

5    not.

6        Q.   Does Martha Gimbel's name ring a bell?

7        A.   Yes, I know her.

8        Q.   Did you meet with her about trying to

9    find other work in the City?

10       A.   I did.

11       Q.   And did she tell you that she was going

12   to schedule a skills assessment for you to

13   determine what other jobs you'd be a good fit

14   for?

15       A.   Yes, I remember that.

16       Q.   Did she ever tell you that there was not

17   going to be another position for you in the City

18   after June 30th, 2007?

19       A.   I don't remember that.

20       Q.   Other than Terry Jones, did anybody at

21   the City ever tell you that there wasn't going to

22   be a position for you at the City after

23   June 30th, 2007?

24       A.   I don't remember that.

Le T. Le

59

1     If I were to tell you that other

2 people have stated that the network group was

3 particularly protective of information that they

4 had access to, would you agree or disagree with

5 that statement?

6  A. Could you repeat that again?

7  Q. Sure. If I were to tell you that people

8 have stated that the network group was

9 particularly protective of information that they

10 had access to, would you agree or disagree with

11 that statement?

12  A. Of course I would.

13  Q. Why's that?

14  A. Because those are sensitive information

15 and you cannot just come in and expect us to give

16 information out to anybody. That's security

17 violation. We have to make sure that, you know,

18 the person coming in depend on what they do, they

19 only have access to certain information that

20 pertaining to what they come in for. And because

21 we have to cover ourself in case if something

22 happen when a consultant come in and having too

23 much information, just like one of the incident

24 where a person that was hired by Jim O'Donnell to

Le T. Le

60

1    come in and do a network assessment, what he did

2    was he ran some hacking software on the network

3    internally and that locked out pretty much

4    everybody in the system in the City, and that was

5    something that we were trying to prevent.

6        Q.   Would you agree that Jim and Joe had no

7    input on whether or not you were going to be

8    allowed to exercise bumping rights?

9        A.   I do not know.

10       Q.   Would you agree that Jim and Joe had no

11   input on whether or not you were going to get

12   another position in the City?

13       A.   I do not know that.

14       Q.   Some people have referred to you as Terry

15   Jones' right-hand man.  Would you agree or

16   disagree with that statement?

17       A.   It depend on what it refer to.  If it

18   talks about work where I am his assistant to do

19   things related to the network fixing issue, he

20   would ask me to fix issues and I would go and get

21   my other issue fixed relating to network in that

22   regard.

23       Q.   I'm sorry, I didn't mean to interrupt

24   you.



Le T. Le

64

1    elsewhere in the City besides in the network

2    group?

3         A.   Excuse me?  Could you repeat that?

4         Q.   On June 5th, 2007 --

5         A.   Yes.

6         Q.   -- you removed software from the City; is

7    that correct?

8         A.   Yes.

9         Q.   And that was before June 30th, 2007;

10   right?

11        A.   Yes.

12        Q.   And you were still employed at least

13   through June 30th, 2007; is that correct?

14        A.   Yes.

15        Q.   Or sorry, you were supposed to have been

16   employed at least through June 30th; is that

17   correct?

18        A.   Yes.

19        Q.   As of June 5th, were you still trying to

20   find other work within the City?

21        A.   Yes, I was.

22        Q.   Okay.  And as of June 5th, had anybody at

23   the City told you that there was not going to be

24   other work available for you come June 30th?

Le T. Le

65

1    A.   I don't recall that.

2    Q.   Okay.  As of June 5th, were you scheduled

3    for a skills assessment?

4    A.   I do not remember.

5    Q.   Were you ever issued an order telling you

6    not to alter or remove software?

7    A.   Yes.  That would be, depend on what kind

8    of software or what kind of changes were made on

9    the network.

10   Q.   I'm going to show you a document.  If we

11   can mark this as Exhibit 1, please.

12           (DX-1 was marked for identification.)

13   BY MR. McMACKIN:

14   Q.   When you've had an opportunity to review

15   DX-1, please let me know.

16   A.   Yes, I've seen that.

17   Q.   Are you familiar with this document?

18   A.   Yes.

19   Q.   Did anybody ever tell Joe or Jim that

20   this only applied to certain software?

21   A.   I do not know if anybody tell him that.

22   Q.   Do you have any reason to suspect that

23   Joe or Jim knew that you were allegedly permitted

24   to remove the instant ticketing software?

Le T. Le

68

1      A.   It's about right.   I don't know the exact

2   date, but in 2007.

3      Q.   Any time between when it went live and

4   June 5th, 2007, did you remove the instant

5   ticketing software?

6      A.   I don't remember exactly when I removed

7   it, because there's so many times I did remove it

8   and put it back on, so I don't know when all

9   those --

10     Q.   So you don't know --

11     A.   I don't know when all those incidents

12  are.

13     Q.   So you don't know if after the date it

14  went live until June 5th, 2007, there were any

15  times when you removed the instant ticketing

16  software; is that correct?

17     A.   Yes, I don't remember.   Might not.   I

18  don't remember.

19     Q.   And are you aware of any times when

20  instant ticketing -- I'll drop the question.

21          Other than the fact that you've

22  stated that Jim and Joe knew you were removing

23  and adding the software prior to June 5th, 2007,

24  are you aware of any other reason to suspect that

1   Jim or Joe knew that the software that dealt with

2   instant ticketing was exempt from Terry Jones'

3   order prohibiting adding and removing software

4   from the network?

5       A.  Could you repeat that?

6             MR. McMACKIN:  Could you read that

7   back, please.

8             (The pending question was then read

9   back by the reporter.)

10            THE WITNESS:  I don't know.

11  BY MR. McMACKIN:

12      Q.  When you removed the software on

13  June 5th, 2007, did you tell anybody before him

14  that you were going to remove it?

15      A.  I told Jeff Starkey, the commissioner of

16  L&I, a couple of months before that when I leave

17  the City I was going to take my -- whatever

18  belonged to me with me, and I also told Terry

19  that when I leave the City, I'm going to take

20  whatever belongs to me with me.

21      Q.  When you stated that, did you state that

22  you were going to remove the instant ticketing

23  software specifically, or did you just state in

24  generalities that you were going to take what you



1   thought belonged to you?

2       A.   I just -- I didn't specifically say it

3   was instant ticket because there were other

4   things that I brought in to work that I would

5   take home with me.

6       Q.   Like pictures, stuff like that?

7       A.   Pictures.  I have a printer that belonged

8   to me.  I have a heater and stuff like that that

9   belonged to me that I would take home.

10      Q.   Did you get permission from anybody to

11  remove the instant ticketing software on

12  June 5th, 2007?

13      A.   I don't need the permission to take it

14  off because, as I said earlier, I was taking it

15  off and on at will, even prior to Jim and Joe

16  came into IT.  So I didn't need the permission to

17  take it off or put it on.

18      Q.   To your recollection, though, did you

19  ever take it off after it went live?

20      A.   I don't remember.

21           MR. McMACKIN:   I'm going to show the

22  witness a document that I please ask be marked as

23  Exhibit 2.

24           (DX-2 was marked for identification.)



1     me, and I have done that previously, take it off

2     and put it on.  As I said earlier, I have done

3     that numerous time and there were no issue with

4     anybody when I did that.  And so there was no

5     need for me to ask him because I never make any

6     changes to the network.  According to myself,

7     those are not changes to the network that was

8     belonging to the City.  I purely take whatever

9     belong to me, and I left the part that belong to

10    the City.

11        Q.   What part was that?

12        A.   I only took the code with me.  I left

13    everything else intact, which is the database and

14    the data, and I told Jim O'Donnell and Joe

15    Capodanno that I left the part that I work at the

16    City on the server intact and that all the data

17    were still there if they need it.  I only took

18    the source code, which is what I copyright and

19    what belonged to me.  Those are the only thing

20    that I took.

21        Q.   Would you agree that without the source

22    code and the program itself the instant ticketing

23    software was useless for the City to use?

24        A.   I would say so.



1     Q.   Do you have any reason to suspect that

2    Jim O'Donnell and Joe Capodanno knew that

3    removing the instant ticketing software was not a

4    change to the network?

5     A.   I would not know.

6     Q.   Before June 5th, 2007, had you told

7    anybody at the City that the instant ticketing

8    software was allegedly your property?

9     A.   I have numerous talks to Jeff Starkey

10    when I implement the software on the City's

11    network and let Jeff and his people in L&I test

12    it out.   Jeff asked me when will I copyright the

13    software, and I told him that I will copyright it

14    when I feel comfortable that it's working

15    correctly to copyright.   And he told me that he

16    will help me market the software after I get my

17    copyright done.

18     Q.   Had you told anybody else at the City

19    besides the L&I people?

20     A.   No, because that only -- I only dealt

21    with the L&I people in regard to the instant

22    ticket.

23     Q.   So you have no basis to believe that Jim

24    or Joe knew that the instant ticketing software



Le T. Le

75

1    was allegedly your property before June 5th,

2    2007; is that correct?

3              MR. BATTAGLIA:  Objection to the form

4    of the question.

5              MR. McMACKIN:  What's the objection,

6    please?

7              THE WITNESS:  You phrase it -- could

8    I hear the question once again, please.

9              (The pending question was then read

10   back by the reporter.)

11             MR. BATTAGLIA:  Okay, I'll withdraw

12   the objection.

13   BY MR. McMACKIN:

14      Q.  You can answer the question.

15             MR. BATTAGLIA:  Yes, go ahead.

16             THE WITNESS:  I do not know if they

17   know or not.  They never asked me about it.

