## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

LE T. LE,                               :
                                        :
                    Plaintiff,          :
                                        :
        v.                              :       Civ. No. 08-615-LPS
                                        :
CITY OF WILMINGTON,                     :
JOSEPH F. CAPODANNO, JR., and           :
JAMES J. O'DONNELL,                     :
                                        :
                    Defendants.         :

### MEMORANDUM OPINION

On September 24, 2008, Le T. Le ("Le" or "Plaintiff") filed the present lawsuit (Docket

Item ("D.I.") 1) against the City of Wilmington ("City"), the City's Manager of Integrated

Technologies, Joseph F. Capodanno, Jr. ("Capodanno"), and the City's Director of Integrated

Technologies, James J. O'Donnell ("O'Donnell") (collectively, "Defendants"). Le alleges:

(i) copyright infringement in violation of the Copyright Act of 1976, 17 U.S.C. § 101, *et. seq.*;

(ii) discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et.*

*seq.* ("Title VII"), as well as 42 U.S.C. §§ 1981 and 1983; (iii) conspiracy to interfere with civil

rights in violation of 42 U.S.C. § 1985; and (iv) neglect or refusal to prevent conspiracy in

violation of 42 U.S.C. § 1986. (D.I. 17) In his Amended Complaint (the "Amended

Complaint"), Le also raises state law discrimination claims, pursuant to 19 Del. C. §710, *et. seq.*,

and a claim for *prima facie* tort under Delaware state law. (*Id.*)[1]

---

[1]The only difference between Plaintiff's original complaint and his Amended Complaint
is his amendment to his *prima facie* tort claim, as permitted by Judge Davis' June 19, 2009
Order. (D.I. 17)

On October 1, 2008, this case was assigned to the Honorable Legrome D. Davis of the

Eastern District of Pennsylvania, sitting as a Visiting Judge in the District of Delaware.  On July

27, 2009, Judge Davis approved the parties' joint stipulation consenting to the exercise of

jurisdiction by a magistrate judge and referred the case to the undersigned.  (D.I. 25)[2]

Pending before the Court are two defense motions for summary judgment: (i) Defendants'

Motion for Summary Judgment with respect to Counts III-VIII of Plaintiff's Amended Complaint

(the "Discrimination Motion") (D.I. 138), and (ii) the City's Motion for Summary Judgment with

respect to Counts I-II of Plaintiff's Amended Complaint (the "Copyright Motion") (D.I. 140).

The Court heard oral argument on both motions on August 3, 2010.  (*See* Transcript of August 3,

2010 hearing (D.I. 158) (hereinafter "Tr.").)

For the reasons set forth below, the Court will grant both motions.[3]


## BACKGROUND[4]

Plaintiff Le T. Le was hired by the Defendant City of Wilmington as an Information

Analyst II on November 3, 2003.  (D.I. 142 Ex. A at 4)  He worked as part of the Network

---

[2]Judge Stark was sworn in as a United States District Judge on August 16, 2010.

[3]Pursuant to Plaintiff's request (D.I. 143 at 1), the Court will also dismiss Counts IV (§ 1981 claim against the individual defendants), VI (conspiracy under § 1985), and VII (conspiracy under § 1986) of the Amended Complaint.  As all of Plaintiff's claims have now been resolved, the Court will further order this case closed.

[4]The Court has gleaned the following factual background from the parties' summary judgment filings and review of the record provided by the parties.  The Court has also found much help in Judge Davis' June 19, 2009 Order, which set forth the pertinent background of the case.  (D.I. 16)  Where there are disputes of fact, all reasonable inferences are drawn in Plaintiff's favor.  As is evident from the grant of summary judgment to Defendants, the Court does not find any genuine issues of material fact.

Division. (*Id.* at 121; D.I. 144 Ex. 1, Le Dep. at 5-6)  Plaintiff's duties involved support and technical assistance to users of the City's computer network. (D.I. 142 Ex. A at 145)

In 2003, Plaintiff decided to attempt to develop an "Instant Ticketing" software program for use by the City's Department of Licenses and Inspections ("L&I"). (D.I. 144 Ex. 1, Le Dep. at 257) Jeffrey Starkey, the City's Commissioner of L&I, first described the problem to him. (D.I. 142 Ex. A at 262; D.I. 144 Ex. 1, Le Dep. at 260-61) The program was intended to allow the L&I to keep track of citations by computer software rather than paper tickets. (D.I. 144 Ex. 1, Le Dep. at 263-64) Plaintiff believed that if the program was successful he would be able to provide it to the City and market it to other municipalities.

Plaintiff claimed that his immediate supervisor, Terry Jones, expressly forbade Plaintiff from working on the Instant Ticketing program while at work.[5]  Plaintiff asserts that he then began working on the program exclusively on his own time in his own home. In 2004, Plaintiff completed a prototype of the program and was authorized by Jeffery Starkey, the City's Commissioner of L&I, to install the software on the City's computer network for testing and comment by L&I personnel. (D.I. 142 Ex. A at 378; D.I. 144 Ex. 1, Le Dep. at 286-87)

The Network Division consisted of Plaintiff, who is of Vietnamese descent, and two other individuals, who were both African American. (D.I. 155 Ex. D at CITY001032) According to Plaintiff, Capodanno and O'Donnell's campaign to eliminate the Network Division was racially motivated. (D.I. 142 Ex. A at 102) Plaintiff claimed that Capodanno and O'Donnell had been overheard by City employees making derogatory remarks about minorities and making remarks

---

[5]Jones denies this claim. (D.I. 142 Ex. B at 50-53)  Because the Court finds that summary judgment for the City is proper on numerous grounds, this is not a material dispute.

about not being able to understand Plaintiff when he spoke. (*Id.* at 36, 84)  Plaintiff himself did

not hear Capodanno or O'Donnell make any racially insensitive comments. (*Id.* at 87, 99)