18   BY MR. McMACKIN:

19      Q.  At the time of June 5th, 2007, would you

20   agree that the City was using the software to

21   issue instant tickets?

22      A.  Yes.

23      Q.  And once it was removed, the City could

24   not issue instant tickets; is that correct?

Le T. Le

76

A.   Yes.

Q.   Were you ordered to put the software back on the network?

A.   I was threatened with prosecution and arrest if I don't put it on.

Q.   Who threatened you?

A.   During the first meeting, it was Joe Capodanno and Jim O'Donnell, and Joe was the one that said somebody please call the cop.

Q.   Is that a quote of what he said or did he say something along the lines of "You could have been arrested for this"?

A.   I believe he said "Somebody please call the cops," and that is the part that I remember the most.  I don't remember -- I don't recall what else that he say.

The second meeting I had a couple minutes later, there were Monica Gillespie and I believe Brenda James-Roberts was there, and Monica was the person that said you could be prosecuted for this.

Q.   Who was present when Joe allegedly said, "Somebody call the cops"?

A.   Jim O'Donnell was there.

**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1        Q.  Was anybody else there besides yourself,

2    Jim and Joe?

3        A.  I don't remember who else.

4        Q.  Did anybody heed that order to call the

5    cops?

6        A.  I do not know.

7        Q.  Did the cops show up?

8        A.  Not that I seen, no.

9        Q.  Okay.

10           Why didn't you just take a copy of

11   the program?  Why did you take the program off

12   the system?

13       A.  Well, the program is mine.  When I leave,

14   I could take it with me.  Just like if I go to

15   the store and purchase an already made program on

16   a weekend with my own money and bring it on

17   Monday to install it, when I leave the City, I

18   could either take it with me or the City going to

19   have to pay me or purchase that software.  And if

20   the City is not paying me for it, I could just

21   take the software with me.

22       Q.  You weren't leaving as the June 5th, were

23   you?

24       A.  No, I wasn't.



Le T. Le

78

1     Q.  Why did you decide on June 5th that you

2    were going to take it off the network?

3     A.  Because it was mine.  I can decide when I

4    take it off.

5     Q.  You didn't care that the City was using

6    it?

7     A.  It doesn't matter if the City's using it

8    or not.  I mean if it was mine I could take it

9    off and on at will.

10     Q.  The City's a public entity; right?

11     A.  Yes.

12     Q.  And there's thousands of citizens under

13    the jurisdiction of the City of Wilmington, is

14    that a fair statement?

15     A.  I would say so.

16     Q.  And one of the responsibilities of the

17    City government is to provide for the health,

18    welfare and safety of the citizenry; is that

19    correct?

20     A.  Uh-huh.

21     Q.  And it's your belief that because it's

22    yours it didn't matter what effect removing the

23    software would have on the City; is that correct?

24     A.  Excuse me?



Le T. Le

1       A.   Before June 5th, actually.

2       Q.   Well, how did they know that you were

3   going to take the software on June 5th?

4       A.   They don't.  I never tell them when.  I

5   just told them when I leave the City, I will take

6   it with me.  I never specified when, but I told

7   Jeff Starkey a few months prior to that.

8       Q.   You testified before that you had told

9   Mr. Starkey that when you left you were going to

10  take what belonged to you, but you didn't make

11  specific reference to the program.

12      A.   Well --

13      Q.   Now you're saying you did.

14      A.   Sorry.

15      Q.   Which is correct?

16      A.   Because the only thing that I worked with

17  Jeff Starkey on is the program.  When I tell him

18  that when I leave I'm going to take what belong

19  to me with me, he would know that I was talking

20  about the instant ticket, because that's the only

21  thing that I worked with him on.

22      Q.   Are you assuming that he would know that

23  or did you know that he would know that?

24      A.   If he did not know that, he would not say

**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Le T. Le

82

1      if the City wants it, they will pay you for it.

2          Q.   Did Joe or Jim on June 5th, 2007, ask you

3      for a copy of the copyright certificate?

4          A.   He asked me if I have copyright it.

5          Q.   And what did you say?

6          A.   I said that I already send in the

7      application.  I haven't received the certificate

8      yet.

9          Q.   Did Brenda, Monica, Jim and Joe convince

10     you to put the software back on the system?

11         A.   If you mean convinced by threaten me with

12     prosecution, then you can say that.

13         Q.   Did Brenda and Monica threaten you with

14     prosecution?

15         A.   Monica did.

16         Q.   Initially did you refuse to reinstall the

17     software?

18         A.   Yes, I would.

19         Q.   And that was because you contended that

20     it was yours; is that correct?

21         A.   Yes.  Because it was mine.  I will not

22     put it back on -- I told them I will not put it

23     back on because it was mine.

24         Q.   When you remove the software, was anybody

1   else present?

2       A.   No.

3       Q.   When you reloaded it, was anybody else

4   present?

5       A.   I believe another person was present.   I

6   don't recall who.

7       Q.   Did you know that James Lewis got another

8   job in the City?

9       A.   Yes, I heard about that.

10      Q.   And was he black?

11      A.   Yes.

12      Q.   Or is he black?   I guess people don't

13  change color.   Is he an African-American?

14      A.   Yes.

15      Q.   Did you ever think that James Lewis was

16  discriminated against on the basis of race?

17      A.   I believe so.

18      Q.   What makes you think that he was

19  discriminated against on the basis of race?

20      A.   Well, it was discriminate against the

21  whole network group.

22      Q.   Other than the Melvin Tuller incident

23  that we talked about before, the network cable

24  incident that we talked about before, did Joe or



Le T. Le

84

1    Jim ever complain to you or criticize you for

2    your performance?

3        A.   Not to my face, no.

4        Q.   And you said not to your face, because

5    I'm assuming you heard stuff from Terry Jones; is

6    that correct?

7        A.   I mean when I say "not to my face," I

8    don't know of anything else.

9        Q.   Okay.  Did Terry Jones tell you that Jim

10   or Joe complained or criticized you?  Excuse me.

11   Complained about you or criticized you?

12       A.   You mean besides the fact that they say

13   we're incompetent?

14       Q.   Correct.

15       A.   I remember they told Terry Jones that

16   they could not understand my accent.

17       Q.   Okay.

18            And Terry Jones told you about that;

19   is that right?

20       A.   Yes.

21       Q.   Did they ever tell you that they couldn't

22   understand your accent?

23       A.   Joe actually did tell me that he did not

24   understand me.



1    A.   No, I did not.

2    Q.   Why not?

3    A.   I believe it was just a moot point to

4  file any grievance because Jim and Joe and Monica

5  are pretty much in the group together, and it

6  would not do me any good to file a grievance

7  because of an example where Terry was falsely

8  accused of something he did not do and he filed a

9  grievance, and even though it got to Bill

10  Montgomery, nothing was said.  He was still

11  disciplined for something he did not do.

12    Q.   Was that the network cable plug-in

13  incident that you're referring to?

14    A.   Yes.

15    Q.   And would you agree with me that while

16  Mr. Jones may not have actually plugged the cable

17  in himself, he was responsible for overseeing the

18  job?

19    A.   He was responsible for overseeing the

20  job, but also one of the consultants was

21  responsible for overseeing the job, which is

22  Roland.  He was there at that time also

23  overseeing the job.  Somehow Terry was the only

24  one responsible for it even though he's not the



1   person that actually done the deed.  Even when

2   saying he's responsible for it, he could never be

3   around everybody because at that time not

4   everybody was at the same place, so he cannot be

5   around all the people to monitor them every

6   second to know what they have done.  So there are

7   mishaps that happen, but you know, you cannot

8   blame the blame on -- something on just him alone

9   and not the person that actually did the deed.

10      Q.  You said that you did not get a copy of

11  your 2006 evaluation.  Do you recall that?

12      A.  Yes.

13      Q.  Did you ever follow up with anybody to

14  ask where that evaluation was?

15      A.  I remember asking Terry, but Terry said

16  he doesn't know either.

17      Q.  Did Joe or Jim ever make any racially

18  insensitive statements or comments that you

19  heard?

20      A.  Not that I heard.

21      Q.  And did they ever make any racially

22  insensitive statements or comments that they said

23  to others that were relayed to you?

24      A.  I don't know that.



1    Q.   Same questions with regard to national

2    origin.   Did you hear Jim or Joe make any --

3    excuse me, any comments that were insensitive to

4    one's national origin?

5    A.   I don't know that.

6    Q.   And was it ever relayed to you that they

7    made comments that were insensitive to one's

8    national origin?

9    A.   I don't know that either, no.

10            From my opinion, actions speak louder

11   than words.   Sometimes you don't have to say

12   something.   Your action would show it.

13   Q.   Thank you.   You allege in your initial

14   disclosure that Jim and Joe have a history of

15   making statements that demonstrate a

16   predisposition to discriminate on the basis of

17   race.

18            Now, in light of the fact that you

19   just told me that they haven't made any

20   statements that you heard or that were relayed to

21   you that were insensitive on the basis of

22   national origin or race, why have you stated that

23   they have a history of making statements that

24   demonstrate a predisposition to discriminate?

1    that, if I remember correctly, that -- I'm not

2    sure if he knows or if he heard from other

3    people, that there were a history of -- that Joe

4    Capodanno made comments relating to race.

5       Q.   In our production, we produced a copy of

6    Joe Capodanno's employment file.  Did you have an

7    opportunity to take a look at it?

8       A.   Yes, a little bit.

9       Q.   And would you agree that Joe Capodanno

10   has been a City employee for approximately 35

11   years?