Plaintiff testified that as part of Capodanno and O'Donnell's campaign to eliminate the

Network Division, they decided to blame a series of ongoing computer problems on the Network

Division. (D.I. 142 Ex. A at 43-45, 48)  In Plaintiff's view, all of those problems were caused by

a new computer application called "MUNIS" that had been recommended by Capodanno and

O'Donnell. (*Id.* at 33-34)

The City contends that for the 2008 Fiscal Year ("FY '08") Budget, the City determined

that it would be more economical and efficient in terms of cutting edge technology to outsource

the functions of its Network Division. (D.I. 155 Ex. D at CITY001032)[6]  This major decision to

outsource a City Division required the approval of Wilmington City Council.  Although the City

Budget would not come up for a vote by City Council until May 2007, out of consideration of the

impact of the outsourcing of the Division on the affected employees, if approved by City

Council, the City decided to inform the staff of its intention to outsource the Division.

Therefore, on January 8, 2007, IT and staff from the City Personnel Department met informally

with the Division staff to explain the City's intention to outsource the functions of the Division

and to briefly inform them of some of their options, including placement in vacant City positions,

for which they were qualified; bumping into positions in their respective pay plans that were

equal to or lower than their current position and for which they could qualify to perform within

---

[6]The record support for all of the statements in this paragraph is the response the City
made with the Delaware Department of Labor in connection with the discrimination complaint of
Jones, Le's former supervisor. This material was added to the record by Plaintiff. (Tr. at 52-53)
(order granting motion to supplement record)

4

twenty (20) working days; seeking employment with other entities; and lay-offs, should City

Council approve the Budget with the outsourcing of the functions of the Network Division. (D.I.

142 Ex. A at 51, 56-57, 76, 188) On May 18, 2007, Wilmington City Council passed the FY '08

Budget, which included the elimination of the Network Division.

     The City replaced the Network Division with an outside contractor, Diamond

Technologies. All of the Diamond employees who undertook the responsibilities formerly

carried out by the Network Division were white.

     Three days after the City Council vote, on May 21, 2007, Plaintiff filed a Certificate of

Registration with the United States Copyright Office seeking federal copyright protection for his

Instant Ticketing software. (D.I. 144 Ex. 1, Le Dep. at 329) On May 24, 2007, Plaintiff and the

other members of the Network Division were officially informed that their positions would be

eliminated. (D.I. 142 Ex. H at 1636) On June 5, 2007, Plaintiff removed his Instant Ticketing

software from the City's computer network server. (D.I. 142 Ex. A at 64)[7] Before he removed

the software, Le did not inform his supervisor, Jones, that he intended to do so, and Jones did not

give Le permission to remove the software before he did so. (D.I. 142 Ex. B at 67, 75) Without

the source code Le removed, what the City had left was useless, and the City could not issue

instant tickets. (D.I. 142 Ex. A at 73, 75-76) On these points, Le testified:

> I told Jeff Starkey, the commissioner of L&I, a couple of months before that when
> I leave the City I was going to take my – whatever belonged to me with me, and I
> also told Terry [Jones] that when I leave the City, I'm going to take whatever
> belongs to me with me. . . . I didn't specifically say it was instant ticket because
> there were other things that I brought in to work that I would take home with me. .

---

    [7]Le removed only the source code; he concedes the database and data belong to the City.
(D.I. 142 Ex. A at 73)

.. I don't need the permission to take it off because, as I said earlier, I was taking it off and on at will, even prior to Jim [O'Donnell] and Joe [Capodanno] came into IT. So I didn't need the permission to take it off or put it on.

(*Id.* at 69-70; *see also id.* at 81)  Defendants did not feel the same way: later on June 5, 2007, the

day Le removed the software from the City's server, Le was suspended, directed to reinstall the

Instant Ticketing application, and threatened with prosecution if he did not do so.  (D.I. 142 Ex.

A at 75-76)  After Plaintiff complied, he was terminated.  (*Id.* at 83, 251)[8]

## LEGAL STANDARDS

A grant of summary judgment is appropriate only where "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c).  The moving party bears the burden of demonstrating the absence of a genuine issue of

material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10

(1986).  If the moving party has carried its burden, the nonmovant must then "come forward with

'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587 (quoting Fed. R. Civ. P.

56(e) (emphasis in original)).  The Court will "draw all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*

*v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than

---

[8]Absent his individual termination, Le's employment with the City's Network Division would have ended on or before July 1, 2007, due to City Council's May 2007 decision to eliminate the Division.  (D.I. 142 Ex. A at 51, 64)

simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475

U.S. at 586; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (party

opposing summary judgment "must present more than just bare assertions, conclusory allegations

or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

However, the "mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment;" a factual dispute is genuine

only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50

(internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (entry of

summary judgment is mandated "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial").


## DISCUSSION

### I.      Copyright Claims

#### A.      The Parties' Contentions

In Counts I and II of his Amended Complaint, Le alleges copyright infringement, in

violation of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (D.I. 17 at ¶¶ 38-48)

Specifically, Le alleges the City infringes the instant ticketing software application registered by

Le with the Copyright Office as TXu1-359-357 (the "Work"), when the City uses such

application for its program to issue instant tickets for code violations. (D.I. 141 at 1; *see also*

7

D.I. 17 at ¶¶ 7-19, 38-48; D.I. 130 Ex. A, Countercl. ¶¶ 6-7; D.I. 144 Ex. 11 at LTL 0183) Le

contends he registered only his source code with the Copyright Office, so he claims a copyright

only on the code (the "Code"). (D.I. 143 at 8-9, 36; *see also* D.I. 144 Ex. 1 at 73; D.I. 151 Ex. 1

at 333-35) He concedes that the City's database is City property. (D.I. 144 Ex. 1 at 73)

   The City presents several responses to Le's allegations of copyright infringement. (*See*