12      A.   Yes.

13      Q.   Did you see any discipline in his file?

14      A.   No.

15      Q.   How about Jim O'Donnell, he's been an

16   employee for 20 something years; is that right?

17      A.   Yes.

18      Q.   And did you see any discipline in his

19   file?

20      A.   No.

21      Q.   Did you see any record in either of their

22   files in the 55 years or so of employment that

23   they have with the City that they have ever been

24   disciplined or reprimanded for making any sort of



Le T. Le

91

1   insensitive comment?

2       A.   Not that I could see, no.

3       Q.   You allege Capodanno and O'Donnell spread

4   rumors.   Were you referring to rumors that you

5   heard from Jones that the network group was

6   incompetent, or were you referring to something

7   else?

8       A.   That it was incompetence.

9       Q.   Anything else?

10      A.   I believe that was it.

11          MR. McMACKIN:   I'm at a logical

12   breaking point, and we're at about 12:25.   Why

13   don't we take as quick a break as possible.

14          MR. BATTAGLIA:   We'll be back as

15   quickly as we can.

16          MR. McMACKIN:   Yeah, I'll be ready to

17   start whenever you get back, so the sooner the

18   better.   It's Friday night.

19          MR. BATTAGLIA:   Can I leave my stuff

20   here?

21          MR. McMACKIN:   Absolutely.   I

22   represent I will not touch it.

23          VIDEO SPECIALIST:   Off the record at

24   12:22 p.m.



1          (Lunch recess, 12:22 p.m.)

2          (Resumed, 1:10 p.m.)

3          VIDEO SPECIALIST:   On the record at

4    1:10 p.m.

5    BY MR. McMACKIN:

6       Q.  Mr. Le, did you and Terry Jones ever talk

7    about feeling as if you were discriminated

8    against?

9       A.  During the time we were there or after

10   or?

11      Q.  At any time?

12      A.  Yes, we did.

13      Q.  Was that while you were still employed

14   with the City or afterwards?

15      A.  While we were employed.

16      Q.  What was said?

17      A.  We -- basically we talked about we think

18   we were targeted because we were minority based

19   on, you know, the fact that they came in and they

20   would not listen to any of our advice on the

21   network bringing in their own people to oversee

22   what we were doing as though we were a criminal

23   or untrustworthy.  They never met with us to

24   know, okay, is what we're doing correct, is what

1   we are doing our job responsibility?  Are we

2   being professional?  They just came in, Jim and

3   Joe came in and brought in their own people and

4   just start putting those consultants on top of us

5   and to monitor what we did.

6      Q.  Was every consultant that they brought in

7   Caucasian or were there some minorities?

8      A.  The one that I know of in the IT

9   department are Caucasian.

10      Q.  You're not aware of any minorities that

11   were brought in by Jim or Joe?

12      A.  As far as the IT staff that they brought

13   in, I do not know any other one besides that.

14      Q.  What about Demond May?

15      A.  Demond, I don't recall.

16      Q.  Did Joe or Jim ever say that you were

17   hard to work with?

18      A.  I don't recall that.

19      Q.  Did Joe or Jim ever say that you don't

20   take orders well?

21      A.  I do not recall that.

22      Q.  Do you agree that when consultants were

23   brought in to work at the City that this cost the

24   City money?



Le T. Le

94

1       A.   Of course it cost the City money.

2       Q.   And do you agree that the vendors --

3   excuse me.  Do you agree that the consultants

4   were brought in frequently, infrequently, how

5   often?

6       A.   The consultant were brought in

7   frequently.  Even though sometime they are not

8   needed, they were brought in to oversee what

9   we're doing.  Sometime the work was done by us,

10  but they were brought in by Jim O'Donnell and Joe

11  Capodanno, because they need the consultant to

12  look over us.  I do not know for whatever reason,

13  they do not trust us, they do not take advice

14  from us because of our -- because we're a

15  minority and we know more than them.  That's what

16  I would think, and they brought their own

17  consultant in just to follow some of our work and

18  make sure we, you know, our work was done

19  correctly, but that was not needed.  We weren't

20  doing anything outside what we were supposed to

21  do.

22      Q.   During the break that we took for lunch,

23  I'm assuming that you and Mr. Battaglia didn't

24  talk about the case at all, did you?



1    to people or whatever work I've done that I have

2    to watch for people to look at to watch over me.

3    There a time when I went to off site in remote

4    building to do my work, and when I came back, I

5    was told that Jim -- Joe Capodanno was in my

6    office looking for me.  I don't know what for.  I

7    mean he could just send me an e-mail or give me a

8    call and leave a voicemail.  I mean he has no

9    reason when I'm not there to go into my offices.

10            I just feel as though, you know, I

11   wasn't welcome, a welcome part of the IT.  I was

12   no longer a part of IT when Jim O'Donnell and Joe

13   Capodanno came, because they made it so that it's

14   really hard to get any work done without having

15   to go through so many obstacles trying to get

16   your work done.

17      Q.  Anything else?

18      A.  That's about what I could remember for

19   now.

20      Q.  Would you agree that Jim and Joe got

21   along well with James Lewis?

22      A.  I would not know that.

23      Q.  Did you ever see them arguing or

24   bickering?



Le T. Le

1    A.   I don't remember.   I mean I'm never

2    around with any of them that much, so I couldn't

3    say.

4        Q.   Where was your office in relation to

5    James Lewis' office?

6        A.   My office was actually right close to

7    James' office.   Just right next to or maybe an

8    office away from James' office.   I don't recall

9    the exact location.

10       Q.   And you don't recall Mr. Lewis

11   interacting with Jim or Joe at all?

12       A.   I mean I do not pay attention to other

13   people in direction with their co-worker.   They

14   might have interact, but I don't know.   I mean

15   I'm not sure on what level the interaction.

16       Q.   Would you agree that Jim and Joe got

17   along well with Emerson Gale?

18       A.   That, again, I do not know.

19       Q.   Okay.

20            Did Jim or Joe ever demote you from

21   your position as an Applications Specialist II?

22       A.   Information Analyst.

23       Q.   Excuse me.   Information Analyst II?

24       A.   No.

1     Q.   Did they ever deny you vacation time?

2     A.   Of course not.

3     Q.   Did they ever deny you overtime pay?

4     A.   We never have overtime pay.

5     Q.   Okay.   Did anybody in your group ever get

6  overtime pay?

7     A.   Not that I know of.   They might.   I just

8  don't know.

9     Q.   Did Joe or Jim ever deny you a position

10 that you applied for?

11    A.   Yes.

12    Q.   What position was that?

13    A.   Application Specialist I and Application

14 Specialist II.

15    Q.   When was that?

16    A.   I believe it's between April and May

17 2007.

18    Q.   What makes you say that Jim or Joe denied

19 you that position?

20    A.   I applied, I got the interview, and Jim

21 O'Donnell and Joe Capodanno monitor -- not

22 monitor.   Susan Oliver, a consultant with the

23 City, was there on the panel that interviewed me.

24 During the interview process, there were no

Le T. Le

99

1    technical question being asked.  Mostly it was

2    about customer service question, and very few

3    question was being asked.  And how I got a low

4    score on pretty much all aspect, even though they

5    never asked any technical question, I also got

6    low grade on those questions.

7         Q.  Do you know who ultimately got the

8    position?

9         A.  I think Tamara Thompson and Stewart.  I

10   forgot her first name.

11        Q.  They are both minorities; right?

12        A.  Yes, they are.

13        Q.  Did Joe or Jim ever cut your hours from

14   40 hours a week to something less?

15        A.  No.

16        Q.  Did they ever call you names to your

17   face?

18        A.  Of course not.

19        Q.  Did they ever tell you that you're

20   stupid, or anything like that, to your face?

21        A.  No, they wouldn't do that, no.

22        Q.  Did they ever do anything to you that

23   caused you to complain to human resources about

24   them?



1     A.   Like what do you mean by do things to me?

2     Q.   Did you ever complain to human resources

3   about Joe or Jim?

4     A.   There are time I have want to, but I

5   didn't, because I see the example that Terry had

6   with human resource and Jim and Joe.  It actually

7   went no where.  He still got discipline for

8   something he didn't do.  That led me to believe

9   that they were all against us, even HR.  So it

10   really doesn't make any sense for me to go there

11   any more.

12     Q.   You knew Monica and Terry don't get

13   along; right?

14     A.   I do not recall that.  They might, they

15   might not.  I don't know.

16     Q.   Did you and Terry resent Joe and Jim for

17   being your bosses despite the fact that they

18   didn't have an IT background?

19     A.   We don't resent them being our boss.  We

20   do not -- we only do not like the fact that they

21   bring in a consultant in to overlook us.  We were

22   only trying to make a living by working at the

23   City of Wilmington, and we're just trying to do

24   our job.  We just want to go in, get the job



Le T. Le

101

1    done, and go home.  The reason why Terry didn't

2    pursue when he did not get the director position,

3    even though he was qualified for it, he just want

4    to get his work done, just want to, you know,

5    work and make a living.

6        Q.  Was there tension between Joe and Jim on

7    the one hand and Terry on the other because he

8    was more skilled than they were?

9        A.  Could you repeat that, please?

10       Q.  Was there tension between Joe and Jim on

11   the one hand and Terry on the other because he

12   was more technically skilled than they were?

13       A.  Tension?  As in?

14       Q.  As in conflicts?

15       A.  Argument or just what?

16       Q.  An uncomfortable atmosphere?

17       A.  I would not know that.

18       Q.  Was Jones so good with computers and

19   software that he made Joe and Jim look bad

20   because they were not technically savvy?