*generally* D.I. 130 Ex. A; D.I. 140; D.I. 141; D.I. 142; D.I. 146; D.I. 147) First, the City asserts

the Work is a work made for hire and, hence, is rightfully owned by the City. (D.I. 141 at 1-2,

13-17) The City contends that even Le understood this fact, given that in several places in the

Work Le himself included the following copyright notation: "Copyrights ©2004. City of

Wilmington, Department of Information Technology" ("the City Mark"). (*Id.* at 1-2) The City

further asserts a fraud defense, contending that Le, after learning his position with the City would

be outsourced, intentionally and without the City's knowledge or consent, altered the copyright

notice to make it appear as if he owned the copyright. (*Id.* at 1-2, 11-12) The City also argues

that Le is estopped from asserting any infringement claims against the City because Le himself

loaded the Work onto the City's server and encouraged the City to use it both expressly and

impliedly, thereby consenting to its use. (*Id.* at 1-2, 17-18) According to the City, Le was aware

that the City expended considerable resources relying on the ability to issue Instant Tickets using

the contested Work for that purpose, and was further aware that the City would be injured by

removal of the Work. (*Id.* at 1-2) Finally, in the City's view, even if Le owns any copyrightable

portion of the Work, he impliedly granted an irrevocable license to the City to use and revise it as

needed for its Violations and Instant Ticket programs, for which the City provided Le

consideration. (*Id.* at 1-2, 18-20)

Le, of course, challenges the City's assertions. He contends that the record shows material issues of fact precluding summary judgment. As to the "work for hire" defense, Le contends that the City has forfeited the right to assert such a defense because the City, in correspondence from the City Solicitor, represented to Le that he could keep the computer Code he created, and it would not contest ownership. (D.I. 143 at 4) Moreover, according to Le, there are facts in dispute as to whether Le's creation of his Code was within the scope of his employment. (*Id.*) As to the City's assertion of fraud, Le says that the key issue is his intent, which requires a fact-intensive inquiry not amenable to resolution on summary judgment. (*Id.*) Likewise, Plaintiff contends, the City's estoppel and license arguments "rely on disputed facts as to intent, as to when the City was aware Plaintiff claimed ownership of the Code, and also on a mischaracterization of what Plaintiff claims constitutes infringement." (*Id.* at 5) The Court will consider each of the City's defenses in turn.

First, with respect to whether the Work was created by Le as a work-for-hire, the Court agrees with the City that Le created the Work within the scope of his employment and, therefore, Le does not own a valid copyright in it. The Supreme Court has explained:

> The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. § 102. The Act carves out an important exception, however, for works made for hire. If the work is for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright, unless there is a written agreement to the contrary. § 201(b).

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). The Copyright Act

defines a "work made for hire" as including "a work prepared by an employee within the scope

of his or her employment." 17 U.S.C. §101; *see also MacLean Assocs., Inc. v. Wm. M.*

*Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 775 (3d Cir. 1991). It is undisputed that Le was a

City employee during the entire period in which the Work was created. (D.I. 142 Ex. A at 344;

D.I. 143 at 33) It is further undisputed that there is no written agreement assigning ownership of

the Work from the City to Le. Therefore, the only issue is whether Le created the Work within

the scope of his employment. (D.I. 143 at 33) ("In the present case, Plaintiff does not dispute he

was an employee of the City. The issue here is whether the Code was created within the

Plaintiff's 'scope of employment.'")

Le contends that he created the Work "after hours" in his own time. There is evidence in

the record to support Le's contention. (*See, e.g.*, D.I. 144 Ex. 12 at CITY398-99 (apparent

finding of Human Resources Hearing Officer that Le "designed this software program on . . .

own computer during off-duty hours"); D.I. 142 Ex. A at 125 (Le's testimony that he created the

software program on his own time, and that both Terry Jones and Jeff Starkey were aware that Le

did so); D.I. 151 Ex. 1 at 220 (same); D.I. 151 Ex. 2 at 209 (Jones' testimony that he assumed Le

created the instant ticketing program at his home "because [Jones] didn't see [Le] working on it

at work"))[9] For purposes of evaluating the Copyright Motion, the Court credits Le's claims that

_____

[9]There is also evidence to the contrary, including substantial evidence that Le worked on
the Work at the City's offices, during hours in which he was compensated for working for the
City, and attended meetings with other members of the Network Division – again during work
hours in the City's offices – to discuss the Work. (*See, e.g.*, D.I. 141 at 5-6 (discussing Le's
provision of status reports to Jones regarding the Work and citing to various examples, found at
D.I. 142 Ex. M); D.I. 142 Ex. A at 301) Le admits that he "participated in the implementation
process as part of his job responsibilities and, in part, during regular working hours," but
attempts to distinguish between such implementation activities and the creation (i.e., writing) of
the Code, which he contends occurred almost exclusively at home. (D.I. 143 at 30)

he worked on the Work essentially exclusively on his own time, on his own computer at home. (D.I. 143 at 7; D.I. 142 Ex. A at 125; D.I. 144 Ex. 1 at 261)

However, there is persuasive authority to the effect that, even if Le created the Work on his own time, if he did so during his employment and without a specific written agreement from the City to the contrary, the copyright on the Work belongs to the City. For instance, in *Genzmer v. Public Health Trust of Miami-Dade County*, 219 F. Supp. 2d 1275, 1281-82 (S.D. Fla. 2002), a salaried employee (a doctor), whose job description did not include computer programming, wrote a computer program at home during his off-duty hours using a home computer he had purchased for himself. The doctor had been hired by the defendant as a full-time fellow to undertake a research assignment that encompassed "a myriad of activities" regarding organizing, directing, and administering a critical care unit. *Id.* at 1281. He wrote a computer program – one which computerized his department's patient consultation reports – at home, then beta-tested it at work, and thereafter altered the program. *Id.* at 1282. The doctor had obtained his employer's approval to load the program into the employer's computers. *Id.* at 1278. He also registered a copyright for the program. *Id.* After being terminated by the defendant, the plaintiff programmed a "bug" to disable the program. *Id.* In granting defendant's motion for summary judgment, the court emphasized the fact that the doctor had developed the program during the period in which he was employed by the defendant. *Id.* at 1282. The time of day and location of the work were not important. *See id.* (Plaintiff "developed the computer program on his own time [but] . . . was a salaried employee involved in a research project. It is undisputed that, during the research period, fellows normally would not be in [the hospital] seeing patients. Rather, they would be working on their projects primarily outside of their department, such as by