21       A.  It could have been because Jim O'Donnell

22   and Joe Capodanno have no IT experience and

23   somebody of a minority background under them has

24   the experience, of course they would feel

Le T. Le

102

1    uncomfortable.

2            And from what I recall from hearing

3    of Mr. Jones that in meetings, directors'

4    meetings, sometime where the Mayor would ask

5    question regarding IT to Jim O'Donnell, he would

6    not be able to answer and it was up to Terry to

7    answer those questions.

8        Q.   Other than in the IT group -- excuse me.

9    I strike the question.

10           Other than in the network group, were

11   there other minorities in the IT group when you

12   were working there?

13       A.   Yes, there were.

14       Q.   Okay.  And from what I've heard you say,

15   you believe Joe and Jim wanted to eliminate the

16   network group because they were all minorities;

17   is that correct?

18       A.   Yes.

19       Q.   Okay.  Other than the fact that you were

20   all minorities, are you aware of any facts that

21   suggest that the reason they wanted to get rid of

22   the network group was because you were all

23   minorities?

24           MR. BATTAGLIA:  You mean to include



Le T. Le

103

1    the testimony he's given so far in your question?

2    Do you want him to recite the whole thing?

3              MR. McMACKIN:  Well, he said that

4    they wanted to get rid of them because they were

5    -- that they may have been a threat.

6              MR. BATTAGLIA:  Yes.

7              MR. McMACKIN:  And because they were

8    all minorities.

9              MR. BATTAGLIA:  Yes.

10   BY MR. McMACKIN:

11      Q.  So dealing with the motivation to get rid

12   of you because you were, all three of you were

13   minorities, two African Americans and one Asian,

14   do you have any other evidence other than the

15   fact that the three of you were minorities that

16   suggest that Jim and Joe wanted to get rid of the

17   network group because you were minorities?

18      A.  **You were saying all the evidence besides**

19   **all the ones that I've said so far?**

20      Q.  No.  I mean other than the fact that you

21   were minorities and the happenstance that the

22   three of you were minorities, do you have any

23   evidence that they got rid of you because you

24   were minorities?

1   consultants are saying they're right and that you

2   guys are wrong.  And there's a back and forth as

3   to who's right and who's wrong.  But my question

4   is -- and they weren't listening to you, I

5   understand that.  But do you have any reason to

6   believe that Mr. Capodanno and Mr. O'Donnell knew

7   that you guys were right about what was causing

8   the network connectivity issues and decided that

9   they weren't going to listen to you because of

10  your race?

11      A.  Well, because we told them that.  We told

12  them that it wasn't a connectivity issue and the

13  consultant told them that it was.  Now, they did

14  not trust us even though we worked there prior to

15  them coming and yet they trust the consultant.

16  You know, you could see from then that, you know,

17  it's the minority's opinion versus what the, you

18  know, the white consultant tell them.  And who do

19  they believe?  They believe the consultant and

20  they keep saying that it was the network issue.

21      Q.  Do you have any reason to suspect that

22  you and Mr. Jones had better credentials than did

23  the consultants?

24      A.  I don't know that.

1     Q.  You stated in your complaint that other

2  high level City employees besides Joe and Jim

3  wanted to get rid of you.  Who were those people?

4     A.  I believe it was Monica Gillespie.  I do

5  not remember any other names.

6     Q.  And Monica wanted to get rid of you

7  because of a bias against minorities or because

8  of your technical skills or some other reason?

9     A.  I do not know, but Monica is, I believe,

10  in good relationship with Jim and Joe, so I do

11  not know.

12     Q.  Are you aware of any facts suggesting

13  that Jim and Joe agreed or conspired together to

14  discriminate against you, other than the fact

15  that you allege that they did discriminate

16  against you?

17     A.  Could you repeat that again?

18          MR. McMACKIN:  Would you read the

19  question back, please.

20              (The pending question was then read

21  back by the reporter.)

22          THE WITNESS:  Other than all the

23  facts that I said earlier?

24  BY MR. McMACKIN:

Le T. Le

118

1        A.   Others?

2        Q.   Others.

3        A.   As in?

4        Q.   Other people?

5        A.   Other people.

6             Who are the other people?

7        Q.   I'm asking you.  You've alleged that they

8   knew that other people were discriminating

9   against you and did nothing about it, and I'm

10  asking you if you have any facts to support that

11  allegation?

12            MR. BATTAGLIA:  I'm going to object

13  to the question because I think it's misleading

14  and I won't say any more unless you want me to.

15            THE WITNESS:  There were just Jim and

16  Joe that were discriminating against.

17  BY MR. McMACKIN:

18       Q.   Nobody else?  Is that right, nobody else

19  did?

20       A.   I do not think anybody else, as long as I

21  can recall, I do not think anybody else.

22       Q.   Okay.  So is it your position that only

23  Jim and Joe discriminated against you and nobody

24  else did?

Le T. Le

119

1      A.   As far as I know, those are the only two.

2      Q.   Do you believe that Jim and Joe

3  discriminated against you for getting a copyright

4  when they confronted you about taking the

5  software off the system and ultimately that

6  leading to your termination?

7      A.   Could you repeat that, please?

8      Q.   Do you believe that Joe and Jim

9  discriminated against you for getting a copyright

10  when they confronted you about removing the

11  software from the system and that ultimately led

12  to your termination?

13      A.   In addition to the other discrimination?

14      Q.   Are you saying that in addition to the

15  other discrimination, they also discriminated

16  against you for getting a copyright?

17      A.   I believe so.

18      Q.   Are you aware of any facts suggesting

19  that Capodanno or O'Donnell desired to use the

20  instant ticketing software without paying for it?

21      A.   Could you repeat that, please?

22          MR. McMACKIN:   Would you read the

23  question back?

24          (The pending question was then read

1          MR. BATTAGLIA:  I think he answered

2    it, but.

3          THE WITNESS:  Yes.

4    BY MR. McMACKIN:

5      Q.  It is.

6          Are you aware of any facts suggesting

7    that Jim and Joe knew prior to June 5th, 2007,

8    that you allegedly developed the instant

9    ticketing software on your own time?

10     A.  If they know?

11     Q.  Yes.

12     A.  I don't know if they know or not, but it

13    has -- it was always, the copyright was always

14    there, and I talked to Jeff Starkey numerous

15    time, because the application I create was only

16    being used by L&I.  The interaction I had was

17    mostly with Jeff Starkey regarding the instant

18    ticket program, and he and I were talking about

19    me copyrighting it and marketing the application.

20    When Jim came aboard, he never bothered to ask me

21    about it.  I don't know why he didn't.  It was

22    never my responsibility to do what application.

23    I was the network personnel.

24         MR. McMACKIN:  I'm sorry, Victor, if



Le T. Le

125

1      Q.   That's not my question.   My question is,

2   your contention is that you did the software

3   program on your own time; is that correct?

4      A.   Yes.

5      Q.   Okay.   And is there any way Jim or Joe

6   could have known that you did this on your own

7   time?

8              MR. BATTAGLIA:   Could I suggest a way

9   around this impasse?

10             MR. McMACKIN:   Sure.

11             MR. BATTAGLIA:   I think maybe if you

12   ask him who knew.

13   BY MR. McMACKIN:

14      Q.   Did anybody know that you did this

15   software programming allegedly on your own time?

16      A.   Terry, Jeff, at least some of his people

17   might know.   Mostly it would be Jeff Starkey and

18   Terry Jones.

19      Q.   Do you have any reason to suspect that

20   Jim or Joe were among the people that knew that

21   you allegedly did this on your own on your own

22   time?

23      A.   I wouldn't know.   I don't know if they

24   know or not.



1          MR. McMACKIN:  Off the record,

2     please.  It was a good suggestion.  That's fine.

3          VIDEO SPECIALIST:  Off the record at

4     1:54 p.m.

5          (Pause.)

6          VIDEO SPECIALIST:  On the record at

7     1:55 p.m.

8     BY MR. McMACKIN:

9     Q.  Are you aware of whether there was a City

10    policy regarding what to do if an employee

11    experienced discrimination or harassment?

12    A.  **No, I don't know that.  I don't recall**

13    **that.**

14    Q.  Other than what you've told me today, are

15    you aware of any facts that lead you to conclude

16    that you experienced a hostile workplace?

17          MR. BATTAGLIA:  Other than what he's

18    already testified to?

19          MR. McMACKIN:  That's what I said,

20    yes.

21          THE WITNESS:  As far as I remember.

22    BY MR. McMACKIN:

23    Q.  Other than the fact that all three

24    network group employees were minorities, do you



1    have any facts to lead you to believe that you

2    were discriminated against, other than what

3    you've told me already so far about the fact that

4    you guys were all minorities and the other stuff

5    you mentioned, do you have any facts that suggest

6    you were discriminated against?

7        A.   Well, other than what I told you, those

8    are as far as I remember.

9        Q.   You allege that there was a conspiracy to

10   interfere with your civil rights.   What facts do

11   you have to support that allegation?

12       A.   Civil rights?

13       Q.   You said that there was a conspiracy to

14   interfere with your civil rights.   Do you have

15   any facts in support of that?

16       A.   Just all the facts that I told you.

17       Q.   In your initial disclosures, you allege

18   that -- or you state that Monica Gillespie had a

19   goal to get rid of minorities.   What's the basis

20   for that allegation?

21       A.   I do not remember that.   Do you have

22   something that could refresh my memory on that?

23       Q.   You had just made a statement in your

24   initial disclosures that Monica Gillespie had a

Le T. Le

128

1    goal to get rid of minorities, and I'm just

2    asking you if you have any support for that

3    contention?