11

conducting research in the library.  Because [plaintiff] was completing most of the computer

program during his research phase, it follows that he would not have developed the software, or

performed any other aspect of his research project, in the Department.  What matters is that

[plaintiff] performed the work during the time period in which he was employed by [defendant]

to complete the research program."); *see also Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d

1041, 1058 (S.D. Iowa 2007) (holding employee cannot avoid application of work-for-hire

doctrine solely based on performing work off-hours at home); *Miller* v. *CP Chems., Inc.,* 808 F.

Supp. 1238, 1240, 1244 (D.S.C. 1992) (finding employer owned copyright on computer

programs created by employee – at employee's home, and for which employee received no

compensation – solely for purpose of simplifying employee's work-related duties); *Marshall* v.

*Miles Labs., Inc.,* 647 F. Supp. 1326, 1330 (N.D. Ind. 1986) (stating that work-for-hire doctrine

cannot be avoided merely by preparing work during non-working hours in place not controlled by

employer).

The issue here remains whether Le created the Work in the scope of his employment

(regardless of whether he did so at home during his own time or at the office during working

hours).  The undisputed record establishes that the Work was made to facilitate the City's

business of issuing tickets of various violations.  (D.I. 17 ¶ 10 ("During 2003, plaintiff became

personally challenged by the idea of developing a software application that could be used by L&I

to issue and keep track of citations by computer software rather than paper tickets. . . . [I]f he

could create such a software application, an instant ticketing application[,] . . . he would be able

to provide it to the City . . . ."); D.I. 144 Ex. 1 at 263 ("The original goal was I thought it would

help City's department, would lessen their workload, the paperwork.")) Le began to work on the

ticketing program at the direction of Jeffrey Starkey, Commissioner of L&I.  (D.I. 142 Ex. Q at 18-19)  In December, 2003, following a meeting to discuss how the Department of Information Technology ("IT") could assist L&I, it was decided that: "Le T. Le will be developing a web-enabled Building Inspection/Violation Notice form.  Currently this form is filled in manually and sent to Word Processing.  Web-enabling this form will allow the Building Inspectors to generate their own forms without the need to send them to Word Processing.  This project will reduce the turnaround time from two weeks to one day."  (D.I. 142 Ex. E at CITY16999)  Le's supervisor, Terry Jones, assigned Le to the task of developing software for the instant violation/ticketing application because the software was not to be purchased from a vendor but instead created by IT.  (D.I. 142 Ex. B at 16)  Jones chose Le to develop it because of his programming skills discussed at his hiring interview.  (*Id.* at 17)  Le was given sample paper tickets in use before Instant Ticketing which contained the information which needed to be captured in the electronic version.  (*See* D.I. 142 Ex. E at CITY 2277-2283, Le Dep. Ex. 61; *id.* Ex. A at 321-22; D.I. 147 Ex. U at 266)  There is no dispute that Le used an old form to determine what to include, and that he purported to copyright only the source code, and not the form.  (D.I. 142 Ex. A at 323-324)  Le acknowledges that part of the City's business was to issue tickets for code violations.  (*Id.* at 345)

Le testified that he completed coding the application on June 28, 2004.  (D.I. 142 Ex. A at 378; *id.* Ex. M at CITY035697)  Le did not file the Certificate of Registration of the copyright until May 21, 2007.  (D.I. 144 Ex. 1 at 329)  The copyright registration indicates that the program was not completed until May 3, 2007.  (D.I. 142 Ex. H at LTL 1450-51, Le Dep. Ex. 63)  This nearly three-year discrepancy is due to the fact that the code was continuously tested and revised not by Le alone, but with much assistance of other City personnel.  (*See, e.g.,* D.I. 151 Ex. 1 at

13

231-32 (with respect to when "the creative part of establishing the instant ticket program [was]
done," Le testified that it was "probably about mid-2004, that's when I brought it in and
implemented it. . . . The implementation takes a couple of months to have people go back and
forth, test it. Actually it takes more than that. It takes them throughout 2004, '05, and up until
2007, because there were a couple modifications here and there and things get add and removed,
the layout get changed a little bit here and there. So the implementation takes longer than the
actual design and the writing.")) The City's network was used for testing. (D.I. 142 Ex. B at 69;
D.I. 147 Ex. U at 266-67; D.I. 151 Ex. 1 at 231) Jones testified that City personnel gathered data
for the program. (D.I. 142 Ex. A at 24) Le ran tests of the Work and shared the results with City
employees. (*Id.*) He consulted with the City's L&I department when working on the Work and
provided them with drafts. (*Id.* at 43)

Le was aware the City was using the Work from the time he put it on the City's network
until June 2007. (*Id.* at 370-71) He received input from other City employees about the data with
which the Work would run. (D.I. 142 Ex. A at 343; *id.* Ex. N; D.I. 147 Ex. U at 268-69) He was
instructed as to the appearance of the form and text and heading modifications. That is, Le was
told what reports – by inspector, census track, dates, and street – were required. (D.I. 142 Ex. N
at CITY010968) The assistance he received included that of Commissioner Starkey, who closely
supervised Le in this project. (*Id.* Ex. Q at 17) Meetings were conducted, sometimes weekly (*id.*
Ex. A at 301), and the program was adjusted even after the copyright was registered (*see* D.I. 141
at 8-9 and Tr. at 8 (citing exhibits)). Le admits to making changes to the application based on
communications with others. (*See, e.g.,* D.I. 147 Ex. U at 267, 269, 274-77, 281-82, 285)