4        A.   Other than the fact that I already state,

5    I mean she is in good with Jim O'Donnell and Joe

6    Capodanno and she is part of the decision to

7    outsource the network group and part of the

8    decision to upheld the discipline that were

9    against Terry Jones on something that he didn't

10   do.

11       Q.   Brenda James-Roberts is an

12   African-American female; right?

13       A.   Yes.

14       Q.   And she was part of the decision to

15   suspend you?

16       A.   Yes.

17       Q.   And Monica -- strike that question.

18            Do you think that part of the reason

19   the network group was outsourced had anything to

20   do with the fact that Jim or Joe Capodanno -- Jim

21   O'Donnell or Joe Capodanno may have had an

22   ownership interest in Diamond Technologies?

23       A.   I do not know.

24       Q.   Was it suggested to you that you apply

**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Le T. Le

129

1    for a job at Diamond Technologies after

2    January 8th, 2007?

3        A.  It was suggested, yes.

4        Q.  Did you apply for a job?

5        A.  I went there for a short interview just

6    to see what it is there.

7        Q.  Did you accept a position?

8        A.  They never gave me a position to be

9    accept.

10        Q.  Did you express interest in a position

11    there?

12        A.  I don't recall either way.

13        Q.  You had a laptop that was issued by the

14    City.  Do you recall that laptop?

15        A.  Yeah.

16        Q.  And what did you do to it before you

17    turned it over so that nobody could access it?

18        A.  Excuse me?  Excuse me, could you repeat

19    that?

20        Q.  What did you do to that computer before

21    you turned it in so that nobody could access it?

22            MR. BATTAGLIA:  I'm going to object

23    to the question.  It really assumes a fact not at

24    issue.

Le T. Le

144

1     A.   Favoritism from who, for who?

2     Q.   Do you think Joe and Jim liked some

3  people more than they liked others?

4     A.   I don't know.

5     Q.   Where is Egress Media located?

6     A.   I do not know the exact address.  I

7  mostly work at home, so I do not know the exact

8  address.

9     Q.   Have you ever been to the office?

10     A.   Once or twice at meeting, but I don't

11  remember the address.

12     Q.   Do you know what town it was in?

13     A.   I believe it's Lansdale, PA, or something

14  like that.

15     Q.   At some point you got the Keys to Success

16  Award; is that right?

17     A.   Yes.

18     Q.   Did you get that for working on the

19  instant ticketing software for L&I?

20     A.   I believe so.

21     Q.   It was L&I that sponsored you for it;

22  right?

23     A.   I didn't know it until, I guess, later

24  on.  Actually, yeah, later on.  I didn't know it

Le T. Le

145

1    at that time.

2        Q.   But you knew eventually that it was L&I

3    that nominated you; is that correct?

4        A.   I believe so.

5        Q.   While you were working the network group,

6    of the three network group guys, were you the

7    person that was the lead on networking issue or

8    was it James or was it Jones or was it anybody

9    else?

10       A.   It was me.

11       Q.   I'm going to show you a document, if we

12   could have this marked, please.

13                (DX-3 was marked for identification.)

14   BY MR. McMACKIN:

15       Q.   When you've had a chance to review it,

16   please let me know.

17       A.   (Pause.)

18       Q.   Are you familiar with this document?

19       A.   I don't know who wrote the document, if

20   that's what you mean.

21       Q.   Do you see where it says "Le"?  These are

22   IT projects and each one of the people has a list

23   of what projects they were working on?

24       A.   Uh-huh.



Le T. Le

148

1            Your answer is as good as mine.  I do

2   not know.

3     Q.  Are you aware that there were issues that

4   prohibited connectivity between the system and

5   MUNIS some time in late spring of 2005?

6     A.  Spring of 2005?  No, at that point, I did

7   not know.

8     Q.  Are you aware of whether connectivity

9   issues -- let me start the question over.  I

10  apologize.

11          Are you aware that the MUNIS project

12  fell behind because of issues in the City's IT

13  department?

14    A.  Around what time?

15    Q.  In April of 2005?

16    A.  I don't believe I know it at that time.

17    Q.  At any time?

18    A.  After Tyrone left.  When Jim O'Donnell

19  became director, that's when, that's when I know

20  regarding the issue, because I was pulled in to

21  help trying to fix the issue.

22    Q.  Among the issues, were disconnections one

23  of the problems?

24    A.  Yes, I believe so.

Le T. Le

149

1      Q.   Were printer time outs among the

2   problems?

3      A.   I don't recall the printer time out just

4   because I don't work with the printer too much.

5   But I do, but I do know regarding the connection

6   time out.

7      Q.   Were applications running slowly one of

8   the problems?

9      A.   I don't know about that one.

10     Q.   How about server connections, were those

11  one of the problems?

12     A.   That would be part of the connection

13  issue, I believe.

14     Q.   When you were brought in, you said it was

15  right around the time that Jim started.  These

16  problems that we just mentioned with connectivity

17  and et cetera, are you aware whether those caused

18  the MUNIS implementation to be delayed?

19     A.   It might have.  I don't know for sure.

20     Q.   Were you aware that there were -- that

21  the people at MUNIS expressed disappointment to

22  the City of Wilmington that the City's networking

23  group and IT people were not able to maintain

24  connectivity?

Le T. Le

174

1      A.   Yes.

2      Q.   The first one is essentially that you had

3  copyrighted the work.   The second was regarding

4  the consultants being better equipped with

5  skills.   The third is that the state merit rules

6  weren't followed.   The fourth is that you tried

7  to exercise bumping rights.   And the fifth is

8  that you've removed your own personal work from

9  the City's property.   Is that essentially the

10 five reasons you set forth in here for why you

11 were wrongfully terminated?

12     A.   Yes.

13     Q.   You don't make mention of race, though,

14 do you?

15     A.   Not at that time, no.

16     Q.   And you don't make reference to national

17 origin, do you?

18     A.   Not at that time, no.

19     Q.   Why is it that you have five reasons why

20 you were unlawfully discharged in an e-mail to

21 the HR director, but you don't mention race or

22 national origin?

23     A.   At that point, I was under stress of

24 being suspended and terminated.   I could not



1    You testified before, though, that

2 nobody told you that you were not going to be

3 able to bump.

4    Why did you state in your letter

5 to -- or your e-mail to Miss Gillespie that you

6 had an issue with your bumping rights?

7  A. I never said -- well, I said that nobody

8 said I could not bump.  In here I said I was

9 discouraged.

10  Q. Who discouraged you?

11  A. Basically I went and tell, I believe it

12 was Martha Gimbel, that I wish to bump into the

13 help desk position, which is a lower grade than

14 my position, and it is closely matched with my

15 technical background and experience.

16    And she said that I could not bump

17 into those positions.  It would be the position

18 that would be chosen by personnel, and I believe

19 that means she's trying to discourage me from

20 bumping.  Because what if she decide that some

21 position she put me into that is not what I would

22 know what to do with that position.

23  Q. And that was June 21st, 2007, that you

24 sent that e-mail?



1        A.  Yes, I think I did.

2        Q.  I'm going to show you a document we will

3    mark as Exhibit 19.

4                (DX-19 was marked for

5    identification.)

6                MR. BATTAGLIA:  18.

7                MR. McMACKIN:  I have 19.

8                MR. BATTAGLIA:  Did I miss one?  Oh,

9    I'm sorry.  Thank you.

10   BY MR. McMACKIN:

11       Q.  Are you familiar with this document,

12   Mr. Le?

13       A.  Excuse me.  Yes, I have seen that.

14       Q.  July 19th, 2007; is that right?

15       A.  Yes, that would be right.

16       Q.  It indicates you had a hearing on

17   July 13th, 2007; is that correct?

18       A.  That would be -- no, I did not.

19                Yeah, I was at the hearing.

20       Q.  I'm sorry, can you repeat that?

21       A.  Yes, I was at the hearing.

22       Q.  And you were represented by counsel; is

23   that right?

24       A.  Yes.



1      Q.  Again, here, it indicates that you did

2   not identify race or national origin as one of

3   the reasons why you were wrongfully terminated;

4   is that correct?

5      A.  At that time, no.

6      Q.  Now we're three weeks after the June 21st

7   letter or e-mail from you to Monica, and you're

8   still not mentioning race or national origin.

9   Why is that?  You're alleging all these other

10  reasons why you were wrongfully discharged, but

11  you're not mentioning race or national origin.

12  Why is that?

13     A.  I believe at this point I wasn't stable

14  enough to sit and read things on what has

15  happened.  I was trying to get back my

16  application.

17     Q.  Did you have a subsequent hearing on

18  August 7th?

19     A.  Subsequent hearing?

20     Q.  I'll show you the document to refresh

21  your recollection.

22     A.  No, I never went to this one, no.

23     Q.  Let me bring you back, if I may, and I

24  apologize, back to No. 19, which was the July 19,

1    2007 letter.

2        A.  Uh-huh.

3        Q.  The hearing was conducted before Sam

4    Pratcher, right, the July 13, 2007, appeal

5    hearing was conducted before Sam Pratcher; is

6    that correct?

7        A.  I believe it was Joe Capodanno, Jim

8    O'Donnell, Monica, and someone from the City

9    solicitor.  I'm not sure -- I don't remember if

10   Sam was there or not.

11       Q.  I'm sorry, the question is, who was it

12   before?  Who was the decision maker there?  I

13   know those people that you just mentioned

14   testified, but does this letter indicate that Sam

15   Pratcher was the individual who was assigned to

16   hear your appeal?