Le acknowledged testified that he "created and fixed" some of the source code at the City.
(D.I. 142 Ex. A at 346) Le also admitted that when he created the Work he "reused and modified

some code from files he had created for City owned programs." (D.I. 143 at 32; D.I. 144 Ex. 1 at

365) Moreover, Le periodically identified the job responsibilities he was handling for the City,

which included the L&I Violations project (later to include the Instant Ticket project). (D.I. 142

Ex. M at CITY11030, Le Dep. Ex. 3; *see also id.* at CITY016925, 016895, 012668 (Le listing his

responsibilities in January 2007 as including "creat[ing] web application system for housing &

building inspectors to do instant ticketing and inspections") Le further admitted to making

"small" changes to the software that others had suggested. (D.I. 147 Ex. U at 267-285; D.I. 142

Ex. N) Le was awarded a "Key to Success" award from the City in connection with his work on

the Work. (D.I. 143 at 24; D.I. 141 at 7-8) The Mayor of Wilmington recognized Le's

contribution to the L&I team project on October 4, 2004, in recognition of "outstanding service

to the City of Wilmington." (D.I. 142 Ex. H at LTL 52)

In the Court's view, all of this evidence establishes that Le created the Work within the

scope of his employment with the City, rendering – in the circumstances presented here – the

Work a work-for-hire. There is not evidence in the record that would permit a reasonable

factfinder to conclude otherwise. Accordingly, Le does not hold a copyright in the Work and the

City cannot be liable for copyright infringement, making summary judgment for the City

appropriate.[10]

---

[10]Le insists the City "has forfeited the right to make a 'work for hire' defense because the
City, in correspondence . . . represented to Plaintiff he could keep the Code, and it would not
contest ownership." (D.I. 143 at 4) This is incorrect. In the letter on which Le relies, dated
August 7, 2007, the City stated it "stands by its position that the computer code is a work made
for hire and that it is the City's property." (D.I. 147 Ex. Y at LTL 185) The letter continued:
"The City will allow Plaintiff to keep the computer code that he prepared for the City, *even
though it is a work made for hire* . . . ." (*Id.* at LTL 186 (emphasis added)) The only reasonable
reading of this letter is that the City was offering to permit Le the opportunity to retain a copy of
the Work, not that the City was agreeing to waive its right to contest ownership of the Work.
Indeed, this is precisely how Plaintiff's counsel understood the City's letter at the time, as he
responded to the City with his own letter stating, "Your letter reasserts the City's ownership of

The Court now turns briefly to the other defenses asserted in the City's Copyright Motion. First, the Court does not agree with the City that it is entitled to judgment as a matter of law on its fraud defense. Le is correct that such a defense requires a fact-intensive inquiry. *See Norman v. Elkin*, 617 F. Supp. 2d 303, 310 (D. Del. 2009). The City has demonstrated, through screen shots of files on a CD received from the Copyright Office, that Le likely changed the copyright symbol on the Work from a City copyright to a Le copyright sometime between September 14, 2004 and February 1, 2007. (Tr. at 10; D.I. 142 Ex. J) This evidence does not show, however, that Le changed the copyright precisely in February 2007 in response to learning in January 2007 that his job might be outsourced by the City. There is simply not a basis to grant summary judgment on the City's fraud defense.

With respect to the estoppel defense, the Court agrees with the City that the undisputed record demonstrates that Le knew of the City's use of the Work, that Le consented to that use, and that the City detrimentally relied on that consent.[11] Le knew the City was using the Work and encouraged the City to do so; Le's insertion of the City Mark on portions of the Code for at least some time, his failure to disclose to the City his registration application, and his lack of demand for a written license agreement left the City ignorant of Le's claim of ownership of the

---

Mr. Le's copyrighted software program . . . ." (*Id.* at LTL 187) In yet another letter from the City to Le's attorney a few days later, the City reiterated: "Please allow this letter to confirm that the City **does not** acknowledge Mr. Le's ownership of the copyright." (*Id.* at LTL 188 (emphasis in original))

[11]*See Carson v. Dynergy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) ("Although there is no on-point circuit authority articulating the elements of estoppel as a defense to a copyright infringement allegation, a consensus has developed that a copyright defendant must prove four conjunctive elements to establish estoppel in such cases: (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury.").

Work and caused the City to believe it had Le's consent to use the Work; and the City

detrimentally relied on the Work by transforming (at significant expenditure of money and

employee time) its system of issuing L&I tickets to use the Work. (*See, e.g.,* D.I. 142 Ex. A at

343, 345-46, 359, 371-72, 374)  The City was using the Work at the time Le removed it from the

City's server and could not issue L&I tickets at that time without the program. (D.I. 141 at 9;

D.I. 142 Ex. A at 73, 75-76)  Le is estopped from asserting that the City is liable for copyright

infringement in connection with its use of the Work.

Finally, the Court concludes that summary judgment is appropriate also because the

parties' conduct created in the City an implied and irrevocable license in the Work.  "[C]ourts

have found an implied license where three factors are present: (1) a person (the licensee) requests

the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to

the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and

distribute his work." *National Assoc. for Stock Car Auto Racing, Inc.* v. *Scharle,* 184 Fed. Appx.

270, 275 (3d Cir. 2006) (internal quotation marks omitted).  Here, (1) Le was asked by the City

to create the Work, (2) Le (with assistance of other City employees) created and delivered the

Work, and (3) Le intended the Work to be used by the City.