17       A.  I don't recall him being there, no.

18       Q.  Is he a black man?

19       A.  Yes.

20       Q.  Okay.

21           MR. McMACKIN:  I'm going to not show

22   the witness what I thought I was going to show as

23   Exhibit 20.

24           I'll take it back, if I may.  Sorry.



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Le T. Le

183

1    or not.  I'm not sure.

2       Q.  If you look at the third full paragraph

3    on Page 1488, about eight lines down, there's a

4    sentence that begins, "When first the software

5    was put in, Tyrone directed the network group not

6    to help the MUNIS team with anything."

7          Do you see that?

8       A.  Yes.

9       Q.  Do you agree that's not a team

10   environment right there?

11      A.  I was working for Tyrone at that time and

12   I was following the direction of what he tells me

13   what to do.  At that time, I did not know what

14   MUNIS was about or who purchased MUNIS, and so he

15   just said do not give them any help.  I would

16   just say do not give them any help.  I was just

17   following orders.

18      Q.  Do you agree that Tyrone's orders were

19   not exactly in the spirit of cooperation?

20      A.  It is what it is.  I have no comment on

21   why he's doing that.

22      Q.  Oh, I'm sorry.  I'm not asking you why he

23   did it.  I'm just asking you whether you agree

24   that's not being cooperative?



Le T. Le

185

1      Q.  When you left in 2007, was Karen Stewart

2  working at IT?

3      A.  She was -- I believe she was.

4           MR. McMACKIN:  I'm going to ask to

5  change the tape.

6           THE WITNESS:  Okay.

7           VIDEO SPECIALIST:  Off the record at

8  3:18 p.m.

9           (Pause.)

10          VIDEO SPECIALIST:  On the record at

11 3:20 p.m.

12 BY MR. McMACKIN:

13     Q.  You said Karen Stewart was there when you

14 left in 2007; right?

15     A.  I believe so.

16     Q.  And she's black?

17     A.  Yes.

18     Q.  Tamara Thompson, was she there when you

19 left?

20     A.  Yes.

21     Q.  Is she black?

22     A.  Yes.

23     Q.  Brian Berry, was he there when you left?

24     A.  Yes.

**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Le T. Le

186

1     Q.  Was he black?

2     A.  Yes.

3     Q.  Daretta Saunders, was she there when you

4  left?

5     A.  Yes.

6     Q.  Was she a minority?

7     A.  I think so.

8     Q.  Harry Tran, was he there when you left?

9     A.  Yes.

10    Q.  Is he a minority?

11    A.  Yes.

12    Q.  So we got the communications group.

13  There are three minorities in that group; right?

14    A.  Yes.

15    Q.  So you said before that you were the only

16  all minority group.  That's not correct, is it?

17         MR. BATTAGLIA:  I'm sorry, is there a

18  date on this?

19         MR. McMACKIN:  I asked him when he

20  left if these three people were in the IT group.

21  He said that they were.

22         THE WITNESS:  They were, but they

23  were all off site.

24  BY MR. McMACKIN:



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Le T. Le

187

1      Q.   They were all off site?

2      A.   Yes.

3      Q.   But they all worked for O'Donnell and

4  Capodanno?

5      A.   The person, Oscar Kaneli is the person --

6  I do not know if he is a manager under O'Donnell

7  or he called himself a director of communication.

8  So I don't know his relationship.  He used to be

9  under IT.

10     Q.   But communications falls under IT you

11 testified to before; right?

12     A.   Okay.

13     Q.   So isn't there another all minority

14 group, i.e., the communications group in IT in

15 the summer of 2007?

16     A.   Yes.

17     Q.   Desktop, Melvin Tuller, black?

18     A.   Yes.

19     Q.   Was he there when you left in 2007 in the

20 IT group?

21     A.   Yes.

22     Q.   How about Beth Napier?

23     A.   She was there, yes.

24     Q.   Is she a minority?

1      A.   Yes.

2      Q.   How about Emerson Gale, was he there when

3  you left in '07?

4      A.   Yes.

5      Q.   Was he a minority?

6      A.   Yes.

7      Q.   You mentioned regarding bumping rights.

8           MR. McMACKIN:   I'll show you

9  Exhibit 23, please.

10          (DX-23 was marked for

11  identification.)

12  BY MR. McMACKIN:

13     Q.   Is there anything in this letter that

14  I've shown you as Exhibit 23 dated May 29, '07,

15  that leads you to believe that you would not have

16  bumping rights?

17     A.   I do not remember ever saying I do not

18  have bumping rights.  I said I was discouraged

19  into trying to exercise it because, as I said, I

20  know my skills and I have been -- I have always

21  worked in the technology field and I feel like as

22  though I could bump into a help desk position

23  because those are a lower IT position that I

24  could fill that I would be able to work on.

1       Q.   Did Jim O'Donnell or Joe Capodanno ever

2   give you a written reprimand?

3       A.   I don't think so.   I do not recall.

4       Q.   I'm putting before you Exhibit 30.

5               (DX-30 was marked for

6   identification.)

7   BY MR. McMACKIN:

8       Q.   This is Jones to help desk, you, Lewis

9   and Hobbs, about account lockouts.   "I don't know

10  who keeps locking out my account via using my

11  log-on name and a bogus password.   Well, it's not

12  effective because I just unlock it."

13              What is this e-mail in regard to?

14      A.   It's the same issue that I told you

15  before, that somebody was trying to use this,

16  user name and password, and since it's a bogus

17  password, it lock him out after three tries.

18      Q.   The first one was just to you and Lewis,

19  or Lewis was cc'ing you, actually.   This one is

20  to the help desk and Hobbs also.   Why are

21  different persons on this e-mail than on the

22  first e-mail?

23      A.   I do not know.

24      Q.   The first e-mail you said you thought



1    A.  Only after I was terminated and when they

2    swore before the Department of Labor.

3    Q.  Just a couple more questions and then

4    I'll quit.  When you took the instant ticket

5    creation off the internet, how long was it off

6    the internet?

7    A.  Possibly an hour or two.

8    Q.  Possibly an hour or two.  And you put it

9    back on and you testified under threat, is that

10   not so?

11   A.  Yes.

12        MR. BATTAGLIA:  I think those are the

13   only questions I have, Jim.  I give him back to

14   you.

15   BY MR. McMACKIN:

16   Q.  Mr. Le, I have a couple follow-up

17   questions, if I may.

18        Had you been paid a royalty or some

19   sort of compensation in exchange for the City's

20   continued use of the software on June 5th, 2007,

21   would you then have not felt as if you were

22   discriminated against?

23   A.  I would still feel discriminated against

24   regarding my position, but I would be willing to



Le T. Le

252

1    give them the instant ticket program to use.

2        Q.   Would you still have filed a charge of

3    discrimination?

4        A.   For the layoff, yes.   Not for the instant

5    ticket program.

6        Q.   You said that Starkey wanted a piece of

7    the profits for the instant ticketing software.

8    Do you remember that testimony?

9        A.   Yes.

10       Q.   Do you have any evidence to support that?

11       A.   No.   Only the verbal talk that I had with

12   him.

13       Q.   I've looked through the documents that

14   you've kept and you were shown the Keys For

15   Success Award.   You've also got stuff, I think,

16   going back to, was it, Germantown High School,

17   and you've got things going all the way back,

18   awards you have received and commendations going

19   back all the way to high school and perhaps

20   sooner.   Do you recall those documents?

21       A.   Yes.

22       Q.   You didn't keep the CD's that pertain to

23   your lawsuit.   Can you explain that?

24       A.   Those were actually kept by my father.



1  web pages and stuff.

2      Q.  If you were a webmaster, you would still

3  work for Jim and Joe?

4      A.  I would be.

5      Q.  And they offered you the job?

6      A.  They asked if I was interested in the

7  job.

8      Q.  And what did you say?

9      A.  I did not say either way.

10      Q.  Why did you not accept a job knowing you

11  were subject to a layoff?

12      A.  I told them I would think about it.

13      Q.  Did you ever get back to them?

14      A.  I do not remember getting back to them

15  before the time I was terminated.

16      Q.  During the period of time when the

17  computer -- strike that.

18          During the period of time when the

19  instant ticketing system was removed, you said it

20  was for an hour or two.  During that hour or two,

21  could the City issue tickets?

22      A.  No.

23          MR. McMACKIN:  I have nothing

24  further.



Le T. Le

262

BY MS. MATTERER:

Q.   No?

So it was Jeffrey Starkey who first described the problem in licenses and inspection; correct? .

A.   Yes.

Q.   Is it your understanding that the idea of instant ticketing is copyrighted?

A.   Excuse me?

Q.   Is it your understanding that the idea of instant ticketing is copyrighted?

A.   The idea, you mean my idea or the idea as in just idea of instant ticketing was copyrighted by somebody else, or what do you mean by that?

Q.   I mean -- let me just rephrase it.  Is it your understanding that the idea of the instant ticketing program is part of the copyright that you registered?

A.   I registered -- when I did the registration form, I registered the instant ticketing program and I believe -- I'm not sure what exactly was the whole package that was registered.  I sent in the source code and I believe the registration certificate came back

1    I would get it done.  I just didn't want to tell

2    her that I would get it done in two or three

3    days, and I could not meet the deadline.  That

4    would be bad.  So I would, usually I would tell

5    her a longer period of time in case something

6    happened, I could not meet that.

7        Q.  If you had not had the input from the

8    individuals that we've just been talking about

9    from licensing and inspection and elsewhere, the

10   inspectors --

11       A.  Uh-huh.

12       Q.  -- would you have been able to write the

13   application in the form that you copyrighted it?