Plaintiff's position is that he granted the City merely a revocable license, and that he

exercised his right of revocation in June 2007 when he removed the Work from the City's server.

(*See* D.I. 17 ¶ 17; D.I. 144 Ex. 1 at 69-70, 73)  But the conceded license Le granted the City is

revocable only if Le was not provided any consideration for it. *See Attig v. DRG, Inc.,* 2005 WL

730681, at *6 (E.D. Pa. Mar. 30, 2005) ("[I]t would be counterintuitive to hold that an entity or

persons in the position of Defendants in this matter would pay good consideration to have a

website created and not be able to use it.") (internal quotation marks omitted); *see also Lulirama*

*Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 882-83 (5th Cir. 1997) (discussing nonexclusive licenses and noting that "[a] nonexclusive license may be irrevocable if supported by consideration"). Le received consideration, beginning with his salary and also including the use of City equipment to test and refine the Work, the assistance of City employees in doing the same, access to the City's database, and an award for outstanding performance as a City employee. While it may be true that Le also, as he insists, spoke to City officials about "marketing the Code as well as applying for a copyright" (D.I. 143 at 37; D.I. 144 Ex. 1 at 121), this only shows that the license to the City was non-exclusive; it does not render the license revocable by Le.

Thus, summary judgment will be granted to the City on Plaintiff's claims of copyright infringement.

## II.    Discrimination Claims

### A.    The Parties' Contentions

Le's Amended Complaint recites that the Defendants' conduct toward him and his termination from City employment were motivated by Plaintiff's race and/or ethnic background, and that Defendants created a hostile work environment through their wrongful and discriminatory conduct toward him. (D.I. 17 ¶¶ 49-54, 59-64)[12]  Plaintiff brings these claims against the City for violation of Title VII (Count III) (*id.* ¶¶ 49-54)[13] and against Capodanno and

---

[12]Plaintiff is no longer pressing his hostile work environment claim. (Tr. at 52)

[13]Title VII requires exhaustion of administrative remedies prior to filing suit in federal court. *See* 42 U.S.C. § 2000e-5(e)(1); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973). Le filed a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (D.I. 17 at 15 ¶ 10)  Although it is not in the record, the parties are in agreement that, following filing of the instant suit, Plaintiff received a "right to sue" letter from the EEOC. (D.I. 15; Tr. at 34-35)

O'Donnell for violation of 42 U.S.C. § 1983 (Count V) (*id.* ¶¶ 59-64).  Defendants' multiple

responses to Le's claims of discrimination essentially amount to a contention that his claims fail

for lack of admissible evidence.  (*See* D.I. 139; D.I. 145)  Defendants contend that Le has failed

to meet his burden of establishing a *prima facie* case of discrimination and has offered nothing to

rebut Defendants' proffered reason for his termination.

### B.  No Reasonable Factfinder Could Find Unlawful Discrimination Against Le

The Court's role in evaluating a motion for summary judgment in a discrimination case is

"to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the

light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of

material fact as to whether the employer intentionally discriminated against the plaintiff."

*Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987).  "A plaintiff may prove national

origin or race discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490

U.S. 228, 244-46, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), or indirectly through the familiar

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.

Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Shah v. Bank of America*, 598 F. Supp. 2d 596, 603 (D. Del.

Feb. 18, 2009).

With respect to *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of

discrimination by showing that: (1) he belongs to a protected class; (2) he suffered an adverse

employment action; and (3) the circumstances of the adverse employment action give rise to an

inference of unlawful discrimination such as might occur when a similarly situated person not of

the protected class is treated differently. *See* 411 U.S. at 802; *see also Fuentes v. Perskie*, 32

F.3d 759, 763 (3d Cir. 1994).  If the plaintiff establishes a *prima facie* case of discrimination, the

burden of production shifts to the defendant, who must "articulate some legitimate,

nondiscriminatory reason" for its treatment of the plaintiff. *McDonnell Douglas*, 411 U.S. at

802; *see also Fuentes*, 32 F.3d at 763. If the defendant produces a sufficient reason for its

actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence

that the employer's rationale is pretextual. *See McDonnell Douglas*, 411 U.S. at 804; *see also*

*Fuentes*, 32 F.3d at 763.

It bears emphasis though that "throughout this burden-shifting paradigm the ultimate

burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at

763. Therefore, once the defendant has articulated a nondiscriminatory reason for its actions, the

plaintiff must point to some evidence, direct or circumstantial, that the defendant's proffered

reasons are merely a pretext for discrimination. *See Fuentes*, 32 F.3d at 763-64. That is, the

plaintiff must point to some evidence from which the "factfinder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). Thus, to make a

sufficient showing of pretext, the plaintiff must "demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in the employer's reason that "a reasonable

factfinder *could* rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (internal

quotation marks omitted).

Le contends that the Defendants intentionally discriminated against him on the basis of

his race or ethnic background. As an initial matter, it must be noted that nearly the entirety of the

evidence on which Le relies to defeat Defendants' Discrimination Motion consists of deposition

testimony, primarily his own. Le's subjective beliefs that wrongdoing occurred, without any

evidence in support of those claims, are not sufficient to establish a genuine issue of material fact

and overcome summary judgment. *See, e.g., Jones v. School Dist. of Philadelphia*, 198 F.3d 403,

414 (3d Cir. 1999) (deeming unsupported allegations of discrimination based solely on plaintiff's

personal beliefs to be irrelevant); *Longmire v. Wyser-Pratte*, 2007 WL 2584662, at *11

(S.D.N.Y. Sept. 6, 2007) (granting summary judgment on hostile work environment claim

against plaintiff, who "relie[d] exclusively on his own conclusory allegations – which [were]

wholly and uniformly uncorroborated"); *Shramban v. Aetna*, 262 F. Supp. 2d 531, 536 (E.D. Pa.