14       A.  I would be able to write a more, I guess

15   a different version of the application.  This

16   would be things that would change after it was

17   implemented that they want to put on that would

18   be -- that they would like to see on there prior

19   to these things, the application was working,

20   workable.  But it might not be exactly 100

21   percent to their liking.  That's the reason for

22   these changes, minor changes.

23       Q.  The prototype was completed in mid-2004;

24   is that right?



Le T. Le

294

```
 1        Q.   You produced to us a disk --

 2        A.   Uh-huh.

 3        Q.   -- of your program.

 4        A.   Uh-huh.

 5        Q.   And I'm wondering what the source of that

 6    production was, where it came from?

 7        A.   Oh, it came from the -- that computer,

 8    the only thing with the drive is every once in

 9    awhile I format my computer, I reformat my

10    computer when it get too heavy, and then what I

11    did before I do that is I move all the stuff I

12    need, I move it to a separate drive and then

13    when -- after I reformat and reinstall the new

14    windows, I put everything back where it's

15    supposed to be.  And that might be the second or

16    the third time I reformat my computer since I

17    have it.

18        Q.   Did you search everything available to

19    you for all versions of the copyrighted software

20    that's in dispute?

21        A.   I believe so.  Yes, I believe so.  I

22    don't remember anywhere else that I would have

23    put it, aside from CD's that I no longer -- that

24    are no longer in my possession.  But everything
```



1     like that, before you started coding?

2         A.  I know I have a sketch.  I just don't

3     remember exactly when or where I have it.  I

4     remember that I might have sketched something

5     down on paper.  I just don't remember exactly

6     what or when or where.

7         Q.  Have you looked for that sketch?

8         A.  I've looked for it, but I don't know

9     if -- I haven't seen it yet.  A lot of paperwork,

10    a lot of paperwork got moved around when I

11    move -- when I first came to the City, I was at

12    an apartment.  Me and my sister rent an

13    apartment.  And then when I move a lot of

14    paperwork with trash, when we moved to the house

15    that she purchased, a lot of stuff were trash and

16    then over the year, after accumulating so much

17    stuff, you know, I decide to trash a portion of

18    the stuff that I don't think is needed any more.

19    So I mean things --

20        Q.  But you didn't have a sketch.  Do you

21    remember anything what it looked like?

22        A.  I don't remember what it look like.  No,

23    I'm sorry, I don't.

24        Q.  Did the City provide you with a desktop



Le T. Le

299

1    computer?

2        A.   Yes.

3        Q.   And did you ever use it working on the

4    application?

5        A.   I have the application on there just in

6    case if some error happened that I would have

7    access to see what the error is.

8        Q.   How about a BlackBerry, did the City

9    provide you with a BlackBerry?

10       A.   Yes.

11       Q.   Was that ever used with respect to the

12   application?

13       A.   No.

14       Q.   You didn't use it for communicating with

15   inspectors or when they were on the site?

16       A.   No, I don't recall.

17       Q.   With respect to the e-mails that we

18   talked about earlier, none of those were sent to

19   you through your BlackBerry?

20       A.   Well, the e-mail would be sent.  I would

21   get the e-mail on my BlackBerry.  That's where

22   the e-mail would come both at my desktop and my

23   BlackBerry.  But I don't recall sending back

24   anything through the BlackBerry.



Le T. Le

1      Q.  Did the City provide you with a camera

2  for this project?

3      A.  The camera was given me -- I don't know

4  when.  After the application was put in for

5  implementation.  That was just me asking to get a

6  camera so I could take some test pictures.

7      Q.  Commissioner Starkey was leading this

8  project; is that correct?

9      A.  I do not know what he was leading on the

10  City side.  I do not know.

11      Q.  But he told you what to put in the

12  program and you responded; correct?

13      A.  He would have, sometime would have input

14  on the program.

15      Q.  I think we saw earlier some project

16  reports that you prepared.  Do you recall that?

17      A.  Project report?

18      Q.  Were you providing project reports to

19  Terry Jones?

20      A.  Sometime he would ask me what kind of

21  work I would be doing.

22      Q.  And you would include the work you were

23  doing with licensing and inspections in those

24  reports; right?

1      A.   Not pertaining to the creation and the

2   creating of the application.   I would go to

3   meetings with L&I.

4      Q.   You would meet with L&I and who else --

5   would you meet with anybody else?

6      A.   I meet with other people.   But with L&I,

7   I meet with Jeff Starkey and Karen, and stuff

8   like that, and asking them on how do they think

9   regarding the application and stuff.

10     Q.   Were there weekly meetings at some point?

11     A.   At one point after it was implemented, we

12   do have meetings weekly and those are the report

13   I have for Terry because it would be -- I would

14   take time during my workday to meet with them and

15   see what their comment were on the application.

16     Q.   When you had meetings, would they be at

17   your house?

18     A.   No.

19     Q.   Would they be at the City County

20   Building?

21     A.   The City County Building.

22     Q.   And would they be during business hours?

23     A.   Yes.

24     Q.   Can you estimate how many of those

1    BY MS. MATTERER:

2        Q.   Have you seen this before?

3        A.   I don't remember.   I don't remember

4    seeing this.

5        Q.   Do you understand what these instructions

6    are designed to do?

7        A.   It looks like instruction to create a

8    citation or a ticket, a violation from, you know,

9    taking photos and stuff like that and looking up

10   the information, but I don't recall doing the

11   instruction or --

12       Q.   That wasn't written by you?

13       A.   No.

14       Q.   Somebody else?

15       A.   I totally don't recall.

16       Q.   Actually, do you know Yvonne Davis?

17       A.   Yvonne Davis, the name sounds familiar.

18   It could be an L&I inspector.   I don't recall.

19       Q.   You don't recall who she is?

20       A.   No.

21       Q.   Can we go back to Defendants' Exhibit 61.

22       A.   Okay.

23       Q.   And I was asking you if you recognize

24   this form?



1        A.   It's -- well, from the look of it, it's

2    an old violation notice from '89.

3        Q.   I would ask you to look at the document

4    and see if you can identify any features of this

5    ticket that are common to the application that

6    you copyrighted?  For example, at the top of the

7    page I see a certification number.  Was that

8    included in the application you copyrighted?

9        A.   Yes.

10       Q.   And what other bits of information on

11   this page?

12       A.   The date inspected, date prepared, the

13   disclaimer, I guess.  The premise in violation.

14   The name and number, occupancy status,

15   responsible party.

16       Q.   How about over on the right, the

17   inspection area?

18       A.   The facade, story, type building.  If I

19   remember correctly, those are on there.

20       Q.   How about the disclaimer warranty?

21       A.   I said that.  It's on there.

22       Q.   What about the reference at the top to

23   the department of licenses and inspections?

24       A.   It might have been on there.  I don't



1    recall.

2        Q.   Would it help you to take a look at --

3    I'm not going to use this as an exhibit, but I do

4    have a copy of what you produced to us as your

5    copyrighted system.

6        A.   Uh-huh.

7        Q.   If that helps you to see if there is

8    anything else.

9             Does anybody else want a copy?

10       A.   (Pause.)

11       Q.   Did you find anything else?

12            MR. BATTAGLIA:   63?

13            MS. MATTERER:   Yes.

14            THE WITNESS:   It has a code and a

15   complying date.  Obviously I have extra stuff on

16   here at the description.  I do have initial stuff

17   on here, compliance section, initial.

18   BY MS. MATTERER:

19       Q.   Now, that's not a coincidence that those

20   two documents have those features in common, is

21   it?

22       A.   I mean, as I said earlier, I took one of

23   their old violation notice with me to see what

24   they have before.  It could be, you know,



Le T. Le

324

1  similar.  I would not disagree that it's not

2  similar, and as I said earlier, the copyright was

3  the code, not the form.  I don't know if you

4  think that's different.

5      Q.  You have not produced to us a copy of the

6  application as it was filed with the copyright

7  office; is that correct?

8      A.  I believe when I sent to them the

9  copyright certificate, is also the form that I

10  fill out.  The certificate that they send back is

11  also the form that I fill out.  Plus I do have

12  the CD -- well, I send them the CD with the

13  source code on there and print out like a couple

14  hundred page.  And I believe I gave the CD with

15  the source code to my lawyer and I believe you

16  also have that, I would think.

17      Q.  That's my question, is that CD that we

18  received does not appear to be identical to --

19      A.  It's not the CD that I sent to them

20  because I never get that CD back, so obviously I

21  can't give you something I don't have.

22          I print -- I copy out that one CD to

23  send to them and then I print out a whole bunch

24  of different page, different source code and send



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    offered to share it with us and we would share

2    the cost, and we could not afford to do that so

3    we don't have that, but you do.

4              THE WITNESS:  I mean since then, I

5    update, I make changes.  After I left the City,

6    for the couple months that I was out of work, I

7    did try to, you know, make changes to the

8    application to add more stuff to it, as I think,

9    because I thought I would want to sell it to

10   other people.  But then I got jobs from other

11   places and then I put that project on hold.

12             So when you receive the CD from me,

13   it's not the same file any longer.  I mean there

14   are addition, there were things that were

15   different from the one that I sent to them for

16   copyright.

17   BY MS. MATTERER:

18        Q.  And you didn't bother to preserve a copy

19   of what you sent to the copyright office?

20        A.  No, I didn't.  At that point I didn't

21   think there was a need for me to do that, so I

22   never did.

23        Q.  You didn't send one to your father?

24        A.  No.



Le T. Le

330

1    doing it, but I never sent in an application

2    around that time.