2003) (holding that plaintiff failed to produce enough evidence beyond her allegations and

deposition testimony to create a sufficient issue of fact to be resolved by a jury), *aff'd*, 115 Fed.

Appx. 578 (3d Cir. 2004).

Le offers almost nothing in the way of direct evidence of discrimination against him.

"Direct evidence is evidence sufficient to allow the jury to find that the decisionmakers placed

substantial negative reliance on [race or national origin] in reaching their decision." *Shah*, 598 F.

Supp. 2d at 603 (internal quotation marks omitted). Le does not contend that he has adduced any

direct evidence of discrimination against O'Donnell. With respect to Capodanno, Le points only

to one "racially charged remark[]" by Capodanno to an African-American employee and

evidence that Capodanno "had difficulty understanding Plaintiff's speech because of an accent."

(D.I. 143 at 20; *see also* D.I. 144) Capodanno's remark was directed neither toward Le nor

toward an individual sharing Le's racial background. With respect to Capodanno's expressed

difficulty with Le's accent, Capodanno testified it had to do with Le's technical vocabulary as a

computer specialist. (D.I. 144 Ex. 6 at 73-75) It is undisputed that Capodanno lacked the

technical skills and knowledge held by Le. In any event, while "[d]iscrimination based on accent

can be national origin discrimination," it is also true that "an employee's heavy accent or

difficulty with spoken English can be a legitimate basis for adverse employment action where

effective communication skills are reasonably related to job performance." *Yili Tseng v. Florida A & M Univ.*, 2010 WL 2130625, at *1-2 (11th Cir. May 27, 2010) (distinguishing between observation that one's speech pattern or accent may be difficult for average listener to understand and disparaging remarks about one's language skills and national origin); *see also generally Fuentes*, 32 F.3d at 767 (holding that a manager's difficulty pronouncing Latino name may reflect insensitivity or unprofessionalism, but could not reasonably be construed as evidencing bias against Latinos).

Turning to the indirect evidence of discrimination, on which Plaintiff primarily relies, Defendants concede Le has satisfied the first two prongs of his *prima facie* case: Le has offered evidence that he belongs to a protected racial or national origin class (Asian-American), and that he suffered adverse employment actions (termination and failure to afford him another position). (D.I. 143 at 19; D.I. 145 at 1-2) The dispute is whether Le has made a *prima facie* case that his termination gives rise to an inference of unlawful discrimination.

Le contends that an inference of discrimination arises here because the Network Division was "the only all minority Unit in IT," was eliminated, and was replaced by an all-white consulting group. (D.I. 143 at 20) Le also again points to the racially-charged remark Capodanno made to an African-American colleague and that Capodanno had trouble with Le's accent. (*Id.*) Finally, Le contends that when Smith, an African-American, resigned, "he was replaced not by a more qualified African-American, Jones, but the unqualified Caucasian O'Donnell." (D.I. 143 at 21; D.I. 144 Ex. 3 at pp. 8-10; D.I. 144 Ex 11 p. LTL 1297)

But the record does not support Le's contentions. Le admitted in his deposition that it is not true that the Network Division was the only all-minority Unit. (D.I. 142 Ex. A at 186-87; *see also* Tr. at 36-37) Also, although the Network Division was replaced with consultants who

happened all to be white, the record shows that the City selected the vendor (Diamond Technologies), but not the actual individuals who came in to perform the work formerly performed by the Network Division. There is no evidence the City asked for white contractors or that the individual contractors sent to the City site were interviewed by the City before their placement. (*See* D.I. 139 at 3-4; D.I. 145 at 2; Tr. at 37-40 (discussing, for example, *Kaplan v. Beth Israel Med. Ctr.*, 2010 WL 1253967 (S.D.N.Y. Mar. 31, 2010); *Mitchell v Worldwide Underwriters Ins. Co.*, 967 F.2d 565 (11th Cir. 1992); *Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776 (6th Cir. 2007); *Meinecke v. H&R Block of Houston*, 66 F.3d 77 (5th Cir. 1995)).) The one "racially charged remark" made by Capodanno to an African-American employee, William Cornelius, was "Yes sir boss." (D.I. 147 Ex. R at 5-6) As already noted, the remark is not evidence of discrimination directed toward Le or to Asian-Americans. Likewise, Le's testimony about Capodanno's difficulty with Le's accent does not give rise to an inference of discrimination. *See Fuentes*, 32 F.3d at 767. Finally, Smith's replacement by O'Donnell has nothing to do with Le, whose job was three levels below. Taking all of Le's evidence of discrimination in the light most reasonable to Le, the Court nonetheless concludes there is no basis from which a reasonable juror could infer that Le was unlawfully discriminated against.[14]

Even if the Court were to conclude that Le had established a *prima facie* case of discrimination, Le has presented no evidence that the nondiscriminatory reasons articulated in defense of the outsourcing of the Network Division are merely a pretext for discrimination. The

---

[14]Plaintiff cites *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 321 (3d Cir. 2000), for the proposition that courts "must be cautious about granting summary judgment to an employer when . . . its intent is at issue" (internal quotation marks omitted). (D.I. 143 at 18) The Court acknowledges this general principle and has exercised caution. However, *Goosby* does not preclude summary judgment in an employment discrimination case where, as here, the stringent standards for summary judgment are met. *See Fuentes*, 32 F.3d at 759; *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