3        Q.  Well, in a document Mr. Battaglia showed

4    you earlier today, I saw a copyright symbol with

5    the year 2004.  Do you recall that?

6        A.  Yes.  That was when I had intend to

7    copyright, but I did not do it at that time

8    because I didn't think it was ready and I wasn't

9    ready to have it copyright.

10       Q.  So are you claiming a copyright from 2004

11   or from 2007?

12       A.  The copyright would start in 2004, and

13   there would be different versions of it.  Because

14   I did not know how the copyright office would

15   work, I -- basically I just combined it all

16   together and sent in just one.

17       Q.  So part of the application as filed in

18   2007 didn't exist yet in 2004; is that correct?

19       A.  That is correct.

20       Q.  Now, you chose Terry Jones to be your

21   contact with the copyright office; correct?

22       A.  Yes.

23       Q.  Why?

24       A.  He was my manager and so he know what my



1    you don't recall looking at Circular 9?

2        A.   No.

3        Q.   Have you at any time consulted with a

4    copyright lawyer to confirm your understanding of

5    work for hire?

6        A.   Not during the time when I applied for

7    the copyright.

8        Q.   Did you give the City a writing

9    indicating that you claimed ownership of the

10   application that you copyrighted?

11       A.   No, not in writing.

12       Q.   Isn't it true that the City, and in

13   particular L&I, had control over the application?

14       A.   No.  Well, what do you mean by "control"?

15       Q.   That they provided the input that they

16   needed for their business?

17       A.   Only when it's implemented that they

18   would make changes to it.  But I was the one

19   doing the changes.  They would give some input on

20   how to do certain things, on how to move things

21   around.  But by then, you know, most of the

22   application was already coded and that was just

23   some fixing, and a couple additions.

24       Q.   But you couldn't have done it without the



1   input of L&I; correct?

2      A.   I could have, which I did at first, and

3   that was just customize it to the client, as I

4   have been doing work development on the side and

5   in my previous job.  Whenever you do this type of

6   application, you always customize to your client.

7   But the basis -- the basic background would be

8   the same for the client.

9      Q.   You worked on the application -- the

10  entire time you worked on the application, you

11  were employed by the City of Wilmington; correct?

12     A.   Yes, at the time.

13     Q.   And isn't it true that during that period

14  the City had control over you, such as your

15  schedule, the performance of your assignments,

16  method of payment, hiring assistants?

17          MR. BATTAGLIA:  Objection to the form

18  of the question.  It assumes only the part of the

19  day when he's not working with the City.

20          THE WITNESS:  Only when I was working

21  with the City, not at home or during weekends,

22  no.  I would come in during weekend if it need

23  my -- if I have work that need to be done at work

24  to get things done and fixed, but when I'm at



1    home, I mean you're not telling me that, you

2    know, your employer would have control of your

3    whole life.  Then obviously that's not what I

4    would want.

5    BY MS. MATTERER:

6       Q.  Isn't it true that part of the City's

7    business at the time you were working on the

8    application was to issue tickets for code

9    violations?

10      A.  They might have.  I mean I would guess

11   that's what they would do.

12      Q.  You know that, don't you?

13      A.  Well, I mean that's what they would do.

14   I don't see it in action.

15      Q.  And this program was designed

16   specifically for the City of Wilmington; correct?

17      A.  The program is designed and thought that

18   it could be used by any City.  Other cities,

19   license and inspections for other cities could be

20   used with minor changes that would be catered to

21   them, but the whole infrastructure would be the

22   same.

23      Q.  But you included the logo of the City of

24   Wilmington in the screen shots; right?



1     A.  Yes, in the screen shot.  Though I did

2  not send any screen shot with the application.  I

3  did send the logo, but not the screen shot, with

4  the application.  I sent the source code.

5     Q.  Did you ever hire any assistants for this

6  project of coding the application?

7     A.  No.

8     Q.  So you claim that you have, that your

9  copyright includes the source code and nothing

10  more; right?

11     A.  Yes.

12     Q.  Does it include all of the source code in

13  the program that you copyrighted?

14     A.  It probably -- it would not be all the

15  source code.  Some of them I actually -- were

16  created and fixed at the City.

17          MS. MATTERER:  Can you read that

18  back.

19          (The answer was then read back by the

20  reporter.)

21  BY MS. MATTERER:

22     Q.  And some of them did you get online?

23     A.  Yes, I did.

24     Q.  I'm marking an Exhibit 65.



1    times and I don't remember.

2       Q.  Do you remember using any copyright

3    symbols that did not say "Le T. Le"?

4       A.  There were a copyright symbol that do not

5    have my name on there and those were application

6    that I work during the time when I was at the

7    City, like the inventory.  There were a couple

8    other ones I do not remember.

9       Q.  Were there any that said "copyright City

10   of Wilmington"?

11      A.  There might have been "copyright City of

12   Wilmington."

13      Q.  Why would you put those on there?

14          MR. BATTAGLIA:  Excuse me.

15   Objection.  Hypothetical question.  He said he

16   doesn't remember whether.

17   BY MS. MATTERER:

18      Q.  Did you put those on there in the

19   application?

20      A.  I do not remember because, as I told you,

21   I have done application for the City also.  Like

22   the City inventory itself, because I work on it

23   during the day at work, so I have to put the City

24   of Wilmington copyright on there.  And most of

Le T. Le

370

1     A.  I do not recall when.  It could have been

2  after I talked to Jeff Starkey.  I don't recall.

3     Q.  Does February 2007 sound about the right

4  time frame?

5     A.  I don't recall.

6     Q.  Is that possible, can you rule it out?

7     A.  I don't recall, no, that.

8     Q.  If I tell you that the features of the

9  program that you copyrighted differ from the

10  program that was -- strike that.  I may be

11  finished.  I want to take a minute to consult

12  with Jim.

13          VIDEO SPECIALIST:  Would you like to

14  go off the record now?

15          MS. MATTERER:  Yes, please.

16          VIDEO SPECIALIST:  Off the record at

17  7:58 p.m.

18          (Recess.)

19          VIDEO SPECIALIST:  On the record at

20  8:02 p.m.

21  BY MS. MATTERER:

22     Q.  Mr. Le, you were aware that the City was

23  using the application that you copyrighted from

24  the first time that you put it on the system

Le T. Le

371

1    through, I don't know how far your knowledge

2    goes, at least until June, let's take it that

3    far?

4              MR. BATTAGLIA:   June of what year?

5    BY MS. MATTERER:

6       Q.   June 2006?

7       A.   Yes, I believe so.

8       Q.   2007, I'm sorry.

9       A.   Okay.

10      Q.   It's late.

11             MR. BATTAGLIA:   Would you believe

12   2008?

13   BY MS. MATTERER:

14      Q.   So the time you put it on the program

15   through at least June 2007, you knew the City was

16   using that?

17      A.   Yes.

18      Q.   And I believe you told us that that was

19   with your permission?

20      A.   Yes.

21      Q.   Are you aware that the City had expended

22   resources for the use of that application?

23      A.   Not that I know of, no.  Not that I know

24   of.



1      Q.   Well, you knew that they were paying

2   employees to work on the implementation, at

3   least; right?

4      A.   I would guess so.   If they were using the

5   program during the implementation part, during

6   the daytime, then yes, they were paying those

7   employees.

8      Q.   Well, they paid you during the

9   implementation, number one; right?

10     A.   Yes.

11     Q.   And you intended for them to use the

12  application after you put it on the City network;

13  correct?

14     A.   Yes.

15     Q.   At the time you filed your amended

16  complaint, did you have any basis to believe that

17  the program Susan Oliver wrote infringed your

18  application?

19     A.   I would think so.   She took the general

20  idea and used previous -- I mean she would look

21  at the code and use the general idea that I have

22  to generate her application.

23     Q.   How do you know that?

24     A.   There were times that she has established



1       Q.   You took a vacation while you were

2    employed by the City; right?

3       A.   Of course I took vacation while I was

4    employed.

5       Q.   That's what I mean by a benefit.   During

6    the time period that you were --

7       A.   That I was --

8       Q.   -- working on the application, the City

9    was providing benefits to you as an employee?

10      A.   When I was implementing it with the City,

11   yes.

12      Q.   And they paid you a salary; correct?

13      A.   Yes, they did pay a salary.   Not for

14   creating the application, but for implementing

15   it.

16      Q.   You were a salaried employee during the

17   time period that the application was created?   By

18   time period, I mean December 2003 to May --

19   June 2007?

20      A.   Yes, I was at that time.

21      Q.   You received a W-2?

22      A.   Yes.

23      Q.   So they withheld your taxes?

24      A.   Yes.



1        A.   Yes.

2        Q.   And when was the creation part of the

3    program completed?

4        A.   In early 2004, if I remember correctly.

5    Around 2004.

6        Q.   Now, do you know of any copyright applied

7    for by the City or anybody on behalf of the City

8    for any of the instant ticket apparatus?

9        A.   Not that I know of.

10            MS. MATTERER:   Objection to form.

11   BY MR. BATTAGLIA:

12       Q.   You can answer.

13       A.   Not that I know of.

14            MR. BATTAGLIA:   That's all.

15            MR. McMACKIN:   Let's get out of here.

16            VIDEO SPECIALIST:   This deposition is

17   ending at approximately 8:11 p.m.

18            COURT REPORTER:   Reading and signing?

19            MR. BATTAGLIA:   I think he better

20   read it.

21            (Witness excused.)

22            (The deposition concluded at 8:11

23   p.m.)

24