City defends its termination of Plaintiff as being due solely to inadequate performance. (D.I. 139 at 11)[15] The record does not show that Defendants were "so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). To the contrary, the undisputed record establishes that the City's network had performance issues. For example: (i) the City's conversion to the "MUNIS" software platform was delayed and wrought with difficulties (D.I. 142 Ex. E at 10278, 10284, 14097-98, 36206); (ii) connectivity problems continued from at least May 2006 through October 2006 (D.I. 147 Ex. S at CITY36093-94, 36656, 12919, TJ0001); (iii) Le admitted disconnections and server connections were problems (D.I. 142 Ex. A at 148-49); (iv) other software programs (*e.g.*, Microsoft Outlook, Riskmaster) experienced connectivity problems (D.I. 142 Ex. E at 11721, 12479, 36173, 37001); (v) Le admitted it was his group's responsibility to maintain the network, but there were always "minor" problems with network connectivity and the network was working only 95-97% of the time (D.I. 142 Ex. A at 32-33); and (vi) Le admitted that anything other than 0% packet loss (the amount of information not received between two communicating devices) was unacceptable (D.I. 144 Ex. A at 151), but tests run repeatedly by independent persons showed packet loss was a systemic network problem (D.I. 142 Ex. E at 10264, 12457, 13053-62, 14117, 46609). Le's disagreement with Defendants as to the causes of the network performance problems does not establish pretext. *See Fuentes*, 32 F.3d at 765; *see also Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (stating "plaintiff's view of his performance is not at issue; what matters is the perception of the decision maker"), *overruled on other grounds by St.*

---

[15]The "termination" referred to here is the intended termination that would have occurred on July 1, 2007, with the elimination of the Network Division. It is undisputed that Le's actual termination occurred shortly earlier, in June 2007, as a result of the issues surrounding Le's removal of the Work from the City's server.

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

Plaintiff acknowledges that:

> Inadequate performance is a legitimate reason for employment action such as
> outsourcing or termination. Therefore, under the *McDonnell Douglas* framework,
> the burden shifts back to the Plaintiff to point to some evidence either direct or
> circumstantial from which a fact finder could either disbelieve the employers'
> articulated legitimate reason or believe that discrimination was more likely than
> not the reason for the employer's action.

(D.I. 143 at 22)  For the reasons given, the Plaintiff has failed to do just that.

Finally, the Court turns briefly to Le's contention that following his termination, he was

deprived other employment within the City for which he was qualified, which he also ascribes to

race discrimination.  Assuming, arguendo, such an alleged deprivation could constitute an

adverse employment decision, there is nothing in the record from which a reasonable factfinder

could conclude that Defendants exhibited racial animus or animus based on national origin in

this regard.  Le acknowledges that "he was sent postings of available jobs and met with the labor

relations department to find other work."  (D.I. 139 at 4; D.I. 142 Ex. A at 56-57)  Le applied for

the positions of Application Specialist I and Application Specialist II after he was informed he

may be laid off.  (D.I. 142 Ex. A at 98)  Although he did not get either position, both of the

individuals who did were minorities.  (*See id.* at 99)  Le also admits that no one at the City told

him that he would not be able to get another job at the City.  (*See id.* at 64-65)  Again, there is

simply no basis in the record for a reasonable factfinder to conclude that Le was not offered

alternative employment with the City due to his race.

### C.     Defendants Are Entitled To Summary Judgment On Le's State Law Claims

Counts III and VIII of the Amended Complaint allege the City violated Delaware's

25

statutory protections against employment discrimination, 19 Del C. § 710 *et seq.*, and that all

Defendants have committed a *prima facie* tort against Plaintiff. (D.I. 17 ¶¶ 75-77) Delaware's

discrimination statute, 19 Del. C. § 711, prohibits employment discrimination in terms almost

identical to Title VII of the 1964 Civil Rights Act. *See Schuster v. Derocili*, 775 A.2d 1029,

1033 (Del. 2001); *see also Cannon v. State of Delaware*, 523 F. Supp. 341, 344 (D. Del. 1981).

Because Delaware law is construed in accordance with Title VII, all of the foregoing discussion

of Le's Title VII claims applies with equal force to his state law claims. Accordingly, summary

judgment for Defendants is proper on these claims as well.

The Court will also grant summary judgment to Defendants on Le's *prima facie* tort

claim. *Prima facie* tort is defined as "the intentional harm infliction, resulting in damage,

without excuse or justification, by an act or series of acts which would otherwise be lawful and

which acts do not fall within the categories of traditional tort." *Lord v. Souder*, 748 A.2d 393,

402-403 (Del. 2000). As even Plaintiff recognizes, Delaware law does not recognize a *prima

facie* tort claim in an employment context. (D.I. 143 at 28 ("Defendants['] sole basis for arguing

the *prima facie* tort claim should be dismissed is that Delaware does not recognize *prima facie*

tort in the employment context. <u>Plaintiff agrees that is the law.</u>  In fact, that is the law of the case

here.") (emphasis added); *see also Parker v. Comcast Corp.*, 2005 WL 2456221, at *3 (D. Del.

Oct. 5, 2005)).[16]  In his brief, Plaintiff does not articulate any theory, much less cite any evidence,

to show that his *prima facie* tort claim arises in some context other than his employment dispute

---

[16]Judge Davis' prior ruling was that "Plaintiff may . . . amend his Complaint to restructure
his *prima facie* tort claim *if* he indeed believes that some of Defendants' actions *fall outside the
employment context and can support a prima facie tort claim.*"  (D.I. 16 at 6-7) (emphasis added)

with his former employer.[17]  It follows, as a matter of law, that Plaintiff cannot prevail on this

claim.  Summary judgment for Defendants is, therefore, appropriate.

## CONCLUSION

In sum, the Court concludes that Defendants have demonstrated that no genuine issues of

material fact exist, and summary judgment ought to be granted in their favor pursuant to Federal

Rule of Civil Procedure 56.  An appropriate Order will be entered separately.

---

[17]From the Amended Complaint, it appears Le's *prima facie* tort claim is based on the
City's threats to prosecute him for theft and retaliating against him for copyrighting the Work.
(D.I. 17 ¶ 76)  But even Le's testimony does not support the allegation that he was threatened
with prosecution.  (D.I. 142 Ex. A at 76-77)  Moreover, the purported "threat" and "retaliation"
plainly occurred in the context of a dispute between an employee and an employer.